UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YUKOS CAPITAL SARL, YUKOS HYDROCARBONS INVESTMENTS LIMITED, STICHTING ADMINISTRATIEKANTOOR YUKOS INTERNATIONAL, STICHTING ADMINISTRATIEKANTOOR FINANCIAL PERFORMANCE HOLDINGS, LUXTONA LIMITED and MARC FLEISCHMAN, TRUSTEE OF THE 2015 SECURITY TRUST, as successor in interest to the 2004 SECURITY TRUST, <br><br> Plaintiffs, <br><br> -against- <br><br> DANIEL CALEB FELDMAN, <br><br> Defendant. | Case No. <br><br> **COMPLAINT** |

Plaintiffs, Yukos Capital SARL, Yukos Hydrocarbons Investments Limited, Stichting Administratiekantoor Yukos International, Stichting Administratiekantoor Financial Performance Holdings, Luxtona Limited and Marc Fleischman, as trustee of the 2015 Security Trust, as successor in interest to the 2004 Security Trust (the "Plaintiffs"), allege, for their complaint, based upon their personal knowledge, and upon information and belief as to all other matters, as follows:

## NATURE OF THIS ACTION

1.     This action arises from the unlawful self-dealing of defendant Daniel Caleb Feldman ("Feldman" or the "Defendant").   Feldman collected millions of dollars by serving as a director, secretary or trustee of Plaintiffs and their affiliates, and owed fiduciary duties to them.   As set forth more fully below, in breach of his fiduciary duties, Feldman used or revealed privileged and confidential information belonging to the Plaintiffs -- and to which

Feldman was privy solely by virtue of his role as a fiduciary -- for his own personal gain, and to the detriment of those that Feldman purported to serve.   Feldman's pervasive pattern of disloyalty continued for the duration of his service to the Plaintiffs and included illicit schemes to obtain kickbacks and unauthorized bonuses.   As a result of his actions, Plaintiffs suffered significant harm.   As a "faithless servant" Feldman must disgorge all remuneration that he received from the Plaintiffs since the time his disloyalty began.

**The Parties**

2.      Yukos Capital SARL ("Yukos Capital") is a privately held limited liability company incorporated and existing under the laws of Luxembourg, having its registered office at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg.   Yukos Capital does not have an office in New York.

3.      Yukos Hydrocarbons Investment Limited ("YHIL") is a privately held limited liability company incorporated and existing under the laws of the British Virgin Islands under the International Business Companies Act (Cap. 291), having its registered office at Winfred Maduro Building, PO Box 964, Road Town, Tortola, British Virgin islands, VG1110. YHIL does not have an office in New York.

4.      Stichting Administratiekantoor Yukos International, a foundation incorporated under the laws of the Netherlands, having its corporate seat at Herikerbergweg 238, Luna Arena, 1101CM Amsterdam ("Foundation I") and Stichting Administratiekantoor Financial Performance Holdings a foundation incorporated under the laws of the Netherlands, having its corporate seat at 1083 HJ Amsterdam, de Boelelaan 7 ("Foundation II"; together with Foundation I, the "Foundations").

5.     Foundation II is the sole shareholder of YHIL.

6.     The Foundations issue depositary receipts, the holder of which (the "Holder") is entitled to the economic benefit of the Foundations' assets.   The Holder of Foundation I is a Dutch company.   The Holder of Foundation II is a trust organized under the laws of the British Virgin Islands.   Neither the trustee nor the beneficiary of the Holder of Foundation II is a resident of New York, is organized under the laws of New York, has offices in New York or is domiciled in New York.

7.     Luxtona Limited ("Luxtona") is a privately held company organized under the laws of Cyprus, having its registered office at 25B Klimentos Street, Agious Antonios, Nicosia, 1061, Cyprus.   Luxtona is a wholly-owned subsidiary of YHIL.   Luxtona does not have an office in New York.   (Luxtona, together with YHIL, Yukos Capital, Foundation I and Foundation II, are referred to collectively as, the "Companies").

