**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| YUKOS CAPITAL S.A.R.L., *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | **C.A. No. 15-4964-LAK** |
| | § | |
| DANIEL CALEB FELDMAN, | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendant*. | § | **ANSWER, AFFIRMATIVE** |
| | § | **DEFENSES, COUNTERCLAIMS,** |
| | § | **AND THIRD-PARTY COMPLAINT** |

---

DANIEL CALEB FELDMAN,

    *Counterclaim-Plaintiff*,

    v.

YUKOS CAPITAL S.A.R.L., YUKOS
HYDROCARBONS INVESTMENTS
LIMITED, STICHTING
ADMINISTRATIEKANTOOR YUKOS
INTERNATIONAL, STICHTING
ADMINISTRATIEKANTOOR
FINANCIAL PERFORMANCE
HOLDINGS, LUXTONA LIMITED and
MARC FLEISCHMAN, TRUSTEE OF
THE 20015 SECURITY TRUST, as
successor in interest to the 2004 SECURITY
TRUST,

    *Counterclaim-Defendants*.

---

DANIEL CALEB FELDMAN,

    *Third-Party Plaintiff*,

    v.

DAVID GODFREY, STEVEN THEEDE,
MARC FLEISCHMAN, BRUCE

| | |
|---|---|
| MISAMORE, MICHEL de | § |
| GUILLENCHMIDT, GRETCHEN KING, | § |
| FINANCIAL PERFORMANCE | § |
| HOLDINGS B.V., FAIR OAKS TRADE | § |
| AND INVEST LIMITED and DIRECTORS | § |
| PROTECTION LTD, SOLELY IN ITS | § |
| CAPACITY AS THE TRUSTEE FOR THE | § |
| DIRECTORS PROTECT TRUST, | § |
| | § |
| *Third-Party Defendants.* | § |
| | § |

## DANIEL CALEB FELDMAN'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Defendant Daniel Caleb Feldman ("Feldman," and below, "Counterclaim-Plaintiff" or "Third-Party Plaintiff"), by undersigned counsel, presents his Answer, Affirmative Defenses, Counterclaims and Third-Party Complaint in response to the Complaint of Plaintiffs Yukos Capital S.A.R.L. ("Yukos Capital"), Yukos Hydrocarbons Investments Limited ("YHIL"), Stichting Administratiekantoor Yukos International ("Foundation I") and Stichting Administratiekantoor Financial Performance Holdings ("Foundation II"), Luxtona Limited ("Luxtona") and Marc Fleischman ("Fleischman"), as Trustee of the 2015 Security Trust (the successor in interest to the 2004 Security Trust) (collectively, "Plaintiffs," and below, "Counterclaim-Defendants").

The Plaintiffs' Complaint represents a classic example of retaliation and intimidation by parties engaged in illegal conduct and self-dealing that are seeking to silence an individual who dared to speak up. The Plaintiffs, who have had nearly $2 billion under their control, and who are burning off assets at a rate upwards of $50 million per year to the detriment of the true beneficiaries of those assets, will stop at nothing to silence Feldman. The Third-Party Defendants have illegally accessed emails and cell phone records of Feldman and other perceived enemies, have acted as "faithless" officers and directors in creating an illicit bonus scheme to put money into their own pockets at the expense of the rightful beneficiaries, and now

they are using companies they control to sue Feldman in a transparent attempt to silence him and cover up their own misconduct. The Plaintiffs/Counterclaim-Defendants and Third-Party Defendants should be stopped in their tracks, and penalized for their appalling behavior.

In support of his Answer, Affirmative Defenses, Counterclaims, and Third-Party Complaint, Feldman asserts the following:

## ANSWER

## NATURE OF THIS ACTION

1. Feldman admits that he held certain positions with the Plaintiffs and owed certain duties to them. Feldman denies that the remaining allegations of paragraph 1.

**The Parties**

2. Admitted.

3. Admitted.

4. Admitted.

5. Feldman denies, to the best of his knowledge, that Foundation II was the sole shareholder of YHIL up until October, 2014. After that date, Feldman lacks sufficient knowledge or information to either admit or deny the allegation contained in paragraph 5.

6. Feldman lacks sufficient knowledge or information to either admit or deny the allegation contained in paragraph 6.

7. Feldman denies, to the best of his knowledge, that Luxtona was a wholly-owned subsidiary of YHIL up until October, 2014. After that date, Feldman lacks sufficient knowledge or information to either admit or deny the allegation contained in paragraph 7.

8. Feldman lacks sufficient knowledge or information to either admit or deny the allegations contained in paragraph 8.

9.     Feldman admits that the Trust was established under Texas law.  Feldman lacks sufficient knowledge or information to either admit or deny the remaining allegations contained in paragraph 9.

10.     Admitted.

11.     Admitted.  By way of further response, Feldman identifies that he was not hired to act as an attorney for the Yukos entities and never functioned in a legal capacity in his various roles with the Yukos entities.

## JURISDICTION AND VENUE

12.     Admitted.

13.     Admitted.

## FACTUAL ALLEGATIONS

14.     Feldman admits that Yukos Oil Company ("Yukos Oil") had been Russia's largest exporter of crude oil.   Feldman further admits that taxes, interest and penalties were imposed on Yukos Oil by the Russian authorities.  Feldman further admits that Yukos Oil declared bankruptcy in 2006 and a receiver was appointed over the Yukos Oil assets. Feldman denies the remaining allegations of paragraph 14.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     Feldman admits that the Yukos receiver sold Yukos Finance to OOO Promneftstroy ("PNS" or "Promneftstroy") and that the sale was challenged in a Dutch court. Feldman denies the remaining allegations of paragraph 18.  By way of further response, Feldman believes that the Dutch Order was reversed by Dutch Supreme Court in September 2013.

19.     Admitted.

20.     Admitted.

21.     The allegations contained in paragraph 21 do not require a response as it merely states Plaintiffs' defined term for "Yukos Group."

22.     Feldman lacks sufficient knowledge or information to either admit or deny the allegations contained in paragraph 22.

**[Alleged] Feldman's Positions of Trust and Confidence with the Yukos Group**

23.     Admitted.

24.     Admitted.

25.     Feldman admits that he executed a Director's Appointment Agreement dated January 17, 2011 (the "Director's Agreement") with YHIL.  Feldman denies the remaining allegations of paragraph 25.

26.     Feldman states that the Director's Agreement is a writing that speaks for itself. Feldman refers to the Director's Agreement for its true and correct contents and denies any inaccurate characterization or interpretation of the agreement when read in context and in its entirety.

27.     Feldman states that the Director's Agreement is a writing that speaks for itself. Feldman refers to the Director's Agreement for its true and correct contents and denies any inaccurate characterization or interpretation of the agreement when read in context and in its entirety.

28.     The allegations contained in paragraph 28 state conclusions of law to which no response is required.

29.     Feldman admits that paragraph 29 sets forth a portion of the text from the BVI

Act.

30.     Feldman states that the Memorandum of Association and Articles of Association of YHIL is a writing that speaks for itself.  Feldman refers to the Memorandum for its true and correct contents and denies any inaccurate characterization or interpretation of the Memorandum when read in context and in its entirety.

31.     Feldman lacks sufficient knowledge or information to either admit or deny the specific dates contained in paragraph 31.

32.     Feldman lacks sufficient knowledge or information to either admit or deny the starting date contained in paragraph 32.  Feldman admits that his resignation was demanded and submitted on April 24, 2014.

33.     Feldman lacks sufficient knowledge or information to either admit or deny the starting date contained in paragraph 33.  Feldman denies that the last date was on February 10, 2014.

34.     Feldman denies this allegation, as the use of the term "Yukos Group" is inconsistent with the term as defined *infra* in paragraph 21.  Feldman admits that he served as the director of the listed entities, among others.

35.     Admitted.

36.     Admitted.

37.     Feldman admits that he served as secretary for Foundation I and Foundation II and that at times he attended board meetings.  Feldman denies that confidential Yukos Group business was openly discussed at all board meetings.  The remaining allegations contained in paragraph 37 state conclusions of law to which no response is required.

38.     Feldman admits that he attended board meetings, but he did not attend the

Foundations' frequent director-only agenda item sessions and was required to and did leave the room while the agenda items were discussed.  To the best of Feldman's knowledge, director-only meetings did not have minutes recorded.