8.     Marc Fleischman, (the "Trustee") is the trustee of the 2015 Security Trust (the "2015 Trust"), which is the successor in interest to the 2004 Security Trust (the "Trust") created pursuant to that certain Trust Agreement dated May 13, 2004 (the "Trust Agreement"). The Trustee is an individual resident of the State of California.

9.     The Trust was established under the laws of Texas and was subject to the Texas Trust Code.   The 2015 Trust was established under the laws of California and is subject to the California Probate Code.

10.     Defendant Daniel Caleb Feldman is an individual domiciled in New York at all relevant times, with a current address at 680 West End Avenue, Apartment 8A, New York, New York.

11.     Feldman is, and at all relevant times was, an attorney licensed to practice law in the State of New York.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper in this court pursuant to diversity jurisdiction, 28 U.S.C. § 1332 because the Plaintiffs are foreign companies that maintain offices outside the United States, the defendant is a New York domiciliary, and the amount in controversy exceeds $75,000.00.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) (1) because the Defendant resides in New York, New York.

## FACTUAL ALLEGATIONS

### Background Of Yukos Oil

14.     The circumstances leading to the creation of the Defendant's fiduciary obligations to the Plaintiffs arise out of the expropriation by the Russian Government of the assets of Yukos Oil Company ("Yukos Oil").  Yukos Oil had been Russia's largest exporter of crude oil.  As a result of taxes, interest and penalties imposed on Yukos Oil by the Russian authorities, Yukos Oil was forced into bankruptcy in 2006, and a receiver was appointed over the Yukos Oil assets (the "Yukos Receiver").

15.     One of the Yukos Oil assets was the Dutch company, Yukos Finance B.V. ("Finance"), a wholly-owned subsidiary of Yukos Oil.

16.     Another asset of Yukos Oil was the Armenian company, Yukos CIS ("CIS").

17.     Finance and CIS held a number of other Yukos Oil group entities as wholly-owned subsidiaries (such entities collectively, the "Yukos Group").

18.     The Yukos Receiver purported to sell Finance to a Russian company named Promneftstroy ("PNS").  The sale was challenged in a Dutch court, and the sale was voided in 2007 by order of the Dutch Court (the "Dutch Order").

19.     Since the Dutch Order, Yukos-related entities and individuals and PNS-related entities and individuals have been involved in numerous actions pending in the Netherlands and elsewhere over the ownership and management of Finance and the fate of its assets.  That litigation (the "PNS Litigation") continues today.

20.     In addition to the PNS Litigation, members of the Yukos Group were also engaged in years of litigation in various jurisdictions with Rosneft, a Russian state-owned oil company.  The Yukos Receiver purported to sell CIS to Rosneft and since then, Yukos-related entities and individuals and Rosneft-related entities and individuals have been involved in numerous actions pending in the Netherlands and elsewhere over the ownership and management of CIS and the fate of its assets (the "Rosneft Litigation").  The Rosneft Litigation was not settled until this year.

21.     The Yukos Group includes each Plaintiff other than the Trustee.

22.     The Trust was created to fund litigation in order to hold and preserve Yukos Group assets and was funded upon its creation in 2004 with assets from the Yukos Group.

## Feldman's Positions Of Trust and Confidence With The Yukos Group

23.     Feldman was a director of YHIL from June 2006 to September 2012.

24.     Feldman's duties and obligations as a director of YHIL remained the same throughout his tenure as director.

25.     The terms of Feldman's service as director of YHIL were memorialized in a Director's Appointment Agreement dated January 17, 2011 (the "Director's Agreement").

26.     The Director's Agreement provided, at paragraph 6:

> The Director shall devote his best efforts to advance the interests of the Company and comply with all the rules and regulations promulgated by the Company which are not contrary to law or public morals and shall do as the Company might from time to time direct.

27.     The Director's Agreement provided at paragraph 7:

> The Director shall not during the period of his appointment or at anytime thereafter . . . in any way develop or make known any information relating to the Company or the business or any other information which may come to his knowledge in the course of his appointment . . . to any . . . third party without the prior written consent of the Company.

28.     Feldman's service as a director of YHIL was governed by the BVI Companies Act of 2004 (the "BVI Act").

29.     The BVI Act provides, in relevant part:

> 120(1).        . . . [A] director of a company, in exercising his powers or performing his duties, shall act honestly and in good faith and in what the director believes to be in the best interests of the company . . .