39.    Admitted.

40.    Admitted.

41.    Admitted.

42.    The allegations contained in paragraph 42 state conclusions of law to which no response is required.

43.    The allegations contained in paragraph 43 state conclusions of law to which no response is required.

44.    The allegations contained in paragraph 44 state conclusions of law to which no response is required.

45.    Denied.

**[Alleged] The PNS Scheme**

46.    Feldman lacks sufficient knowledge or information to either admit or deny the allegations contained in paragraph 46.

47.    Admitted.

48.    Denied.

49.    Denied.

50.    Denied.

51.    Denied.

52.    Denied.

**[Alleged] The Bogus Bonus Scheme**

53. Denied.

54. Denied.

55. Feldman admits English made a presentation respecting reasoning for a bonus in his role of selling Mazeiku Nafta.

56. Feldman admits English made a presentation respecting reasoning for a bonus in his role of selling Mazeiku Nafta. The board's treatment of English was generally known to all relevant people in the company. English himself expressed his extreme displeasure and disappointment directly to non-foundation group members.

57. Denied. By way of further response, Feldman believes that the treatment of English was a morale killer for all employees and was not a secret.

58. Admitted. The GML kick-back scheme is the subject of one of Feldman's counterclaims.

59. Denied. By way of further response, Feldman denies that the GML kick-back scheme was openly discussed at any regular board meeting. Feldman believes the scheme was devised in negotiations with GML and director-only meetings from which Feldman was excluded.

60. Admitted.

61. Denied.

62. Denied.

63. Denied.

64. Denied.

65. Denied.

66. Denied.

67. Denied.

68. Denied.

69. Denied.

70. Denied.

71. Denied.

**[Alleged] The Intelligent Energy Scheme**

72. Admitted.

73. Admitted.

74. Admitted.

75. Admitted.

76. Feldman lacks sufficient knowledge or information to either admit or deny the allegations contained in paragraph 76 with respect to every package of board materials.

77. Feldman lacks sufficient knowledge or information to either admit or deny the allegations contained in paragraph 77 as to what Foundation I determined by 2006. Feldman admits that Foundation I retained Turquoise Associates, headed by an individual, Ali Naini ("Naini"), to advise and assist Feldman in his service on the board. Feldman denies the remaining allegations contained in paragraph 77.

78. Denied.

79. Denied.

80. Feldman admits that Shoff was tasked with selling the Yukos IE Shares. Feldman lacks sufficient knowledge or information to either admit or deny the allegations concerning Shoff's background or functions performed within the Yukos Group. The remaining allegations

contained in paragraph 80 are denied.

81.    Denied.

82.    Feldman admits that he regularly obtained confidential information from IE.  The remaining allegations contained in paragraph 82 are denied.

83.    Denied.

84.    Denied.

85.    Denied.

86.    Denied.

87.    Feldman denies the allegation of pretext in paragraph 87.  By way of further response, Feldman believes that the Yukos Group lost its right to a board seat once it was diluted below 10%.

**[Alleged] The Trust Scheme**

88.    Admitted.

89.    Feldman admits that paragraph 89 sets forth a portion of the text from the Texas Trust Code.

90.    The allegations contained in paragraph 90 state conclusions of law to which no response is required.

91.    The allegations contained in paragraph 91 state conclusions of law to which no response is required.

92.    The allegations contained in paragraph 92 state conclusions of law to which no response is required.

93.    The allegations contained in paragraph 93 state conclusions of law to which no response is required.

94.     Feldman admits that he agreed to $37,500 and that both he and David Godfrey believed that it was the same as the previous trustee.

95.     Admitted.

96.     Denied.  By way of further response, Feldman identifies that David Godfrey, the long serving protector of the trust, authorized compensation Feldman received.  To be certain, in a 2008 email, Godfrey stated the following: "I authorized this annual fee long ago and reconfirm that authorization."

97.     Denied.

98.     Denied.

99.     Denied.

100.    Feldman admits that the Form K-1's were initially issued in his name.

101.    Denied.

102.    Feldman admits that at all times the Trust retained the principal and proceeds from the UFG Investment.  The remaining allegations contained in paragraph 102 are denied.

103.    Feldman admits that he continued working with the Trust until his position was terminated.  The remaining allegations contained in paragraph 103 are denied.

104.    Feldman admits that the UFG Investment earned the Trust a significant return. By way of further response, Feldman states that the UFG proceeds were never comingled and never went to any account but the Trust's account.  The remaining allegations contained in paragraph 104 are denied.

**[Alleged] The Hidden Campaign Contribution and Indemnity Fund**

105.    Admitted.

106.    Admitted.

107.    Admitted.

108.    Denied.

109.    Denied.

110.    Denied.

111.    Denied.

112.    Denied.

113.    Denied.

114.    Denied.

115.    Feldman admits the existence of an indemnity fund, but lacks sufficient knowledge to either admit or deny the rest of the allegations.

116.    Feldman admits that Georgiades sought an indemnification fund of $1 million.

117.    Denied.

118.    Denied.

119.    Feldman lacks sufficient knowledge or information to either admit or deny the allegations contained in paragraph 119.  By way of further response, Feldman believes that if money was lost, it was not during his term of service.

**[Alleged] The YHIL Compensation Overpayment**

120.    Feldman states that the board resolution is a writing that speaks for itself. Feldman refers to the resolution for its true and correct contents and denies any inaccurate characterization or interpretation of the resolution when read in context and in its entirety.

121.    Admitted.

122.    Feldman states that the board resolution is a writing that speaks for itself. Feldman refers to the resolution for its true and correct contents and denies any inaccurate

characterization or interpretation of the resolution when read in context and in its entirety.

123.    Feldman lacks sufficient knowledge or information to either admit or deny the allegations contained in paragraph 123.

124.    Feldman lacks sufficient knowledge or information to either admit or deny the allegations contained in paragraph 124, and therefore denies the same.

125.    Denied.

126.    Feldman admits that he was aware of the amount of Compensation he received in 2011 as an YHIL director.  The remaining allegations contained in paragraph 126 are denied.

127.    Denied.

128.    Denied.

129.    Feldman states that the letter is a writing that speaks for itself.  Feldman refers to the letter for its true and correct contents and denies any inaccurate characterization or interpretation of the resolution when read in context and in its entirety.

**Feldman's Separation from Yukos and Unexplained Wealth**

130.    Admitted.

131.    Admitted.

132.    Feldman lacks sufficient knowledge or information to either admit or deny the allegations contained in paragraph 132.

133.    Feldman admits that attorneys for the Yukos Group entities generally informed Feldman's Massachusetts based employment lawyer that a settlement had been reached in the Dutch Rosneft Action in March 2015.  By way of further response, Feldman identifies that he was never provided a copy of the settlement, never informed as to the possibility of receiving a release and he lacks sufficient knowledge or information to either admit or deny the remaining

allegations contained in paragraph 133.

134.    Feldman admits that he retained separate counsel to represent him in the Dutch Rosneft Action after Yukos-appointed counsel abruptly resigned and refused to represent Feldman further, citing a conflict of interest as he was also counsel to the Yukos Group and represented them in their settlement negotiations with Rosneft.   Yukos Group entities have a contractual obligation to indemnify Feldman.  The Yukos Group entities' failure to do so is the subject of Feldman's Counterclaims and Third-Party Complaint.   The remaining allegations contained in paragraph 134 are denied.

135.    Denied.

136.    Feldman admits that he made a counterproposal to the Yukos Group's severance package and has not received any remuneration from the Yukos Group since 2014.   The remaining allegations contained in paragraph 136 are denied.

137.    Denied.

138.    Denied.

139.    Feldman lacks sufficient knowledge or information to either admit or deny the allegations contained in the first sentence of paragraph 139.  Feldman admits that he did not fully assist Plaintiffs with their fishing expedition into his private life.  The Yukos Group's counter-surveillance activities are the subject of one of Feldman's Third-Party Complaints.

140.    Denied.

## CLAIM I — BREACH OF FIDUCIARY DUTY

141.    Feldman incorporates herein by reference all the foregoing paragraphs as though fully set forth herein.

142.    Feldman denies the allegations about the positions he held.   The remaining

allegations contained in paragraph 142 state conclusions of law to which no response is required.

143.    The allegations contained in paragraph 143 state conclusions of law to which no response is required.

144.    Denied.

145.    Denied.

146.    Denied.

### CLAIM II — INDUCING AND AIDING AND ABETTING YHIL DIRECTORS TO BREACH THEIR FIDUCIARY DUTIES

147.    Feldman incorporates herein by reference all the foregoing paragraphs as though fully set forth herein.

148.    The allegations contained in paragraph 148 state conclusions of law to which no response is required.

149.    Denied.

150.    Denied.

### CLAIM III — BREACH OF CONTRACT

151.    Feldman incorporates herein by reference all the foregoing paragraphs as though fully set forth herein.

152.    Denied.

153.    Denied.

154.    Denied.

### CLAIM IV — PRELIMINARY AND PERMANENT INJUNCTION

155.    Feldman incorporates herein by reference all the foregoing paragraphs as though fully set forth herein.

156.    Denied.

157.    Denied.

158.    Denied.

159.    Denied.

160.    Denied.

161.    Denied.  Feldman affirmatively avers that determining the lawful order of the group cannot possibly harm the Yukos Group.