> 121.    A director shall exercise his powers as a director for a proper purpose and shall not act, or agree to the company acting, in a manner that contravenes this Act or the memorandum or articles of the company.

> 122.    A director of a company, when exercising powers or performing duties as a director, shall exercise the care, diligence, and skill that a reasonable director would exercise in the same circumstances taking into account, but without limitation,

(a)     the nature of the company;

(b)     the nature of the decision;

(c)     the position of the director and the nature of the responsibilities
undertaken by him.

30.     Pursuant to Section 11.1 of the Memorandum of Association and Articles
of Association of YHIL, the business and affairs of YHIL were managed by its directors.

31.     Feldman was a director of Yukos Capital from February 6, 2007 to
October 10, 2014.

32.     Feldman was a director of Yukos UK Limited from June 30, 2006 to April
24, 2014.

33.     Feldman was a director of Luxtona from September 20, 2012 to February
10, 2014.

34.     At various times, Feldman also served as a director of the following
Yukos Group entities: Fair Oaks Trade, Wincanton BV, Hedgerow Ltd., Finance Performance
Holdings BV and AB Mazeiku Nafta.

35.     Feldman received collective remuneration in excess of $3 million for
service as a director of the Yukos Group entities.

36.     The Foundations were managed by their Board of Directors, which boards
are identical.

37.     Feldman served as corporate secretary for the Foundations from their
inception to 2014. In such capacity, Feldman attended the meetings of the Board of Directors of
the Foundations, at which confidential Yukos Group business was openly discussed among the

board members, thus placing Feldman in a position of trust and confidence with respect to the Foundations and the Yukos Group as a whole.

38.    Specifically, the Yukos Group's litigation strategy in the Rosneft Litigation and the pending PNS Litigation was discussed in great detail at the Foundations' meetings of their Board of Directors.

39.    Feldman was appointed trustee of the Trust on November 30, 2006.

40.    Feldman served as trustee of the Trust until he was removed on October 3, 2013.

41.    Feldman received remuneration in excess of $200,000 for his service as trustee of the Trust.

42.    As a director, Feldman owed the entities he served, including YHIL, Yukos Capital and Luxtona, a fiduciary duty to act in their best interests based on common and statutory law.

43.    As a result of the special relationship of trust and confidence between the Foundations and Feldman, Feldman owed the Foundations, under common and statutory law, a fiduciary duty to act in their best interests.

44.    As trustee of the Trust, Feldman owed the Trust a fiduciary duty to act in the Trust's best interests.

45.    As detailed below, Feldman breached his fiduciary duties and betrayed the Plaintiffs' trust by concocting a series of schemes to loot the Plaintiffs and their affiliates, and to obtain secret pay-offs for his personal benefit, to the Plaintiffs' detriment.

**The PNS Scheme**

46. PNS was managed by a consortium of representatives of VR Capital Group, Renaissance Capital, HBK Investments LP, Jervis and OOO Monte Valle (the "Consortium Parties").

47. Beginning in approximately 2008, representatives of parties involved in the PNS Litigation explored settlement possibilities.

48. In the second half of 2008 and early 2009, Feldman was charged with acting as the Yukos Group liaison with the Consortium Parties in the settlement discussions of the PNS Litigation.

49. Feldman had numerous meetings with representatives of the Consortium Parties over several months, ostensibly acting as a broker of a possible Yukos Group-PNS settlement and negotiating for the benefit of the Yukos Group.

50. In actuality, Feldman was secretly sharing confidential Yukos Group information with the PNS Parties in an effort to obtain remuneration from the Consortium Parties.

51. To conceal his duplicitous conduct, Feldman insisted that his discussions with the Consortium Parties take place only in person.

52. Feldman actively sought cash compensation from the Consortium Parties for his efforts, and demanded the Consortium Parties' agreement that they would not reveal the payoff arrangement to the Yukos Group.

**The Bogus Bonus Scheme**

53.     In 2011, Feldman shared details from a confidential discussion held at a meeting of the Foundations' Board of Directors with fellow directors of YHIL and various other directors and staff members of the Yukos Group (the "Non Foundation Group").