## AFFIRMATIVE DEFENSES

1.    The Complaint fails to state a claim upon which relief can be granted.

2.    Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations and/or laches.

3.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

4.    Plaintiffs' claims are barred, in whole or in part, by the doctrines of acquiescence and/or estoppel.

5.    Plaintiffs' claims are barred, in whole or in part, by the exculpation provisions of the applicable corporate documents.

6.    Plaintiffs' claims are barred, in whole or in part, by the exculpation provisions of the applicable trust documents.

7.    Plaintiffs' claims are barred, in whole or in part, because each and every one of Feldman's allegedly improper actions were within the powers granted to him as Director/Trustee of the Plaintiffs.

8.    Plaintiffs' claims are barred, in whole or in part, because a director has the rights of inspection and communication, and is privileged to discuss business issues with employees, agents, contractors, and fellow directors.  Directors are entitled to full and complete information

as to the corporation's affairs.   A director's "right of inspection and communication" is not merely a right, but a duty.   It is axiomatic that an individual director cannot make a full contribution to the management of the corporate business unless given access to the corporation's books and records, as well as information that may be available only in verbal form from employees, agents, contractors and fellow directors.   Such information is ordinarily requisite to the exercise of the business judgment required of directors in the performance of their fiduciary duties.   Moreover, in making their examination, directors, like the shareholders, are entitled to expert assistance in order to exercise their privilege effectively and may use the aid of attorneys and accountants, among other professionals.

9.       Plaintiffs' claims are barred, in whole or in part, because each and every one of Feldman's allegedly improper actions amount to an appropriate exercise of independent business judgment and/or reasonable care, skill and diligence.

10.       Plaintiffs' claims are barred, in whole or in part, because each and every one of Feldman's allegedly improper actions did not involve a conflict of interest or involve or constitute the accepting of benefits by Feldman from any third parties.

11.       Plaintiffs' claims are barred, in whole or in part, because to the extent that Feldman owed any duties to the Plaintiffs, he fulfilled such duties.

12.       Plaintiffs' claims are barred, in whole or in part, because each and every one of Feldman's allegedly improper actions were taken for a legitimate business purpose and/or in the best interests of and/or to promote the success of the Plaintiffs.

13.       Plaintiffs' claims are barred, in whole or in part, because Plaintiffs ratified, approved, and/or were aware of all of Feldman's actions with regard to the allegations in the Complaint.

14.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs are estopped by their own conduct from recovering for the causes of action alleged.

15.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs' claims are frivolous, brought in bad faith, and/or are brought for an improper purpose.

16.     Plaintiffs fail to allege a cause of action demonstrating entitlement to attorneys' fees, or the relief sought is not permitted by law.

17.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have at least substantially equal responsibility for the alleged wrongs for which the remedies are sought.

18.     Plaintiffs' claims are barred, in whole or in part, because even assuming wrongdoing by Feldman, which Feldman expressly denies, it was not the proximate cause of Plaintiffs' alleged injuries; Plaintiffs' alleged injuries resulted from prior, intervening, and/or subsequent conditions, causes, or occurrences attributable to Plaintiffs or third parties over whom Feldman exercises no control, and for whom Feldman is not responsible.

19.     Plaintiffs' claims are barred, in whole or in part, because they fail to allege an underlying breach of any fiduciary duties owed by Feldman to any members of the Yukos Group.

20.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot establish that they have no adequate remedy at law or will suffer substantial and irreparable harm as a result of any of the alleged conduct.

21.     Plaintiffs' claims are barred, in whole or in part, because the Complaint fails to allege any basis to support the allegation that Feldman is currently breaching any duties owed to Plaintiffs.

22.     Plaintiffs' claims are barred, in whole or in part, under the doctrine of *in pari*

*delicto*.

23.     Feldman hereby gives notice that he intends to rely on such other affirmative defenses as may become available or apparent during the course of discovery and, therefore, he reserves his right to amend his Answer to assert such defenses.

WHEREFORE, Daniel Caleb Feldman respectfully requests that judgment be entered in his favor and against Plaintiffs and that he be awarded his costs and attorneys' fees.

## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Defendant, Counterclaim-Plaintiff and Third-Party Plaintiff Feldman presents his Counterclaims and Third-Party Complaint against Plaintiffs and Counterclaim-Defendants Yukos Capital, YHIL, Foundation I, Foundation II, Luxtona and Fleischman (collectively, "Counterclaim-Defendants,") and Third-Party Defendants Bruce Kelvern Misamore ("Misamore"), Steven M. Theede ("Theede"), David Andrew Godfrey ("Godfrey"), Marc Fleischman ("Fleischman"), Michel de Guillenchmidt ("Guillenchmidt") (collectively, "Third-Party Director Defendants"), Gretchen King ("King" and with the Third-Party Director Defendants, the "Third-Party Surveillance Defendants"), Financial Performance Holdings B.V. ("FPH"), Fair Oaks Trade and Invest Limited ("Fair Oaks") and Directors Protection Ltd, solely as the Trustee of the Directors Protect Trust ("DPT") (all, collectively, the "Third-Party Defendants").  In support of his Counterclaims and Third-Party Complaint, Feldman alleges the following:

## INTRODUCTION

The Counterclaim and Third-Party Defendants' access to over $2 billion of Yukos-related assets has resulted in unfettered corruption and self-dealing, including the astonishing grant by

Theede to himself of a nearly $50 million so-called "bonus."  While working with the Yukos Group companies, Feldman refused to turn a blind eye to their profligate spending and gross disregard for their mandate to work on behalf of whomever is adjudicated to be the rightful owners of the assets they were charged to protect.  As someone aware of their personal extravagances and their draining of money and assets away from the true beneficiaries, Feldman presented a risk to their scheme.  The Counterclaim and Third-Party Defendants now attempt to divert attention from their wrongdoing by bringing baseless claims against Feldman.  Their action is not only intended to discredit, silence and bankrupt Feldman, but also to send a message to other individuals within the Yukos Group companies that they should remain silent and compliant.  This Court should put an end to the Counterclaim and Third-Party Defendants' misconduct.

## PARTIES

1.       Feldman is an individual and resident of the State of New York.

2.       Yukos Capital is a privately held limited liability company incorporated and existing under the laws of Luxembourg.

3.       YHIL is a privately held limited liability company incorporated and existing under the laws of the British Virgin Islands.

4.       Foundation I is a foundation incorporated under the laws of the Netherlands, having its corporate seat in Amsterdam.

5.       Foundation II is a foundation incorporated under the laws of the Netherlands, having its corporate seat in Amsterdam.

6.       Luxtona is a privately held company organized under the laws of Cyprus, having its registered office in Cyprus.

7.       Godfrey is an individual and resident of the State of California.

8.       Theede is an individual and resident of the State of Texas.

9.       Fleischman is an individual and resident of the State of California.

10.      Misamore is an individual and resident of the State of Texas.

11.      Guillenchmidt is an individual and resident of Paris, France.

12.      King is an individual and resident of the United Kingdom.

13.      FPH is a company organized and existing under the laws of the Netherlands having its corporate seat in Amsterdam.

14.      Fair Oaks is a company organized and existing under the laws of the British Virgin Islands, having its corporate seat in Tortola, British Virgin Islands.

15.      DPT is a trust formed in the British Virgin Islands and is directed by Directors Protection Ltd (a/k/a Directors Protection (PTC) Ltd (BVI)) as Trustee.

## <u>JURISDICTION AND VENUE</u>

16.      Pursuant to 28 U.S.C. § 1332, this Court has diversity jurisdiction over the original Complaint because Plaintiffs and Feldman were citizens and residents of different states and foreign jurisdictions and the amount in controversy was alleged to exceed $75,000, exclusive of interest and costs.

17.      Feldman and the Third-Party Defendants are likewise citizens and residents of different states and foreign jurisdictions and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.      This Court has jurisdiction over the Third-Party Complaint because the suit arises under a federal statute, namely the Computer and Fraud Abuse Act, 18 U.S.C. §§ 1030 <u>et seq.</u> ("CFAA"), in that, among other things, the Third-Party Surveillance Defendants intentionally

accessed computers used for interstate and international commerce and communication, without authorization or by exceeding authorized access to such computers, and by obtaining information from such protected computers.