54.     Feldman recounted to the Non Foundation Group an event that took place at a Foundations directors' meeting concerning Nelson English, a director of certain Yukos Group entities.

55.     According to Feldman, Mr. English made a presentation to the Foundations' Board to receive a bonus for his role in developing and selling a Yukos Group asset called Mazeiku Nafta.

56.     In the presentation, Feldman stated that Mr. English demonstrated from data supplied to him by compensation consultants, that the mid-range value of an appropriate bonus for Mr. English was $30 million dollars.  Feldman then told the Yukos Group staff members that the Foundations' Board elected not to award Mr. English a bonus at that time, but to do so in the future, but at a much lower amount, perhaps only $100,000.00-$200,000.00 and that Mr. English should not yet be told of the reduced amount.

57.     Feldman's disclosure to the Non Foundation Group of the alleged unfair treatment of Mr. English by the Foundations' Board was intended by Mr. Feldman to and did, in fact, create resentment toward the Foundations' Board by key members of the Non Foundation Group and foment unrest among the YHIL directors.

58.     Also in 2011, the entity that had been the majority shareholder in Yukos Oil prior to its expropriation ("GML") offered to give the Foundations a percentage share of the

value of the assets GML recovered through the pending litigations, to be used as a bonus pool for various parties who contributed to the success of the litigations (the "GML Bonus Pool").

59.     In his capacity as Secretary to the Foundations' Board of Directors, Feldman became privy to a confidential letter from GML to the Foundations containing the GML offer to pay the GML Bonus Pool.

60.     The Foundations were to control the distribution of funds from the GML Bonus Pool.

61.     Feldman alleged to the Non Foundation Group, including the YHIL Board, that since the Foundations were not going to compensate Mr. English properly for the successful matter he procured, the Foundations may not compensate those staff members properly from the GML Bonus Pool either.

62.     Feldman disclosed the confidential discussion concerning Mr. English and the confidential letter from GML to his fellow directors of YHIL and other Non Foundation Group members in order to recruit them to participate in an illicit scheme to pay themselves bonuses.

63.     Feldman sought professional advice concerning how to create a vehicle from which to siphon funds from YHIL and its subsidiaries in order to create his own bonus pool to distribute to himself and the members of the Non Foundation Group that he recruited.

64.     Feldman also sought professional advice concerning how to avoid an action by other members of the Yukos Group to recover wrongfully paid compensation to Feldman and his co-conspirators.

65.    Feldman's scheme included utilizing a trust, into which $50 to $75 million would be funded from YHIL and its subsidiaries without the Foundations' knowledge or approval.

66.    Feldman took extraordinary steps to conceal his scheme, including the use of electronic messaging designed not to leave a record and frequent in-person meetings, at YHIL's expense, with members of the Non Foundation Group.

67.    Feldman's plan to create the bogus bonus pool even included a penalty to any member of the conspiracy who backed out, in order to obtain the full commitment by all of those with whom Feldman shared his illicit plan.

68.    Feldman billed YHIL for over $30,000.00 for the legal fees Feldman incurred in soliciting advice to permit him to perpetrate the scheme.

69.    Feldman worked for months to set the stage for his scheme.

70.    Certain members of the bonus conspiracy got "cold feet" in or about March, 2012, and would not agree to go through with the scheme.  They insisted that Feldman and the other members of the Non Foundation Group agree to abandon the scheme as well.

71.    With their knowledge of Feldman's scheme, these other former members of the conspiracy posed a threat to Feldman.  Feldman thereby agreed to abandon the scheme for the time being, reserving it as a "contingency plan" if Feldman felt he was not sufficiently compensated by the Foundations from the GML Bonus Pool.

**The Intelligent Energy Scheme**

72.     A Yukos Group entity that was a wholly-owned subsidiary of Foundation I held an approximate 14.8% shareholder interest (the "Yukos IE Shares") in a company called Intelligent Energy Holdings Plc ("Intelligent Energy").