19.     Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the Counterclaims and Third-Party Complaint because the Counterclaims and Third-Party Complaint are so related to claims in the original Complaint such that they form part of the same case or controversy.

20.     Pursuant to 28 U.S.C. § 1391(b)(2), venue for the Counterclaims and Third-Party Complaint is proper in this District because a substantial part of the events or omissions giving rise to the claims occurred in this District.  For instance, Feldman is a citizen and resident of New York, and in particular the Southern District of New York, some or all of the acts complained of and/or the damages suffered by Feldman occurred here.

21.     Personal jurisdiction over the Third-Party Director Defendants and King is appropriate since, at all relevant times, they have engaged in systematic and continuous contacts with New York, and in particular, the Southern District of New York.  For instance, the Board of Directors of Foundation I and Foundation II met regularly in New York City, and thus the Third-Party Director Defendants themselves have traveled to, and transacted in business in, New York City on matters directly related to the allegations in the Complaint, Counterclaims, and Third-Party Complaint.  In addition, Third-Party Defendant Theede owns an apartment in The Plaza on Central Park South in New York City and regularly spends time there, and Third-Party Defendant Godfrey owns a row house in Manhattan as well.  These and other contacts make the exercise of personal jurisdiction over the Third-Party Defendants appropriate.

## FACTUAL BACKGROUND

22.     Feldman incorporates his denials and responses to the allegations in the Plaintiffs' Complaint, as set forth above, as if set forth expressly herein.

23.     Other information and materials pertinent to Feldman's Counterclaims and Third-Party Claims are set forth below.

**A.     Yukos Oil**

24.     Yukos Oil was an entity organized under the laws of the Russian Federation in 1993.

25.     At one time, Yukos Oil was the fourth largest oil company in the world.  It held the most valuable oil resources of the former Soviet Union and alone accounted for a staggering 2.25% of the entire world's oil production.

26.     In 2003, the Russian Federation alleged that Yukos Oil had perpetrated a massive tax scheme.  The Russian Tax Ministry ("Tax Ministry") contended that Yukos Oil owed $3.4 billion in back taxes, penalties, and interest for the year 2000.  The Tax Ministry then examined Yukos Oil's taxes for the years 2001-2003, and claimed that Yukos Oil had employed the same scheme for those years.  All told, as alleged by the Tax Ministry, Yukos Oil owed back taxes, penalties, and interest exceeding $27 billion.

27.     Disputing these findings, Yukos Oil refused to pay and went bankrupt.  The bankrupt company was split into lots and those lots were sold at bankruptcy auction.

28.     The European Court of Human Rights ruled against Yukos Oil's challenges to the tax assessments in the case styled *OAO Neftyanaya Kompaniya Yukos v. Russia*.  Among other things, the European Court: (1) found that the Russian courts' factual findings supporting the tax assessment proceedings from 2000-2003 were sound and (2) "rejected [Yukos'] claims that [its]

debt had been recognised as a result of an unforeseeable, unlawful and arbitrary interpretation of the domestic law." *See* http://hudoc.echr.coe.int/sites/eng/pages/search.aspx?i=001-106308#{"itemid":["001-106308"]} (last visited on July 21, 2015).

**B.    Bankruptcy Proceedings in the Russian Federation**

29.    In 2007, Russian attorney E. K. Rebgun ("Rebgun") became the court-appointed bankruptcy receiver in the Russian Federation as part of the liquidation of Yukos Oil.  Rebgun announced a public auction of the shares of Yukos Finance B.V. ("Yukos Finance").

30.    In August 2007, PNS participated in the public auction and acquired the shares of Yukos Finance for approximately $307 million under the terms of the auction.  PNS paid the full purchase price to Rebgun on August 31, 2007.  As a result of this purchase, PNS asserted that it was the ultimate beneficiary of Foundation I and the assets beneath it.

31.    In a parallel auction, OAO Rosneft Oil Company ("Rosneft") acquired a lot which included Yukos CIS under the terms of the auction. Rosneft thereafter asserted that it was the ultimate beneficiary of Foundation II and the assets beneath it.

**C.    The Dutch Foundations**

32.    Third-Party Director Defendants Godfrey, Theede, and Misamore, among others, created two Foundations (Stichtings) in the Netherlands: Foundation I and Foundation II.

33.    The Third-Party Director Defendants are using Foundation I to deprive the legitimate stakeholders of Yukos International and Yukos Finance — whomever that may ultimately be determined to be — of any ability to control the governance of those companies. Foundation I was created principally to hold Yukos Oil's international operating assets and cash, including Yukos International — a Yukos Finance subsidiary.  Theede, Misamore and Godfrey, among others, had Foundation I issue "depositary receipts" in Yukos International to Yukos

Finance.  The issuance of depositary receipts purported to deprive Yukos Finance and its then shareholder (based on the auction), PNS, of any ability to control Yukos International's numerous subsidiaries and their valuable assets by placing management of these subsidiaries in the hands of Theede, Misamore and Godfrey, among others, as trustees of Foundation I.

34.     Third-party defendants Theede, Misamore, and Godfrey, among others, also created Foundation II.  Foundation II held the group of companies and assets acquired by Rosneft at the bankruptcy auction.

35.     The current board members for the two Foundations are identical.  They each include the following five board members: Godfrey, Theede, Fleischman, Misamore and Guillenchmidt (the Third-Party Director Defendants).  There are no independent directors on the board.  In addition, Fleischman is Godfrey's college friend.  Fleischman's only employment at the present time is to serve as a member of the Foundations, to serve on the boards of various Yukos Group companies, to serve as trustee of the 2015 Trust and is paid to manage cash positions of the Yukos Group companies.

36.     As set forth in their respective Articles of Association, the Foundations' purpose is to protect the "legitimate stakeholders" of the now-defunct Yukos Oil.  In practice, however, the Third-Party Director Defendants have used the Foundations as a black box to shield their disloyalty and self-dealing from public view.

37.     The legitimate stakeholders for Foundation I are either PNS or the former Yukos Oil shareholders.  The legitimate stakeholders for Foundation II are creditors of the former Yukos Oil including Yukos International.

38.     Under no circumstance are the Foundations' legitimate stakeholders its trustees or the directors and officers of the underlying companies.

39.     Unfortunately, the Third-Party Director Defendants have used all available means to entrench their control of the Foundations' $2 billion worth of assets.  The Third-Party Director Defendants have done so because their positions afford them almost unfettered access to and control of the Foundations' coffers, taking for them themselves extraordinary bonuses, outright payments and extravagant personal expenses.  At the same time, they wield the companies' resources to crush anything and anyone who questions or challenges their continued control and lavish lifestyle.

### D.     The Third-Party Director Defendants' Use the Foundations as a Black Box to Obtain Outright Cash Payments and Engage in Self-Dealing Transactions

40.     The Third-Party Director Defendants force the Foundations to incur more than $50 million each year to support their continued entrenchment in power and their extravagant director and trustee expenses and lifestyles.  The Third-Party Director Defendants' rudderless control of billions of dollars in assets has, over time, corrupted them and caused them to run the Foundations and companies thereunder for their own personal benefit and to prolong the period of their continued control.

41.     While Feldman lacks knowledge of all of the payments and extravagancies Godfrey, Theede, Fleischman, Misamore and Guillenchmidt have lavished upon themselves, the following examples demonstrate how these men have made Yukos Oil a personal slush fund for their lifestyles.

42.     Theede gave himself a nearly $50 million "bonus" with Godfrey and Misamore also receiving millions in "bonuses."

43.     While Feldman was a member of the Fair Oaks Trade and Invest Limited ("Fair Oaks") board of directors, he was asked by Theede for a legal fees reimbursement of approximately $400,000 for a tax issue involving the nearly $50 million "bonus" Theede gave

26

himself from Yukos Anguilla Limited.

44.     The Fair Oaks board sought counsel for Theede's request from Nick Neocleous of Edwin Coe LLP and ultimately decided not to pay the demand.

45.     The decision greatly angered Theede.

46.     As a result, Feldman was removed from the Fair Oaks board.

47.     Shortly thereafter, Theede's legal fees claim was paid.

48.     Feldman believes that the other Third-Party Director Defendants have taken similar "bonuses" from Yukos Group companies.