73.     Due to its holding, the Yukos Group entity was entitled to a seat on Intelligent Energy's Board of Directors.

74.     Foundation I appointed Feldman as the Yukos Group director on the Intelligent Energy Board.

75.     As the Yukos Group director on the Intelligent Energy Board, Feldman received packages of materials for use by the Intelligent Energy Board of Directors and minutes from their meetings (collectively, the "IE Board Packs").

76.     In its transmittal of the IE Board Packs to board members, Intelligent Energy expressly stated that they were to be kept confidential.

77.     By 2006, Foundation I determined to sell the Yukos IE Shares, and retained a boutique investment house called Turquoise Associates, headed by an individual, Ali Naini ("Naini"), to assist with the sale. Turquoise Associates was paid a monthly retainer. Its mandate was to sell the Yukos IE Shares at market price. Feldman worked closely with Naini over a number of years purportedly attempting to procure the sale of the Yukos IE Shares on favorable terms for the benefit of the Yukos Group.

78.     Upon information and belief, in actuality, Feldman and Turquoise Associates were working together to structure a deal pursuant to which they would retain a

continuing role in Intelligent Energy after the sale of the Yukos IE Shares for their sole benefit, rather than to structure a deal that was in the best interests of the Yukos Group.

79.    Upon information and belief, Feldman, without the knowledge or approval of the Yukos Group, had an arrangement with Naini whereby Feldman required Naini and/or Turquoise Associates to split with Feldman any success fee that Naini and/or Turquoise Associates received for the sale of the Yukos IE Shares.

80.    The Yukos IE Shares were not sold through Feldman and Naini's efforts, and on March 1, 2009, William Shoff ("Shoff"), an individual with a corporate finance background and who had performed various functions within the Yukos Group, was retained to sell the Yukos IE Shares.

81.    Subsequent to March 1, 2009 Feldman falsely informed potential investors and his fellow directors of Intelligent Energy that Feldman (not Shoff) was responsible for obtaining the sale of the Yukos IE Shares.

82.    Feldman obtained confidential information from Intelligent Energy by virtue of his Board seat and his representation that he was responsible for selling the Yukos IE Shares.

83.    Unbeknownst to the other members of the boards of Intelligent Energy, and without any authorization from the Foundations, Feldman undertook to market the Yukos IE Shares to third parties, proposing that Feldman personally join them as a participant in the purchase, receive a success fee from the purchaser, and/or that Feldman manage, for a fee, a consortium of investors to purchase the Yukos IE Shares and be their designee on the Intelligent Energy Board.

#5778137 v9 \024716 \0001

84.    Upon information and belief, without the consent of the Yukos Group or Intelligent Energy and for his own benefit, Feldman disclosed inside confidential information concerning Intelligent Energy to Naini, including the IE Board Packs.

85.    Upon information and belief, without the consent of the Yukos Group, Feldman disclosed inside confidential information concerning Intelligent Energy to potential purchasers to insure that he would participate in the deal for his own personal benefit.

86.    Unfortunately for Feldman, Intelligent Energy's other Board members learned of his activities in July, 2009 from parties to whom Feldman made his pitch.

87.    Intelligent Energy demanded that Feldman be removed from the Board for the pretextual reason that the Yukos Group investor was no longer entitled to a Board seat due to the dilution of its interest below 10%.

**The Trust Scheme**

88.    From 2006 to 2013, Feldman was trustee of the Trust.

89.    The Texas Trust Code at Section 113.051 provides that a trustee "shall perform all of the duties imposed upon the trustees by the common law . . ."

90.    Texas common law imposes a duty of loyalty upon trustees that precludes them from self dealing.

91.    Section 117.007 of the Texas Trust Code provides that a trustee shall invest and manage trust assets solely in the interests of the beneficiaries.

92.    Pursuant to Texas common law, a trustee must keep trust property separate and not co-mingle trust property.

93.     Section 113.051 of the Texas Trust Code requires that trustees administer trusts in good faith.  Sections 117.03 and 117.04 of the Texas Trust Code require that trustees manage trusts with the skill and prudence that an ordinary, capable and careful person would use in the conduct of his own affairs and manage trust assets as a prudent investor.

94.     At the time of his appointment as trustee of the Trust, Feldman agreed to accept remuneration at the same level received by the outgoing trustee.