49.     As described in more detail below, the Third-Party Director Defendants reached an improper undertaking with GML Limited (f/k/a Group Menatep Limited) ("GML") whereby GML would pay the Third-Party Director Defendants a 10% kick-back for all funds the foundations distributed to GML.

50.     Godfrey and other directors have caused the companies to spend millions on "business intelligence."

51.     The head of this business intelligence unit is Gretchen King.

52.     King is paid in excess of one million dollars in annual fees and disbursements and works in the Yukos London office.

53.     Following her hiring, King hired two additional employees formerly employed by Diligence LLC, a New York-based business intelligence firm.

54.     As identified below, King and these two employees are given a nearly unlimited budget and have no corporate restraint.

55.     King engineered the procurement of telephone records of so-called Yukos adversaries.

56.     King engineered the procurement of a laptop computer and hard drive of a Rosneft employee.

57.     King undoubtedly directs the illegal accessing of personal information of Yukos employees and other perceived enemies.

58.     Foundation members, particularly Godfrey and Fleischman, on a regular basis demand lucrative perks from the law firms and banks where the Foundations' money is held including, but not limited to, elite access to various entertainment events.

59.     The Third Party Defendant Directors have churned Yukos' accounts to create fees for their friends.

60.     Misamore, the former CFO of Yukos Oil, and Fleischman have run an extremely inefficient and ineffective investment management policy and have even added a six figure annual payment to Fleischman to oversee this lost cause.

61.     The Foundations and their subsidiaries have unnecessarily rented a luxury penthouse residential apartment in San Francisco across from the St. Regis hotel, for Godfrey to "work" in, although, upon information and belief, it is primarily used for his own personal entertainment.  Godfrey had a similar perk previously when living in Hawaii.

62.     Both Godfrey and Fleischman only fly first class at the top rates, never business class.  This was not allowed under Yukos Oil's travel policy.

63.     When Godfrey and Fleischman travel for Yukos related business, they stay at top luxury brand hotels, not business hotels, expensing room rates of up to $4,500 per night.

64.     Godfrey unnecessarily keeps his own separate attorney on all matters that is paid for by the Yukos Group companies and, upon information and belief, incurs monthly fees in excess of $100,000.  There are no controls in place over legal fees.

65.     Recently, the Foundations conducted a business meeting at a luxury resort on the island of Turks and Caicos.

66.     The Foundation used company funds to charter a private jet to transport the Third-Party Defendant Directors and their significant others to the meeting.  Many service providers travelling from Europe.  The cost of this business meeting likely exceeded $1 million.

67.     Much of this spending is hidden from auditors by the use of a Singaporean company called Mojave East with an operational office in Gibraltar.  Gibraltar is a known jurisdiction with lax audit requirements.

68.     Mojave East has become a non-transparent vehicle to hide questionable disbursements from auditors.

69.     Mojave East has been used to hide funds and used to pay for illegal business intelligence and procurement of illegally obtained evidence, a perversion of the original tax optimization purpose of the company.

E.     **Feldman's Governance Style and Objectives Diverge from the Third-Party Director Defendants' Style and Objectives**

70.     Over time, Feldman's governance style and view of proper corporate objectives diverged from the Third-Party Director Defendants' governance style and objectives.

71.     Whereas Godfrey, Theede, Fleischman, Misamore and Guillenchmidt's governance style was driven by their desire to maximize their own personal gain, Feldman sought to maximize recoveries for both Foundation I and Foundation II, as required by the duties of loyalty and fair dealing inherent in his Yukos-related positions.

72.     One way Feldman attempted to achieve these objectives was to uphold the Intercreditor Agreement between Foundation I and Foundation II (the "Intercreditor Agreement"), through which recoveries of Foundation II would inure to the benefit of

Foundation I to repay lawful debts.

73.     One recent example of Godfrey, Theede, Fleischman, Misamore and Guillenchmidt's self-dealing is inescapable.  Following a recent Dutch Supreme Court ruling, Foundation I was stripped of one of its main arguments against PNS' assertion of ownership over the companies associated with Foundation I.  This spurred Godfrey, Theede, Fleischman, Misamore and Guillenchmidt to action.

74.     Godfrey, Theede, Fleischman, Misamore and Guillenchmidt prematurely and imprudently settled long-standing litigation with Rosneft directed at the ownership of Foundation II.  As part of the Rosneft settlement, Foundation II walked away from over $700 million of recoverable assets.  That abandoned sum would have allowed Foundation II to fulfill its obligations to Foundation I under the Intercreditor Agreement in full.

75.     Rosneft's exit from the litigation left the creditors and former Yukos Shareholders as the only Foundation II beneficiaries.

76.     The Rosneft settlement was driven by Godfrey, Theede, Fleischman, Misamore and Guillenchmidt's self-dealing and conflicted loyalties.

77.     GML was a Yukos Oil shareholder, once holding a 60 to 70% equity position in Yukos Oil, and is a beneficiary of the depository receipts issued by Foundation II.

78.     In a June 2011 letter from GML to Misamore, GML proposed a scheme whereby Theede, Misamore, Godfrey, Fleischman and Guillenchmidt would receive a 10% kick-back on any amounts the foundations paid to GML.  (GML Letter Agreement, attached as Exhibit 1).

79.     The parties to the GML letter even went so far as to allocate the 10% kick-back: 32.5% to Godfrey, 32.5% to Misamore, 20% to Theede, 7.5% to Fleischman and 7.5% to Guillenchmidt.

80.     The GML Letter Agreement is an improper undertaking by the Foundations, Godfrey, Theede, Fleischman, Misamore and Guillenchmidt because it constitutes clear self-dealing and has manifested itself in such a way as to cause Godfrey, Theede, Fleischman, Misamore and Guillenchmidt to prefer GML and their own self-interests over the interests of the Foundations and other lawful creditors and beneficiaries.

81.     Although Yukos International (and, ultimately, Foundation I) remains an outstanding creditor of Yukos Oil (ultimately, Foundation II) in the amount of $1.15 billion, the boards of Foundation I and Foundation II met during the week of June 15 – 19, 2015 and approved a distribution to GML, *without satisfying the claim of Yukos International*. The proposed distribution to GML includes an initial amount of approximately $260 million. No distributions have been made nor are proposed to be made to minority shareholders.

82.     If, as anticipated, Foundation II ignores its debtor obligations to Foundation I under the Intercreditor Agreement and distributes approximately $260 million to GML, Godfrey, Theede, Fleischman, Misamore and Guillenchmidt will personally profit by as much as $26 million.

83.     When Feldman discovered the secret GML Letter Agreement, he objected to the scheme.

84.     He strongly objected to these illicit and faithless tactics and objectives. As a result, the parties' relationship was then irreconcilably broken and Feldman was terminated from his positions with the Yukos-related companies.

85.     Thereafter, Feldman began to experience a retaliatory smear campaign started by Godfrey, Theede, Fleischman, Misamore and Guillenchmidt.

31

**F.** **The Third-Party Director Defendants Begin to Punish Feldman**

86.     The Plaintiffs/Counterclaim-Defendants and Third-Party Director Defendants have defamed Feldman on repeated occasions, both through slander and libel, by communicating and publishing both orally and in writing, vicious lies about him to third parties.

87.     The Plaintiffs/Counterclaim-Defendants and Third-Party Director Defendants have verbally alleged to business associates in the United States, the United Kingdom, the Netherlands, and the Russian Federation that Feldman embezzled funds from the Plaintiffs.  This is false.

88.     Through an authorized agent, the Third-Party Director Defendants told Ali Naini ("Naini") both verbally and in writing via email, on or about June 18, 2015, that Feldman attempted to use his Yukos position to gain secret and illicit personal fees.  Specifically, this agent told Naini both verbally and in writing that, "[t]he name of the fund where Daniel [Feldman] was seeking to use his Yukos position to gain ongoing personal fees was Fontaine." This is false.

89.     Through an authorized agent, the Third-Party Director Defendants told Naini both verbally and in writing via email, on or about June 18, 2015, that Feldman was removed from the Board of Intelligent Energy for ethical violations. This is false.

90.     The Plaintiffs/Counterclaim-Defendants and Third-Party Director Defendants have verbally alleged to business associates in the United States, the United Kingdom, the Netherlands, and the Russian Federation that Feldman took bribes when he was affiliated with the Third-Party Defendants.  This is false.

91.     The Plaintiffs/Counterclaim-Defendants and Third-Party Director Defendants have verbally alleged to business associates in the United States, the United Kingdom, the

Netherlands, and the Russian Federation that Feldman was fired from his former job as a Senior Attorney in the Enforcement Division of the United States Securities and Exchange Commission (the "SEC").  This is false.