95.     In September 2008, Feldman requested compensation for his service as trustee retroactive to the date of his appointment.

96.     When Feldman requested payment of such compensation from the Trust, he misrepresented the level of compensation received by the outgoing trustee.

97.     In breach of his fiduciary duty, Feldman retained compensation from the Trust in excess of that to which he was entitled.

98.     In or about 2008, Feldman used his position as trustee of the Trust to withdraw $500,000.00 from the Trust and invest it in an investment fund run by a friend of Feldman's, called the UFG Private Equity Fund II, L.P. (the "UFG Investment").

99.     Unbeknownst to the beneficiary or protector of the Trust, Feldman signed all of the subscription documents for the UFG Investment and opened the investment account using his own name, not the Trust's, so Feldman personally held title to the investment.

100.    The account servicer of the UFG Investment, Delphi Management, issued the 2010, 2011 and 2012 Form K-1's to Feldman.

101.    Feldman made no effort to transfer title to the UFG Investment from himself to the Trust for five years, until after Feldman discovered that he would be subject to a

significant personal tax liability and after the Foundations discovered that the Trust did not own the UFG Investment.

102.   The Trust redeemed the UFG Investment and recouped its assets.

103.   Feldman continued to administer the Trust until he was terminated as trustee of the Trust in October, 2013.

104.   The UFG Investment earned a 90% return.  Had it not been discovered that Feldman put the UFG Investment in his own name, Feldman would have been able to return the Trust principal to the Trust and keep the 90% profit for himself.

**The Hidden Campaign Contribution and Indemnity Fund**

105.   Feldman was one of four directors of YHIL.

106.   One of Feldman's fellow YHIL directors was Cleanthis Georgiades ("Georgiades").

107.   In early 2011, Georgiades was raising money for his political campaign for office in Cyprus.

108.   Upon information and belief, Georgiades requested that the Foundations approve a political contribution to his campaign, and the Foundations, with Feldman's knowledge, declined Georgiades' request.

109.   Feldman, with his fellow YHIL directors, caused YHIL to provide an indirect contribution of $99,000.00 to Georgiades' campaign in the first quarter of 2011 (the "YHIL Contribution").

110.   The YHIL Contribution was made without the knowledge or consent of the Foundations.

#5778137 v9 \024716 \0001

17

111.     Feldman and his co-directors intentionally, falsely and fraudulently buried the transfer of the YHIL Contribution as an additional administrative expense of YHIL and concocted an explanation as part of a cover up.

112.     Feldman was questioned by a representative of the Foundations about the increase in YHIL's administrative expenses on June 24, 2011.

113.     Upon information and belief, Feldman deliberately and falsely informed the Foundations on June 27, 2011 that the expense was due to a change of YHIL's registered agent.

114.     Feldman was personally aware that the additional expense to YHIL was due to the YHIL Contribution, and that it had nothing to do with the change of YHIL's registered agent, and was not approved by the Foundations.

115.     In 2007, the directors of YHIL were covered by an indemnity fund that could be used to defend them to the extent that they incurred expense or suffered losses by reason of certain claims made against them concerning their service as directors of YHIL.

116.     Georgiades sought another $1 million from YHIL purportedly to be set aside in an account to provide additional coverage for him, to be maintained for 5 years after Georgiades ceased to be a director of YHIL.

117.     Upon information and belief, Feldman committed YHIL to provide the additional coverage that Georgiades requested, and caused $1 million to be transferred from YHIL to an account to be used for this purpose without approval from the Foundations (the "CG Indemnity Fund").

118. Upon information and belief, Georgiades intended to use the CG Indemnity Fund to cover his own personal expenses, rather than actual third party indemnity claims, and Feldman was aware of his intentions.

119. YHIL has lost approximately $400,000 to date from the CG Indemnity Fund.

**The YHIL Compensation Overpayment**

120. By written resolution of the Board of Directors of YHIL dated May 27, 2010, YHIL fixed Feldman's compensation for serving as director in the amount of $240,000.00 for the period June 20, 2010 to June 19, 2011 (the "2010 Compensation Amount").