92.     These falsehoods were told as part of an orchestrated campaign to smear and discredit Feldman in light of his departure from his former positions related to the Plaintiffs, and in light of his disagreement with the Third-Party Director Defendants' faithless, illegal tactics as described herein.

93.     These false statements have injured Feldman in his trade, business, and profession, as they essentially accuse Feldman of fraud, embezzlement, and other severe crimes, all of which allegations are false.

94.     The campaign against Feldman is intended by the Third Party Defendants as an example to other Yukos Group employees.

> **G.     The Unauthorized Obtaining of Confidential and Privileged Electronic and Digital Information by Plaintiffs/Counterclaim-Defendants and Third-Party Surveillance Defendants**

95.     The Plaintiffs/Counterclaim-Defendants and Third-Party Surveillance Defendants have engaged in a widespread practice of obtaining, illegally and without authorization, confidential and privileged electronic and digital information from Feldman and others, including companies and individuals affiliated with PNS and Rosneft.

96.     The Yukos Group obtained Richard Deitz's telephone records.

97.     The Yukos Group obtained Robert Foresman's telephone records.

98.     The Yukos Group obtained Steven Lynch's telephone records.

99.     In so doing, the Plaintiffs/Counterclaim-Defendants and Third-Party Surveillance Defendants have violated the prohibition against (1) the unauthorized accessing (2) of a

"protected" computer (3) with the intent either (a) to obtain information, or (b) to further a fraud, or (c) to damage the protect computer or its data.

100.    To the extent he was aware of them, Feldman objected to these illegal and unauthorized tactics.

101.    These tactics included (1) access without authorization, (2) unauthorized access, and (3) exceeding authorized access of Feldman's personal email address and protected computers.

102.    These tactics included (1) access without authorization, (2) unauthorized access, and (3) exceeding authorized access of the protected computers of persons associated with Rosneft.

103.    These tactics included (1) access without authorization, (2) unauthorized access, and (3) exceeding authorized access of the protected computers of persons associated with PNS

104.    These tactics included (1) access without authorization, (2) unauthorized access, and (3) exceeding authorized access of the protected computers of persons associated with other perceived enemies.

105.    Feldman's computer and the computers of the principals of PNS and other perceived enemies were "protected" computers in the sense that these computers and the conduct at issue involved interstate or international communications.

106.    This misconduct also relates to unauthorized access to computer systems, theft of computers, interruption of computer services, and misuse of computer system information as well as other electronically and digitally stored information, including cell phone and telephone records.

107.    The Plaintiffs/Counterclaim-Defendants and Third-Party Surveillance Defendants,

directly and through their authorized agents, have, *inter alia*, misappropriated Feldman's personal emails from his private accounts, misappropriated business emails dated later than September 12, 2012, and, based upon information and belief, illegally accessed his cell phone and other electronic records. They took similar actions against persons associated with both PNS, Rosneft and their employees.

108.    The    Plaintiffs/Counterclaim-Defendants    and    Third-Party    Surveillance Defendants' tactics were unauthorized and illegal but perhaps not surprising, given among other things that *comradekoba@\*\*\*\*\*\*\*.com* has been Third-Party Defendant Godfrey's business email address at all relevant times.

109.    As if this insight into Godfrey's tactics wasn't clear enough, the license plate on his personal vehicle, a turbo Porsche Panamera is "T KOBA" which is short for Tovarisch Koba.

110.    Josef Stalin used many aliases throughout his revolutionary career, including the nickname "Koba." This became Stalin's favorite nickname and he was often referred to as "Comrade Koba" or "Tovarisch Koba"

111.    In a fitting and telling move, Third-Party Defendant Godfrey adopted and has been using Josef Stalin's nickname at all relevant times herein.

112.    The Third-Party Surveillance Defendants are obviously engaged in modern-day, quasi-Stalinesque monitoring tactics against their perceived enemies, in violation of federal and state law and enjoy employing Stalinesque intimidation and threats as a means to ensure compliance and obedience among so-called junior managers and employees.

### H.    Feldman's Right to Advancement and Indemnification

113.    Yukos Group directors and officers and Foundation trustees are entitled to indemnification under the entities' charter documents.    In addition, each of the

Plaintiff/Counterclaim-Defendant entities maintains a separate contractual obligation to indemnify their directors and officers.  Nonetheless, the Third-Party Director Defendants wanted additional protections.

114.    Beginning in 2008, the responsible Third-Party Director Defendants established broad advancement and indemnification arrangements to protect themselves from anticipated litigation costs and potential liability.

115.    Specifically, the responsible Third-Party Director Defendants established and funded a separate company and trust to ensure that funds would be available for advancement and indemnification for years to come.

116.    The contractual advancement and indemnification rights were granted to all YHIL directors and officers and Foundation II trustees and officers.

117.    Advancement and indemnification was assured to the directors, officers and trustees regardless of whether the litigation was initiated against them by YHIL or Foundation II.

118.    As a director and officer of the various Yukos Group entities and an officer of the Foundations, Feldman was afforded broad advancement and indemnification rights under both the entities' charter documents and the numerous indemnification agreement and arrangements.

119.    One such indemnification arrangement was the May 20, 2008 agreement between Financial Performance Holdings B.V. ("FPH") and Feldman (the "FPH Agreement").

120.    Pursuant to the FPH Agreement, FPH is obligated to indemnify Feldman for any and all liability imposed upon Feldman by reason of his service as an YHIL director or Foundation II trustee/officer.  Specifically, the FPH Agreement sets forth the following:

> [FPH] hereby indemnifies and undertakes to hold harmless the Indemnitee [Feldman] from and against (a) any and all liabilities imposed on him, including judgments, fines and penalties, (b) any and all expenses, including costs and attorneys' fees, reasonably

> incurred or paid by him, and (c) any and all amounts paid in
> settlement by him, in connection with any claim, action or suit or
> other proceeding, whether instituted by a Group Company, the
> Indemnitee or any third party, in which he becomes involved as a
> party or otherwise by virtue of having been a director
> ('*bestuurder*') of Financial and/or another Group Company and his
> actions or omissions in that position, prior to and/or after the date
> of this Letter.  For the avoidance of doubt: the foregoing shall
> apply equally if the Indemnitee becomes involved in any claim,
> action, suit or other proceeding as an affected party
> ('*belanghebbende*') by his own account, and such involvement can
> reasonably be expected to be considered in the Indemnitee's best
> interest.

121.    The FPH Agreement defined "Group Company" to include the Foundation II,

YHIL, FPH and Fair Oaks Trade and Invest Limited.

122.    The rights afforded Feldman under the FPH Agreement include both

indemnification and advancement of expenses, costs and attorneys' fees, to be paid within seven

(7) days of Feldman presenting FPH with an itemized list of the expenses incurred.

123.    In addition, Feldman is entitled to require FPH to pay all costs associated with

"proceedings in respect of the establishment of [FPH's] obligation to indemnify . . ." within ten

(10) days of Feldman's submission of a statement by him requesting the advance payment.

124.    Another indemnification agreement was executed between Feldman and Fair

Oaks Trade and Invest Limited ("Fair Oaks") on June 19, 2008 (the "Fair Oaks Agreement").

125.    Pursuant to the Fair Oaks Agreement, Fair Oaks is obligated to indemnify

Feldman for any and all liability imposed upon Feldman by reason of his service as an YHIL

director or Foundation II trustee/officer.  Specifically, the Fair Oaks Agreement sets forth the

following:

> Fair Oaks hereby indemnifies and undertakes to hold harmless the
> Indemnitee [Feldman] from and against (a) any and all liabilities
> imposed on him, including judgments, fines and penalties, (b) any
> and all expenses, including costs and attorneys' fees, reasonably
> incurred or paid by him, and (c) any and all amounts paid in

settlement by him, in connection with any claim, action or suit or other proceeding, whether instituted by a Group Company, the Indemnitee or any third party, in which he becomes involved as a party or otherwise by virtue of having been a director ('*bestuurder*') of Financial and/or another Group Company and his actions or omissions in that position, prior to and/or after the date of this Letter.  For the avoidance of doubt: the foregoing shall apply equally if the Indemnitee becomes involved in any claim, action, suit or other proceeding as an affected party ('*belanghebbende*') by his own account, and such involvement can reasonably be expected to be considered in the Indemnitee's best interest.

126.    The Fair Oaks Agreement defined "Group Company" to include the Foundation II, YHIL, FPH and Fair Oaks.

127.    The rights afforded Feldman under the Fair Oaks Agreement include both indemnification and advancement of expenses, costs and attorneys' fees, to be paid within seven (7) days of Feldman presenting Fair Oaks with an itemized list of the expenses incurred.