121. The 2010 Compensation Amount was paid to Feldman in full on July 7, 2010.

122. By written resolution of the Board of Directors of YHIL dated January 17, 2011 (effective as of January 3, 2011), Feldman's compensation for serving as a director of YHIL was increased from $240,000.00 to $500,000.00 for the calendar year 2011 (the "2011 Compensation Amount"). This increase was also documented in the Director's Agreement.

123. $110,465.75, the proportion of the 2010 Compensation referable to the 168 day period between January 3, 2011 to June 19, 2011 (the "On Account Payment"), was paid to Feldman in advance on June 7, 2010.

124. Notwithstanding the "On Account Payment", the full 2011 Compensation Amount was paid to Feldman through monthly payments over the course of 2011.

125. As a result, Feldman received compensation of $610,465.75 for 2011, which exceeds the 2011 Compensation Amount by $110,465.75 (the "Overpayment").

126.    Feldman was aware of the 2011 Compensation Amount and therefore was aware of the Overpayment.

127.    In connection with an audit of YHIL in October, 2012, Feldman confirmed to Euroglobal S.E.E. Audit Limited that he was paid $620,000.00 by YHIL in 2011.

128.    Feldman failed to notify YHIL of the Overpayment or to return the Overpayment.

129.    On June 8, 2015, counsel for YHIL wrote to Feldman and his attorney demanding the return of the Overpayment.  Feldman and his counsel neglected to respond, and Feldman failed to return the Overpayment.

**Feldman's Separation From Yukos and Unexplained Wealth**

130.    Feldman was terminated from all remaining Yukos Group director and agency positions by October, 2014.

131.    At that time, Feldman, along with other Yukos Group entities and directors, was a named defendant in the last of the actions constituting the Rosneft Litigation (the "Dutch Rosneft Action").

132.    The Yukos Group entities and directors involved in the Dutch Rosneft Action other than Feldman settled the claims against them in March, 2015.

133.    Counsel for the Yukos Group entities informed Feldman's attorney of the settlement of the Dutch Rosneft Action in March, 2015.  The settlement did not require Feldman to make any payments or undertake any responsibility, and it provided that Feldman would receive a release.

134.     Feldman, of his own volition and at his own expense, elected to retain separate counsel to represent him in the Dutch Rosneft Action, and, for no apparent reason, did not agree to the settlement for several months.

135.     The Yukos Group proposed a lucrative severance package to Feldman in 2014.

136.     Feldman rejected the proposed severance package and has not received any remuneration from the Yukos Group since 2014.

137.     Upon information and belief, Feldman's only legitimate source of income, if any, is from an internet startup company he developed to promote "fantasy" soccer games.

138.     Notwithstanding that Feldman has not received any remuneration from his former principals in the Yukos Group and that he undertook the expense of his defense unnecessarily in the Dutch Rosneft Action, Feldman's standard of living appears not to have suffered in any way.  To the contrary, Feldman appears to enjoy a surprising degree of wealth, maintaining multiple residences (including in New York City and Southampton).

139.     The Yukos Group undertook an investigation into certain of Feldman's activities in 2014, which yielded much of the information detailed above.  Feldman refused to cooperate with the investigation and withheld electronic evidence.

140.     Additional details concerning Feldman's schemes are uniquely within Feldman's knowledge, and electronic records concerning same are within Feldman's control. Accordingly, it is expected that discovery in this action will yield such additional details.

## CLAIM I – BREACH OF FIDUCIARY DUTY

141.   Plaintiffs incorporate by reference and reallege each and every allegation contained in ¶ 1-140, as though fully set forth herein.

142.   At all relevant times, by reason of his position as a director and secretary of the Companies as described above, Defendant owed the Companies fiduciary duties, including the obligation of good faith, fair dealing, loyalty and due care.

143.   At all relevant times, by reason of his position as trustee of the Trust as described above, Defendant owed the Trust fiduciary duties, including the obligation of good faith, fair dealing, loyalty and due care.

144.   As demonstrated above, Defendant acted as a faithless servant to Plaintiffs.

145.   Defendant violated his duties to the Plaintiffs by taking actions, including actions that constituted self-dealing, that were deliberately contrary to the interests of the Plaintiffs.