128.    In addition, Feldman is entitled to require Fair Oaks to pay all costs associated with "proceedings in respect of the establishment of Fair Oaks' obligation to indemnify . . ." within ten (10) days of Feldman's submission of a statement by him requesting the advance payment.

129.    Another arrangement the Third-Party Director Defendants established for advancement and indemnification was the Directors Protection Trust ("DPT").

130.    The DPT recitals make it clear that the DPT's purpose is to defray certain liabilities that the beneficiaries (of which Feldman is one) may incur as a result of being a director, employee, adviser or consultant to a Yukos Group company.

131.    Indemnification agreements were a standard operating procedure for all officers and directors in Yukos-related entities.  Indeed, the Third-Party Director Defendants themselves are parties to two 100-year, $20 million dollar indemnification agreements totaling $40 million

relating to their various roles in Yukos-related companies.

132.    Further demand by Feldman for advancement and indemnification under the charter documents, contracts and trust is excused as futile given the Third-Party Director Defendants' past conduct.  Specifically, the Third-Party Director Defendants are in a hopelessly conflicted position given their role as decision-makers under the operative indemnification mechanisms and their position in this litigation.  Moreover, the Third-Party Director Defendants have already refused to advance or indemnify Feldman for the Dutch Rosneft Action after he was terminated as a director in October 2014.  Feldman was forced to hire and compensate a Dutch attorney after his Yukos Group appointed attorney resigned due to an alleged conflict of interest.  The alleged conflict was that this attorney had long represented Yukos Group companies and Feldman and could no longer represent Feldman following the settlement with Rosneft.  This attorney continues to represent Yukos Group companies.  Feldman has spent approximately 20,000 euros to date for hiring of counsel for the Dutch Rosneft Action.

133.    Plaintiffs waived exclusive jurisdiction in the Netherlands or elsewhere and placed indemnification at issue in this forum by filing suit against Feldman in this Court alleging that he breached his fiduciary duties.

## COUNTERCLAIMS

### COUNT I
**(Defamation: Slander and Slander *Per Se*)**
**(Against Plaintiffs/Counterclaim-Defendants)**

134.    Feldman incorporates all of the foregoing paragraphs, as if set forth expressly herein.

135.    The Plaintiffs/Counterclaim-Defendants and their authorized agents have

slandered Feldman, i.e., they have engaged in spoken defamation against him.

136.    As set forth above, the Plaintiffs/Counterclaim-Defendants and their authorized agents have verbally and otherwise told business associates and others in the United States, the United Kingdom, the Netherlands and the Russian Federation that Feldman embezzled money, took bribes, was fired from his job with the SEC, sought secret and illicit payments while holding Yukos-related positions, and was terminated from his employment at Intelligent Energy because of ethical violations, when in fact none of these statements is true.

137.    These statements were false and defamatory.

138.    These statements were published without privilege or authorization to a third party.

139.    These statements involve fault as judged by, at minimum, a negligence standard, but which were in fact intentional and fraudulent.

140.    These false statements charge Feldman with a serious crime and tend to injure him in his trade, business, and profession.

141.    As a direct and proximate result of this slander, Feldman has suffered both general and special damages in that his personal and professional reputation has suffered, others now perceive him as a criminal and thief, and Feldman has been denied business opportunities that otherwise would have been available to him.

142.    Feldman has been damaged in an amount to be determined at trial.

## COUNT II
### (Defamation: Libel)
### (Against Plaintiffs/Counterclaim-Defendants)

143.    Feldman incorporates all of the foregoing paragraphs, as if set forth expressly herein.

144.    The Plaintiffs/Counterclaim-Defendants and their authorized agents have libeled Feldman, i.e., they have engaged in written defamation against him.

145.    As set forth above, the Plaintiffs/Counterclaim-Defendants and their authorized agents have verbally, in writing and otherwise told business associates and others in the United States, the United Kingdom, the Netherlands and the Russian Federation that Feldman embezzled money, took bribes, was fired from his job with the SEC, sought secret and illicit payments while holding Yukos-related positions, and was terminated from his employment at Intelligent Energy because of ethical violations, when in fact none of these statements is true.

146.    These statements were false and defamatory.

147.    These statements were published without privilege or authorization to a third party.

148.    These statements involve fault as judged by, at minimum, a negligence standard, but which were in fact intentional and fraudulent.

149.    These false statements charge Feldman with a serious crime and tend to injure him in his trade, business, and profession.

150.    As a direct and proximate result of this slander, Feldman has suffered both general and special damages in that his personal and professional reputation has suffered, others now perceive him as a criminal and thief, and Feldman has been denied business opportunities that otherwise would have been available to him.

151.    Feldman has been damaged in an amount to be determined at trial.

## COUNT III
### (Breach of Contract)
**(Against Yukos Capital, YHIL, Foundation I, Foundation II, Luxtona and Fleischman)**

152.    Feldman incorporates all of the foregoing paragraphs, as if set forth expressly

herein.

153.     As identified herein, the charter documents of Yukos Capital, YHIL, Foundation I, Foundation II, Luxtona and the 2015 Trust and separate contractual undertakings entitle Feldman to indemnification of any and all liability imposed upon him by reason of his service as a director, trustee or officer.   These rights include the right of advancement for his costs, expenses and attorneys' fees.

154.     As identified herein, Yukos Capital, YHIL, Foundation I, Foundation II, Luxtona and the 2015 Trust breached their obligations under the charter documents and contracts.

155.     As a direct and proximate result of the foregoing, Feldman has and continues to suffer damages in the form of the denial of his advancement and indemnification rights under the charter documents and contracts.

156.     Feldman has been damaged in an amount to be determined at trial.


## COUNT IV
### (Declaratory Judgment)
### (Against Foundation I and Foundation II)

157.     Feldman incorporates all of the foregoing paragraphs, as if set forth expressly herein.

158.     This Court has jurisdiction to render declaratory relief pursuant to 28 U.S.C. § 2201.

159.     As identified herein, the GML Letter Agreement was an improper undertaking by the Foundations' trustees.

160.     Given its status as an improper undertaking, Feldman cannot be held liable for its alleged unlawful disclosure.

161.     As a result, Feldman is entitled to a declaration that: (i) the GML Letter Agreement was an improper undertaking and (ii) Feldman is not liable for its disclosure.

WHEREFORE, Feldman respectfully requests that the Court enter judgment in his favor and against the Plaintiffs, Counterclaim- Defendants and award him a Judgment as follows:

A.     An award of compensatory damages in an amount to be determined at trial;

B.     An award of punitive damages in an amount sufficient to punish and deter similar conduct in the future;

C.     An award of pre- and post-judgment interest;

D.     An award of attorneys' fee and costs; and

E.     Such other or further relief that the Court deems just and proper, in law or in equity.

### THIRD-PARTY COMPLAINT

### COUNT I
**(Slander and Slander *Per Se*)**
**(Against Third-Party Director Defendants)**

162.     Feldman incorporates all of the foregoing paragraphs, as if set forth expressly herein.

163.     The Third-Party Director Defendants and their authorized agents have slandered Feldman, i.e., they have engaged in spoken defamation against him.

164.     As set forth above, the Third-Party Director Defendants and their authorized agents have verbally and otherwise told business associates and others in the United States, the United Kingdom, the Netherlands and the Russian Federation that Feldman embezzled money, took bribes, was fired from his job with the SEC, sought secret and illicit payments while

holding Yukos-related positions, and was terminated from his employment at Intelligent Energy because of ethical violations, when in fact none of these statements is true.

165.     These statements were false and defamatory.

166.     These statements were published without privilege or authorization to a third party.

167.     These statements involve fault as judged by, at minimum, a negligence standard, but which were in fact intentional and fraudulent.

168.     These false statements charge Feldman with a serious crime and tend to injure him in his trade, business, and profession.

169.     As a direct and proximate result of this slander, Feldman has suffered both general and special damages in that his personal and professional reputation has suffered, others now view him as a criminal and thief, and Feldman has been denied business opportunities that otherwise would have been available to him.

170.     Feldman has been damaged in an amount to be determined at trial.

## COUNT II
### (Defamation: Libel)
### (Against Third-Party Director Defendants)

171.     Feldman incorporates all of the foregoing paragraphs, as if set forth expressly herein.

172.     The Third-Party Director Defendants and their authorized agents have libeled Feldman, i.e., they have engaged in written defamation against him.