146.   Plaintiffs suffered injury as a direct and proximate result of Defendant's unlawful actions, including but not limited to monetary injury.  As a result of the conduct alleged herein, Defendant is liable to Plaintiffs.

## CLAIM II – INDUCING AND AIDING AND ABETTING YHIL DIRECTORS TO BREACH THEIR FIDUCIARY DUTIES

147.   Plaintiffs incorporate by reference and reallege each and every allegation contained in ¶ 1-146, as though fully set forth herein.

148.    At all relevant times, the directors of YHIL owed fiduciary duties to YHIL's shareholders.

149.    Defendant, with knowledge or reckless disregard of the fact that YHIL's directors would be in breach of their fiduciary duties to YHIL as a result of their participation in the actions alleged above, used his power, authority and access to confidential information to induce the aforementioned breaches of fiduciary duties, and knowingly participated in, aided and abetted, directed, solicited and provided substantial assistance to the YHIL directors' breaches of their fiduciary duties.

150.    YHIL has suffered injury as a direct and proximate result of Defendant's unlawful actions, including but not limited to monetary injury.  As a result of the conduct alleged herein, Defendant is liable to YHIL.

## CLAIM III – BREACH OF CONTRACT

151.    Plaintiffs incorporate by reference and reallege each and every allegation contained in ¶ 1-150, as though fully set forth herein.

152.    Defendant repeatedly breached his contractual obligations to YHIL as detailed above.

153.    Any conditions precedent to this breach of contract all have occurred or been satisfied.

154.    YHIL has suffered injury as a direct and proximate result of Defendant's actions, including but not limited to monetary injury.  As a result of the conduct alleged herein, Defendant is liable to YHIL.

#5778137 v9 \024716 \0001

23

## CLAIM IV – PRELIMINARY AND PERMANENT INJUNCTION

155.    Plaintiffs incorporate by reference and reallege each and every allegation contained in ¶ 1-154, as though fully set forth herein.

156.    Pursuant to the Director's Agreement, Feldman committed (with limited exceptions which do not apply) to maintain the confidentiality of information he obtained concerning the Yukos Group even after his service as director was terminated.

157.    Feldman breached this confidentiality obligation as detailed above.

158.    Upon information and belief, Feldman has continued to breach his confidentiality obligation post termination, including by disclosing confidential information concerning the Yukos Group and its litigation strategy to parties having an interest adverse to the Yukos Group in the PNS Litigation.

159.    The PNS Litigation will determine the sustainability of members of the Yukos Group.  Accordingly, Feldman's actions could have devastating effects on the Yukos Group, including YHIL.

160.    YHIL has no adequate remedy at law and will continue to suffer substantial and irreparable harm unless Feldman is enjoined as requested below.

161.    Greater injury will be inflicted upon YHIL by the denial of the requested relief than will be inflicted on Feldman by the granting of this relief.

**WHEREFORE,** Plaintiffs demand judgment against Defendant as follows:

(a)    Determining and awarding to Plaintiffs the damages sustained by them as a result of the violations set forth above by Defendant;

(b)     Enjoining Feldman from disclosing any information that came to Feldman's knowledge in the course of his service as a director of the Yukos Group entities, requiring Feldman to disclose to them any material provided to third parties in breach of his confidentiality obligation and to return to the Yukos Group entities any materials in his possession or control that he acquired by virtue of his service as director.

(c)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

(d)     Granting such other relief, including equitable and injunctive relief, as this Court may deem just and proper.

Dated: New York, New York
       June 24, 2015

MORRISON COHEN LLP

By:_____
    Mary E. Flynn
    909 Third Avenue
    New York, New York  10022
    (212) 735-8600
    E-mail: mflynn@morrisoncohen.com

*Attorneys for Plaintiffs Yukos Capital SARL, Yukos Hydrocarbons Investments Limited, Stichting Administratiekantoor Yukos International, Stichting Administratiekantoor Financial Performance Holdings, Luxtona Limited and Marc Fleischman, as trustee of the 2015 Security Trust as successor in interest to the 2004 Security Trust*

#5778137 v9 \024716 \0001

25