173.     As set forth above, the Third-Party Director Defendants and their authorized agents have verbally, in writing and otherwise told business associates and others in the United States, the United Kingdom, the Netherlands and the Russian Federation that Feldman

embezzled money, took bribes, was fired from his job with the SEC, sought secret and illicit payments while holding Yukos-related positions, and was terminated from his employment at Intelligent Energy because of ethical violations, when in fact none of these statements is true.

174.   These statements were false and defamatory.

175.   These statements were published without privilege or authorization to a third party.

176.   These statements involve fault as judged by, at minimum, a negligence standard, but which were in fact intentional and fraudulent.

177.   These false statements charge Feldman with a serious crime and tend to injure him in his trade, business, and profession.

178.   As a direct and proximate result of this slander, Feldman has suffered both general and special damages in that his personal and professional reputation has suffered, others now perceive him as a criminal and thief, and Feldman has been denied business opportunities that otherwise would have been available to him.

179.   Feldman has been damaged in an amount to be determined at trial.

### COUNT III
**(Breach of Contract)**
**(Against FPH, Fair Oaks and DPT)**

180.   Feldman incorporates all of the foregoing paragraphs, as if set forth expressly herein.

181.   As identified herein, Feldman, FPH, Fair Oaks and DPT entered into indemnification arrangements whereby FPH, Fair Oaks and DPT agreed to advance and indemnify Feldman for any and all liability imposed upon him by reason of his service as an YHIL director and officer or Foundation II trustee.

182.    These indemnification arrangements entitle Feldman to advance payment and complete indemnification for all his costs, expenses (including attorneys' fees), and judgments incurred in any litigation, including the present litigation.

183.    Feldman satisfied all conditions under the indemnification arrangements.

184.    As identified herein, FPH, Fair Oaks and DPT breached their obligations under the indemnification arrangements.

185.    Feldman is entitled to a recovery of the costs and fees he incurs in pursuit of his advancement and indemnification rights.

186.    As a direct and proximate result of the foregoing, Feldman has and continues to suffer damages in the form of the denial of his advancement and indemnification rights under the indemnification arrangements.

187.    Feldman has been damaged in an amount to be determined at trial.

## COUNT IV
### (Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq.)
### (Against Third-Party Surveillance Defendants)

188.    Feldman incorporates all of the foregoing paragraphs, as if set forth expressly herein.

189.    The Third-Party Surveillance Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq. ("CFAA"), by intentionally accessing computers and computerized mobile devices, including cell phones used for interstate and international commerce and communication, without authorization or by exceeding authorized access to such computers and computerized mobile devices, including cell phones, and by obtaining information from such protected computers.  The Third-Party Surveillance Defendants were involved in such unlawful conduct and/or received such wrongfully obtained information to the

detriment of Feldman, of persons associated with PNS, and other perceived enemies.

190.    As set forth above, the Third-Party Surveillance Defendants, *inter alia*, misappropriated Feldman's personal emails from his private accounts, misappropriated emails dated later than September 12, 2012, and, upon information and belief, illegally accessed his cell phone, telephone, and other electronic records. They did the same with respect to persons associated with PNS and other perceived enemies.

191.    The computer system or systems that the Third-Party Surveillance Defendants accessed as described above constitute "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2).

192.    Feldman has suffered damages and loss by reason of these violations, including, without limitation, harm to Feldman's data, programs, and computer systems and other losses and damage in an amount to be proved at trial, but, in any event, in an amount well over $5,000 (Five Thousand Dollars) aggregated over a one-year period.

193.    As a direct and proximate result, Feldman and the other victims suffered injuries to their person, business and property.

194.    The Third-Party Surveillance Defendants' unlawful access to and theft from the computers of Feldman, PNS, and other perceived enemies, have caused them irreparable injury. Unless restrained and enjoined, the Third-Party Surveillance Defendants will continue to commit such acts insofar as they may still have access to Feldman's systems. Feldman's remedy at law is not adequate to compensate him for these inflicted and threatened injuries, entitling Feldman to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

195.    Feldman is entitled to damages in an amount not less than $5,000 (Five Thousand Dollars).

196.     Moreover, the Third-Party Surveillance Defendants should be required to identify

and disclose to Feldman and all other individuals and entities against whom the Third-Party

Surveillance Defendants engaged in such misconduct that they invaded their privacy, and to

disgorge to these individuals and entities all information, data, and other materials obtained

pursuant to such misconduct.

### COUNT V
### (Trespass to Chattels)
### (Against Third-Party Surveillance Defendants)

197.     Feldman incorporates all of the foregoing paragraphs, as if set forth expressly

herein.

198.     The Third-Party Surveillance Defendants have committed trespass to chattels of

Feldman.

199.     The essential elements of trespass to chattels are (1) intent, (2) physical

interference with (3) possession (4) resulting in harm.

200.     The Third-Party Surveillance Defendants intentionally accessed computers and

computerized mobile devices, including cell phones used for interstate and international

commerce and communication, without authorization or by exceeding authorized access to such

computers and computerized mobile devices, including cell phones, and by obtaining

information from such protected computers.   The Third-Party Surveillance Defendants were

involved in such unlawful conduct and/or received such wrongfully obtained information to the

detriment of Feldman, the persons associated with PNS, and other perceived enemies.

201.     As set forth above, the Third-Party Surveillance Defendants, *inter alia*,

misappropriated Feldman's personal emails from his private accounts, misappropriated emails

dated later than September 12, 2012, and, upon information and belief, illegally accessed his cell

phone and other electronic records.  They did the same with respect to persons associated with PNS and other perceived enemies.

202.    This intentional interference violated Feldman's possession of such chattels.

203.    The computer system or systems that the Third-Party Surveillance Defendants accessed as described above constitute "protected computers" and chattels.

204.    Feldman has suffered damages and loss by reason of these violations, including, without limitation, harm to Feldman's data, programs, and computer systems and other losses and damage in an amount to be proved at trial, but, in any event, in an amount well over $5,000 aggregated over a one-year period.

205.    The Third-Party Surveillance Defendants' unlawful access to and theft from the computers of Feldman, PNS, and other perceived enemies, have caused them irreparable injury. Unless restrained and enjoined, the Third-Party Surveillance Defendants will continue to commit such acts insofar as they may still have access to Feldman's systems. Feldman's remedy at law is not adequate to compensate him for these inflicted and threatened injuries, entitling Feldman to remedies including injunctive relief.

WHEREFORE, Feldman respectfully requests that the Court enter judgment in his favor and against the Third-Party Defendants and award him a Judgment as follows:

A.    Against the Third-Party Surveillance Defendants, an award of statutory compensatory damages in an amount not less than $5,000;

B.    Against the Third-Party Surveillance Defendants, an order requiring that they identify and disclose to Feldman and to all other individuals and entities against whom the Third-Party Surveillance Defendants engaged in such misconduct the fact of the surveillance, and to disgorge to all these individuals and entities all information, data, and other materials obtained or

created pursuant to such misconduct;

C.      Against the Third-Party Surveillance Defendants, an order permanently enjoining them from unlawfully accessing computers, email and computerized mobile devices, including cell phones and the records thereof;

D.      Against the Third-Party Surveillance Defendants, an award of punitive damages in an amount sufficient to punish and deter such conduct in the future;

E.      Against all Third-Party Defendants, an award of compensatory damages in an amount to be determined at trial;

F.      An award of pre- and post-judgment interest;

G.      An award of attorneys' fee and costs; and

H.      Such other or further relief that the Court deems just and proper in law or in equity.

## **JURY TRIAL DEMAND**

Defendant, Counterclaim-Plaintiff and Third-Party Plaintiff Daniel Caleb Feldman hereby demands a jury trial on all claims so triable in the Plaintiffs' Complaint and in this pleading.

Dated: July 21, 2015                              Respectfully submitted,

                                                  BAILEY & GLASSER, LLP


                                                   /s/ Athanasios  Basdekis
                                                  Athanasios Basdekis (AB2574)
                                                  Brian A. Glasser (*pro hac vice* forthcoming)
                                                  Russell M. Soloway (*pro hac vice* forthcoming)
                                                  209 Capitol Street
                                                  Charleston, WV 25301
                                                  (304) 345-6555 (telephone)
                                                  (304) 342-1110 (facsimile)
                                                  tbasdekis@baileyglasser.com
                                                  bglasser@baileyglasser.com
                                                  rsoloway@baileyglasser.com

                                                  *Counsel for Defendant, Counterclaim*
                                                  *Plaintiff and Third-Party Plaintiff*
                                                  *Daniel Caleb Feldman*