UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————

| | |
|---|---|
| YUKOS CAPITAL, S.A.R.L., et al., §<br>§<br>§<br>   Plaintiffs, §<br>§<br>   v. §<br>§<br>DANIEL CALEB FELDMAN, §<br>§<br>   Defendant. § | Case No. 15-4964-LAK |

—————————————————————

DANIEL CALEB FELDMAN, §
§
   Counterclaim-Plaintiff, §
§
   v. §
§
YUKOS CAPITAL S.A.R.L., et al., §
§
   Counterclaim-Defendants. §

—————————————————————

DANIEL CALEB FELDMAN, §
§
   Third-Party Plaintiff, §
§
   v. §
§
DAVID GODFREY, et al., §
§
   Third-Party Defendants. §

—————————————————————

**DEFENDANT/COUNTERCLAIM-PLAINTIFF DANIEL CALEB FELDMAN'S
ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR
<u>PRELIMINARY INJUNCTION, SEALING ORDER, AND EXPEDITED DISCOVERY</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 3

    A.   The Parties ............................................................................................................ 3

        1.    YHIL – A British Virgin Islands Company ........................................... 3

        2.    Foundation I and Foundation II – Both Dutch Stichting Foundations ................... 3

        3.    Mr. Feldman – YHIL Director and Foundation Recording Secretary .................. 5

    B.   Yukos Oil's Tax Fraud and Resulting Bankruptcy Sale ................................................ 5

    C.   The Third-Party Director Defendants Form the Foundations ......................................... 6

    D.   The Foundation Meeting Minutes .................................................................................... 8

    E.   Feldman Did Not Serve Yukos as an Attorney and the
        Georgiades Political Contribution was Approved by the YHIL
        Board and Initially Approved by Godfrey ........................................................................ 9

    F.   Following Mr. Feldman's Yukos Service, Yukos Proposes a Lucrative
        Severance Proposal ........................................................................................................ 10

    G.   Plaintiffs' Complaint Against Mr. Feldman ................................................................... 12

    H.   Plaintiffs' Request for Interim Injunctive Relief ........................................................... 13

ARGUMENT ............................................................................................................................... 16

I.    PLAINTIFFS COMPLETELY FAILED TO DEMONSTRATE
    THAT THEY ARE ENTITLED TO INTERIM INJUNCTIVE RELIEF ...………………15

    A.   Plaintiffs Argue the Wrong Merits and Those Arguments They
        do Present are not Well-Founded ................................................................................... 17

        1.    Mr. Feldman Was Not the Source for the Meeting Minutes ................................. 17

        2.    Plaintiffs Apply the Wrong Law to their Claims ................................................. 18

        3.    The Foundations' Board Meetings and Minutes Were Not
            Confidential and do not Contain Confidential Information ................................. 21

    B.   Plaintiffs Fail to Make an Adequate Showing of Irreparable Harm ............................. 24

    C.   The Balance of Equities and the Public Interest Favor Mr. Feldman ............................ 25

i

II.   PLAINTIFFS' REQUEST TO SEAL WAS DENIED AND, IF
      CONTESTED AGAIN, SHOULD BE SIMILARLY DENIED ........................................... 26

III.  PLAINTIFFS ARE NOT ENTITLED TO EXPEDITED DISCOVERY .............................27

CONCLUSION .............................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

Babcock v. Jackson,
12 N.Y.2d 473 (N.Y. 1963) ...................................................20

In re BP P.L.C. Deriv. Litig.,
507 F. Supp. 2d 302 (S.D.N.Y. 2007).....................................19

Cantor Fitzgerald Inc. v. Luntnick,
313 F.3d 704 (2d Cir. 2002).....................................18

Cedar Swamp Holdings, Inc. v. Zaman,
472 F. Supp. 2d 591 (S.D.N.Y. 2007)......................................16

Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.,
414 F.3d 325 (2d Cir. 2005)......................................19, 20

In re Hydrogen, LLC,
421 B.R. 337 (Bankr. S.D.N.Y. 2010)...............................19, 20

Internat'l Elec., Inc. v. Media Syndication Global, Inc.,
2002 WL 1897661 (S.D.N.Y. Aug. 17, 2002).......................18

Markowitz Jewelry Co. v. Chapal/Zenray, Inc.,
988 F.Supp. 404 (S.D.N.Y.1997) ..........................................16

Naden v. Numerex Corp.,
593 F. Supp. 2d 675 (S.D.N.Y. 2009)....................................16

Nat'l Council of Arab Americans v. City of New York,
331 F. Supp. 2d 258 (S.D.N.Y. 2004)..............................25, 26

Schultz v. Boy Scouts of Am., Inc.,
65 N.Y.2d 189 (N.Y. 1985) ...................................................20

Vringo, Inc. v. ZTE Corp.,
2015 WL 3498634 (S.D.N.Y. June 3, 2015) .....................16, 17, 18, 25

Winter v. NRDC,
555 U.S. 7 (2008)....................................................16

Zorbas v. US Trust Co. N.A.,
48 F. Supp. 3d 464, 479 (E.D.N.Y. 2014) ..............................19

**Statutes**

Dutch Civil Code, Article 2:285 ................................................................................3, 21

Dutch Civil Code, Article 6:198 ....................................................................................4

**Other Authorities**

Shayndi Raice and Margot Patrick, <u>The Rise of the 'Stichting,' an Obscure
Takeover Defense</u>, The Wall Street Journal, April 22, 2015 ......................................................3

Defendant, Counterclaim-Plaintiff and Third-Party Plaintiff Daniel Caleb Feldman ("Feldman") submits his Answering Brief in Opposition to Plaintiffs Yukos Capital S.A.R.L., Yukos Hydrocarbons Investments Limited ("YHIL"), Stichting Administratiekantoor Yukos International ("Foundation I"), Stichting Administratiekantoor Financial Performance Holdings ("Foundation II"), Luxtona Limited and Marc Fleischman's, as Trustee of the 2015 Security Trust as Successor in Interest to the 2014 Security Trust (collectively, the "Plaintiffs")  motion for preliminary injunction, sealing order, and expedited discovery.  In support of his opposition, Mr. Feldman states the following:

## PRELIMINARY STATEMENT

Plaintiffs' request for a preliminary injunction should be denied and the temporary restraining order dissolved for three reasons.

First, Mr. Feldman was not the source of the alleged improper disclosure of Foundation meeting minutes to OOO Promneftstroy ("PNS").  Plaintiffs' circumstantial case attempting to eliminate all other potential disclosing parties no longer holds water.  Layer on top of Mr. Feldman's decisive evidence the fact that Plaintiffs never attempted to apply the proper law to their claims, it becomes clear that Plaintiffs failed to meet their burden to obtain the requested relief.  In addition to these shortcomings, the complete record surrounding the Foundations' meetings and minutes from the meetings demonstrates that neither were confidential nor were they treated as being confidential.  Even if all the prerequisites were met, a simple review of the minutes placed at issue demonstrates that the contents disclose largely historical facts that are long-since stale when viewed in the present day.

Second, Plaintiffs have not and cannot demonstrate that they would suffer irreparable harm in the absence of injunctive relief.  The simple fact remains that Mr. Feldman did not disclose the meeting minutes to PNS.  Even if Mr. Feldman were connected to the disclosures,

the Foundations function for the limited purpose of administering cash and assets for the benefit of Yukos Oil's legitimate stockholders and creditors.  There can be no showing of irreparable harm when any alleged injury could be remedied by money damages.

Finally, the balance of equities and public interest weigh in favor of denying injunctive relief.  Here, the remaining alleged breaches set forth in Plaintiffs' Complaint – but not specifically argued in the Opening Brief – were known to Plaintiffs in 2009 and 2011.  As a result, any request for equitable relief should be barred by laches.  In addition, the public interest weighs in favor of not affording parties disparate treatment stemming from a request that, for all intents and purposes, would preclude Mr. Feldman from being able to fully defend himself against Plaintiffs' claims.

Given these considerations and the facts and analysis set forth below, the Court should deny Plaintiffs' request for a preliminary injunction, dissolve the temporary restraining order and direct that the bond be released to Mr. Feldman.

Plaintiffs fare not better on their request to seal documents and for expedited discovery. The Court already declined to seal the meeting minutes because Plaintiffs could not identify confidential information within the minutes that had any relevance to the present time.  Given Plaintiffs' abandonment of their request for expedited discovery following the temporary restraining order hearing and their unproven showing on a broader (and fairly contested) preliminary injunction record, it would be unreasonable and improper to award expedited discovery following the preliminary injunction hearing.  As a result, both requests should be denied.

## STATEMENT OF FACTS

**A.    The Parties**

There are only four parties directly relevant to Plaintiffs' motion.

      1.      <u>YHIL – A British Virgin Islands Company</u>

Plaintiff YHIL is a "privately held limited liability company incorporated and existing under the laws of the British Virgin Islands under the International Business Companies Act . . . ." (Plaintiffs' Compl. ¶ 3).  YHIL's registered office is in Tortola, British Virgin Islands.  (<u>Id.</u>).  Plaintiffs expressly allege in their Complaint that "Feldman's service as a director of YHIL was governed by the BVI Companies Act of 2004 (the "BVI Act")."  (<u>Id.</u> at ¶ 28).

      2.      <u>Foundation I and Foundation II – Both Dutch Stichting Foundations</u>

Foundation I is "a foundation incorporated under the laws of the Netherlands." Foundation II is also "a foundation incorporated under the laws of the Netherlands." (Compl. ¶ 4).  Both have their corporate seats in Amsterdam.  (<u>Id.</u>).  Both are Stichtings under Dutch law.

A Dutch Stichting is "[a] centuries-old Dutch legal structure that has become a popular self-defense tool for companies and wealthy individuals . . . ."  Shayndi Raice and Margot Patrick, <u>The Rise of the 'Stichting,' an Obscure Takeover Defense</u>, The Wall Street Journal, April 22, 2015 (specifically referencing Yukos' Foundations) (attached as Exhibit 1).  Under Dutch law, a Stichting or Foundation is a legal person formed by means of a judicial act, that has no members, and has as its purpose to realize an objective identified in its articles of association through the use of capital or property that has been conveyed to the Foundation for that purpose. Dutch Civil Code (*Burgerlijk Wetboek*) Article 2:285 (unofficial translation available at http://www.dutchcivillaw.com/civilcodebook022.htm) (last visited Oct. 26, 2015).  The purpose or objective of a Dutch Stichting may not include making distributions to its incorporators or directors.  <u>Id.</u>

Plaintiffs previously submitted the Foundations' Articles of Association to this Court. (Flynn Aug. 21, 2015 Declaration (Dkt. 28) at Exhibits F and G). For purposes of the instant motion, the Foundations' Articles of Association are substantially similar. Both Foundations' Articles of Association identify that "Members of the board shall be admitted to board meetings as well as any other person granted admission by the board members present at that meeting." (Flynn Aug. 21, 2015 Dec. (Dkt. 28) Exhibit F at Article 6:5 and Exhibit G at Article 6:4) (emphasis added). The Articles of Association contain no express obligation that meeting minutes be kept private or that they be maintained as confidential.

In keeping with Dutch civil law requirements, the Foundations' Articles of Association set forth their objectives. Foundation I's objectives are expressed as follows:

> 1.      The objects of the organization are to acquire and to hold shares in the capital of Yukos International UK B.V., a private company with limited liability having its official seat in Amsterdam at Locatellikade 1, 1076 AZ Amsterdam, registered with the Chamber of Commerce under number 34109466 (the "Company"), under title of administration (*ten titel van administratie*), this against issuance of depositary receipts in respect of shares, to exercise voting rights and other rights attached to the shares, to collect the dividends and other payments in respect of the shares and to make such benefits available to the holders of depositary receipts, and to do all that is related thereto, all this with due observance of the applicable conditions of administration.

> 2.      The foundation will further the interests of the Company, Yukos Oil Company, the other direct or indirect subsidiaries of Yukos Oil Company, which are members of the Group of which the Company is a member, the creditors of Yukos Oil Company who have obtained a final and binding judgment from a Dutch court or a final and binding judgment declared enforceable by a Dutch court against Yukos Oil Company ("Creditors"), shareholders of Yukos Oil company and the directors, officers and employees of the Group of which the Company is a member and will exercise the rights attaching to the shares in such a manner as will safeguard these interests. In order to further these interests the foundation may act as benevolent intervener in another's affairs (*zaakwaarnemer*) pursuant to Article 6:198 of the Dutch Civil Code of Yukos Oil Company, . . .

4

(Flynn Aug. 21, 2015 Dec. (Dkt. 28) Exhibit G at Article 2:1-2).  Foundation II's objectives are substantially the same, but focus on Financial Performance Holdings B.V. as the "Company." (Flynn Aug. 21, 2015 Dec. (Dkt. 28) Exhibit F at Article 2:1-2).  Neither of the Foundations' Articles of Association contemplates as objectives the continued entrenchment of their directors over billions of dollars of cash and assets or maintaining in secrecy the decisions of those directors for the purported benefit of the Yukos Oil stockholders and creditors.

      3.     <u>Mr. Feldman – YHIL Director and Foundation Recording Secretary</u>

Relevant to Plaintiffs' present application for interim injunctive relief, Mr. Feldman had two roles.  First, Mr. Feldman was an YHIL director.  Despite Plaintiffs' careless presentation of the facts and the law, Mr. Feldman was never a Foundation director.  (Feldman Dec. ¶ 4). Instead, Mr. Feldman was a recording Secretary for the Foundations during the Foundation directors' general meetings.  (<u>Id.</u>).

**B.**      **<u>Yukos Oil's Tax Fraud and Resulting Bankruptcy Sale</u>**

Yukos Oil was an entity organized under the laws of the Russian Federation in 1993. (Feldman's Answer, Counterclaims and Third-Party Complaint ("TPC") ¶ 24).  At one time, Yukos Oil was the fourth largest oil company in the world.  (<u>Id.</u> at ¶ 25).  It held the most valuable oil resources of the former Soviet Union and alone accounted for a staggering 2.25% of the entire world's oil production.  (<u>Id.</u>).

In 2003, the Russian Federation alleged that Yukos Oil had perpetrated a massive tax scheme.  (<u>Id.</u> at ¶ 26).  The Russian Tax Ministry ("Tax Ministry") contended that Yukos Oil owed $3.4 billion in back taxes, penalties, and interest for the year 2000.  (<u>Id.</u>).  The Tax Ministry then examined Yukos Oil's taxes for the years 2001-2003, and claimed that Yukos Oil had employed the same scheme for those years.  (<u>Id.</u>).  All told, as alleged by the Tax Ministry, Yukos Oil owed back taxes, penalties, and interest exceeding $27 billion.  (<u>Id.</u>).  Disputing these

findings, Yukos Oil refused to pay and went bankrupt.  (<u>Id.</u> at ¶ 26).  The bankrupt company was split into lots and those lots were sold at bankruptcy auction. (<u>Id.</u>).

The European Court of Human Rights ruled against Yukos Oil's challenges to the tax assessments in the case styled *OAO Neftyanaya Kompaniya Yukos v. Russia*.  (<u>Id.</u> at ¶ 27). Among other things, the European Court: (i) found that the Russian courts' factual findings supporting the tax assessment proceedings from 2000-2003 were sound and (ii) "rejected [Yukos'] claims that [its] debt had been recognized as a result of an unforeseeable, unlawful and arbitrary interpretation of the domestic law." *See* http://hudoc.echr.coe.int/sites/eng/pages/search.aspx?i=001-106308#{"itemid":["001-106308"]} (last visited on Oct. 26, 2015).

In 2007, Russian attorney E. K. Rebgun ("<u>Rebgun</u>") became the court-appointed bankruptcy receiver in the Russian Federation as part of the liquidation of Yukos Oil.  (TPC ¶ 29).  Rebgun announced a public auction of the shares of Yukos Finance B.V. ("<u>Yukos Finance</u>"). (<u>Id.</u>).  In August 2007, PNS participated in the public auction and acquired the shares of Yukos Finance for approximately $307 million under the terms of the auction.  (<u>Id.</u> at ¶ 30). PNS paid the full purchase price to Rebgun on August 31, 2007.  (<u>Id.</u>).  As a result of this purchase, PNS asserted that it was the ultimate beneficiary of Foundation I and the assets beneath it.  (<u>Id.</u>).  In a parallel auction, OAO Rosneft Oil Company ("<u>Rosneft</u>") acquired a lot which included Yukos CIS under the terms of the auction.  (<u>Id.</u> at ¶ 31).  Rosneft thereafter asserted that it was the ultimate beneficiary of Foundation II and the assets beneath it.  (<u>Id.</u>).

**C.**      **<u>The Third-Party Director Defendants Form the Foundations</u>**

Third-Party Director Defendants Godfrey, Theede, and Misamore, among others, created the two Stichtings Foundations in the Netherlands:  Foundation I and Foundation II.  (<u>Id.</u> at ¶ 32).  The Third-Party Director Defendants (Misamore having been recently removed) are using

Foundation I to deprive the legitimate stakeholders of Yukos International and Yukos Finance — whomever that may ultimately be determined to be — of any ability to control the governance of those companies.  (Id. at ¶ 33).  Foundation I was created principally to hold Yukos Oil's international operating assets and cash, including Yukos International.  (Id.).  Theede, Misamore and Godfrey, among others, had Foundation I issue "depositary receipts" in Yukos International to Yukos Finance.  (Id.).  The issuance of depositary receipts purported to deprive Yukos Finance and its then shareholder (based on the auction), PNS, of any ability to control Yukos International's numerous subsidiaries and their valuable assets by placing management of these subsidiaries in the hands of Theede, Misamore and Godfrey, among others, as trustees of Foundation I.  (Id.).  Third-Party Defendants Theede, Misamore, and Godfrey, among others, also created Foundation II.  (Id. at ¶ 34).  Foundation II held the group of companies and assets acquired by Rosneft at the bankruptcy auction.  (Id.).

The current board members for the two Foundations are identical.  They each include the following four board members: Godfrey, Theede, Fleischman and Guillenchmidt (the "Third-Party Director Defendants").  (Id. at ¶ 35) (Misamore having been recently removed).  Mr. Feldman was never a Foundations director.  (Feldman Dec. ¶ 4).  Unfortunately, the Third-Party Director Defendants have used all available means to entrench their control of the Foundations' $2 billion worth of assets.  (TPC ¶ 39).  The Third-Party Director Defendants have done so because their positions afford them almost unfettered access to and control of the Foundations' coffers, taking for them themselves extraordinary bonuses, outright payments and extravagant personal expenses.  (Id.).  At the same time, they wield the companies' resources to crush anything and anyone who questions or challenges their continued control and lavish lifestyle.  (Id.).

**D.**     <u>**The Foundation Meeting Minutes**</u>

Mr. Feldman did not provide PNS or any of its agents with the meeting minutes that form the basis of Plaintiffs' motion.  (Feldman Dec. ¶ 14).  Mr. Feldman does not know who did or if anyone did.  (<u>Id.</u>).

Mr. Feldman was not a Foundations director.  (Feldman Dec. ¶ 4).  When he attended meetings for Foundation I and Foundation II, he served as the Foundations' recording Secretary. (<u>Id.</u>).   Mr. Feldman specifically recalls that individuals who were not directors frequently attended the Foundations' board meetings, including, but not limited to, Claire Davidson, Steve Wilson, Piers Gardener, Drew Holiner, Bill Shoff, and many different auditors, lawyers and various other service providers.  (<u>Id.</u> at ¶ 5).  Each Foundation board meeting often had about ten attendees who were not a member of the Foundation's board.  (<u>Id.</u>).  Mr. Feldman is unaware of any of the non-Director participants who attended Foundation board meetings being required to sign a non-disclosure agreement.  (<u>Id.</u> at ¶ 7).  These attendees usually contributed to a single meeting agenda item, but often stayed for the entire meeting.  (<u>Id.</u> at ¶ 5).  During his time with the Foundations, Mr. Feldman would attend board meetings, but was not included in most Director-only (executive session) meetings.  (<u>Id.</u> at ¶ 6).  Mr. Feldman understood that separate minutes, which he had no access to, were kept of the Director-only, executive session meetings. (<u>Id.</u>).

In his role as the recording Secretary for the Foundations, Mr. Feldman would type up the minutes and send the draft minutes to Third-Party Defendant Defendant Godfrey.  (<u>Id.</u> at ¶ 8). Multiple revisions of the draft minutes would pass between Godfrey and Mr. Feldman.  (<u>Id.</u>). Frequently upwards of ten versions would be exchanged prior to the revised draft minutes being sent to the other Directors for their review and corrections.  (<u>Id.</u>).  The draft minutes were at times then sent to non-Director presenters, who had attended and contributed to the meetings, for

their input on the sections of the minutes, which applied to them.  (<u>Id.</u> at ¶ 9).  After receiving the non-Directors' comments, Godfrey would finalize the minutes and copies of the same would be dispersed to the parties.  (<u>Id.</u>).  Godfrey ultimately made the final decision regarding content of the minutes.  (<u>Id.</u>).

The minutes were held by outside service providers including but not limited to TMF Amsterdam, Pan Invest and Crowe Horwath.  (<u>Id.</u> at ¶ 10).  Mr. Feldman believes that so-called *business intelligence* service providers such as Diligence LLC and Gretchen King, were also provided copies of the minutes.  (<u>Id.</u>).  In addition, Mr. Feldman was aware that Tim Osborne attended Foundation meetings, including Director-only meetings both while serving as a Director of the Foundations and continuing after his resignation from the Foundations' Boards in 2008.  (<u>Id.</u> at ¶ 12).  Osborne was, and remains, director for GML Limited – a former large stockholder in Yukos Oil.  (<u>Id.</u>).  It is Mr. Feldman's understanding that Osborne at some point became entitled to also receive the minutes from the Directors meetings after his resignation.  (<u>Id.</u>).  It is also Mr. Feldman's understanding that in 2007 Osborne sent a letter to a PNS agent pledging his company's cooperation.  (<u>Id.</u>).

**E.    Feldman Did Not Serve Yukos as an Attorney and the Georgiades Political Contribution was Approved by the YHIL Board and Initially Approved by Godfrey**

Mr. Feldman was never considered, nor ever acted, as in-house counsel to either of the Foundations.  (Feldman Dec. at ¶ 11).  Teun Struycken was counsel to the Foundations and also opined on all of the minutes and received a copy of each of the minutes.  (<u>Id.</u>).  Mr. Feldman's only official roles within the Yukos Group were as a Director of various Yukos Group companies and as recording Secretary of the two Foundations.  (<u>Id.</u>).  Mr. Feldman was not compensated to act as an attorney for the Yukos Group companies or the Foundations and never functioned in a legal capacity in his various roles.  (<u>Id.</u>).

The Yukos Group companies were parties to a number of legal actions in Cyprus, when in 2011, Cleanthis Georgiades ("Georgiades") decided to run for political office in Cyprus.  (Id. at ¶ 13).  Godfrey voiced his approval for a political contribution to be made from YHIL to Georgiades.  (Id.).  Only after the contribution had been made did Godfrey reverse his position on the making of a contribution after consulting with the other Foundations board members.  (Id.).  As a result, the amount of the contribution was subsequently recouped from Georgiades by assigning a credit of this amount to the next due retainer payment to Georgiades' law firm.  (Id.).  The four members of the independent YHIL board both made the contribution to Georgiades and subsequently recouped that amount.  (Id.).  Because they were an independent board, they did not need the Foundations' approval.  (Id.).  Currently, one of the YHIL four board members continues to be employed by the Yukos Group companies and still acts as a member of the YHIL board.  (Id.).  The other two YHIL board members have left the Yukos Group companies and received severance or settlement payments of hundreds of thousands of dollars.  (Id.).  Only Mr. Feldman is being questioned and accused of impropriety regarding the contribution to Georgiades as undertaken by the YHIL board.  (Id.).

**F.      Following Mr. Feldman's Yukos Service, Yukos Proposes a Lucrative Severance Proposal**

In spite of Plaintiffs' allegations of Mr. Feldman's alleged wrongdoing – both old and new – the fact remains Yukos attempted to pay Mr. Feldman after his relationships with the Yukos Group companies and the Foundations concluded.  Plaintiffs placed these negotiations at issue when their attorneys attempted to make arguments based on speculation and innuendo from Mr. Feldman's attorneys' communications with Yukos attorneys regarding a proposed severance agreement.

Marc Freiberger was Mr. Feldman's personal attorney.  Mr. Freiberger represented Mr. Feldman while attempting to negotiate a separation agreement provided to Mr. Feldman by Yukos in conjunction with the termination of his relationships with the Yukos Companies. (Freiberger Dec. at ¶ 2).  Toward that end, Mr. Freiberger engaged in confidential settlement discussions with Scott A. Kruse, Esq., of the law firm Gibson, Dunn & Crutcher LLP, who represented the Yukos Companies.  (Id. at ¶ 3).

On October 30, 2014, Mr. Freiberger sent to Mr. Kruse by email Mr. Feldman's counter-proposal concerning the terms of the separation agreement.  (Id. at ¶ 4).  On November 17, 2014, Mr. Freiberger emailed Mr. Kruse concerning, among other things, Yukos' lack of a response to Mr. Feldman's counter-proposal concerning the terms of the separation agreement.  (See Flynn Dec. (Dkt. 61) at Exhibit K).  The contents of Mr. Freiberger's November 17 email were intended to be confidential settlement communications not to be used against Mr. Feldman as was clearly designated at the top of the email: "*Confidential, For Settlement Purposes Only.*" (Freiberger Dec. at ¶ 5).  Among other things, the separation agreement contained proposed post-employment obligations that could have limited Mr. Feldman's options for employment (absent entering into a separation agreement, Mr. Freiberger was not aware that Mr. Feldman was subject to any contractual post-employment obligations).  (Id. at ¶ 6).

In Mr. Freiberger's November 17 email, he explained that Mr. Feldman was not in a financial position to wait indefinitely for Yukos to respond to his counter-proposal as the Company had stopped making salary payments to him in October 2014.  (Id. at ¶ 6).  Mr. Freiberger conveyed to Mr. Kruse that if Yukos did not respond to Mr. Feldman's counter-proposal by November 19, 2014, Mr. Feldman would "have no choice but to understand Yukos is not serious about reaching a resolution with him and move forward by testing his value in the

job market." (<u>Id.</u> at ¶ 6).  Mr. Freiberger's concluding statement in the email about Mr. Feldman moving forward by "testing his value in the job market" was in no way intended to be a threat that Mr. Feldman would sell Plaintiff's information as mischaracterized in the Opening Brief. (<u>Id.</u> at ¶ 7).  Rather, it simply reflected that Mr. Feldman could no longer wait on Yukos' response to his counter-proposal given his financial position.  (<u>Id.</u>).  Up to that point in time, Mr. Feldman had been waiting on Yukos' response prior to seeking other employment opportunities given that the separation agreement could have limited his options for employment.  (<u>Id.</u>).

**G.**      **<u>Plaintiffs' Complaint Against Mr. Feldman</u>**

Plaintiffs filed a four count Complaint against Mr. Feldman.  The relevant Counts to Plaintiff's instant motion are Counts I, III and IV.  In Count I, Plaintiffs allege that Mr. Feldman breached his fiduciary duties owed to each of them.  Plaintiffs expressly allege that Mr. Feldman breached some of these duties in 2008 and 2009 and that they knew of the alleged breaches as early as 2009 and 2011.  (<u>See</u>, <u>e.g.</u>, Compl. ¶¶ 47-52; 53-57, 86).  Mr. Feldman denies any wrongdoing, including any alleged wrongdoing six to seven years ago.  Through their instant motion, Plaintiffs' principal argument relies on Foundation I and Foundation II meeting minutes they suggest were disclosed to PNS in breach of Mr. Feldman's alleged fiduciary duties to the Foundations.  (Op. Brf. 7, 10-11; Godfrey Dec. at ¶¶ 4, 6).

In Count III, Plaintiff YHIL alleges that Mr. Feldman breached his contract with the company (the "<u>Directors Agreement</u>") by taking more compensation than he was entitled to in 2011.  (Compl. ¶¶ 25, 122).  Through their motion, Plaintiffs also allege that Mr. Feldman breached an express contractual duty under his Directors Agreement to keep information he learned as an YHIL director confidential.  (Op. Brf. 5, 10-11; Godfrey Dec. at ¶ 6).

In Count IV, Plaintiff YHIL seeks a preliminary and permanent injunction against Mr. Feldman based on the allegations that he breached the confidentiality provision in his Directors

Agreement by "disclosing confidential information concerning the Yukos Group and its litigation strategy to parties having an interest adverse to the Yukos Group in the PNS Litigation." (Compl. ¶ 158).

**H.       Plaintiffs' Request for Interim Injunctive Relief**

Without first providing Mr. Feldman with their Opening Brief and the countless supporting Declarations, Plaintiffs requested broad sweeping injunctive relief through an Order to Show Cause for Temporary Restraining Order, Preliminary Injunction, Sealing Order and Expedited Discovery. (Dkt. 60). This is in spite of the fact that, since September 29, 2015, Mr. Feldman requested that Plaintiffs specifically identify the documents or information they thought was confidential. (Felice Dec. ¶ 5). While Plaintiffs knew of the existence and use of the Foundations' minutes in the Netherlands litigation since October 6, 2015, Plaintiff never once raised it for Mr. Feldman's prior consideration or explanation. (Id. at ¶ 9). Instead, Plaintiffs waited over two weeks to provide Mr. Feldman with an email notification (still without identifying that meeting minutes were at issue) that they intended to seek far-reaching injunctive relief from the Court the next morning.

The Court heard Plaintiffs' application on October 21, 2015. From the beginning of Plaintiffs' application, the Court questioned the "liberties" Plaintiffs were taking with the Directors Agreement. (Oct. 21, 2015 Trans. 6:1-16 (attached as Exhibit 2)). With respect to the language in the Directors Agreement that Plaintiffs failed to identify for the Court in its Opening Brief, the Court recognized that it could be a problem for Plaintiffs' application.

> THE COURT:  The problem with your little argument is that it's just not consistent with the language you left out.
>
> It says, "The director" -- and now I am going to track as far as you quoted – "shall not, during the period of his appointment, or at any time thereafter" – that's the part you quoted.  Then what you left out was, "Except so far as may be proper, and/or lawful, and/or

13

> obligatory in the ordinary course of the business of the company as
> contemplated herein."
>
> MS. FLYNN:  Correct.
>
> THE COURT:  Now, at least one reading of this is that paragraph 7
> imposes no obligation of confidentiality to the extent that the
> disclosure is either proper or lawful or obligatory in the ordinary
> course of the business of the company.
>
> I understand that you will argue that the phrase about "in the
> ordinary course of the business of the company" modifies "proper"
> and modifies "lawful," but it is not even remotely self-evident that
> you would be right in that argument.  It is an argument.  And so I
> am really actually a little troubled by the fact that you decided not
> to face up to the problem, but rather to sweep it under the rug.

(Oct. 21, 2015 Trans. 7:2-22).

In June 2015, Plaintiffs explicitly requested preliminary injunctive in Count IV of their Complaint.  Through Count IV, Plaintiffs alleged that Mr. Feldman "[u]pon information and belief, has continued to breach his confidentiality obligation post termination, including by disclosing confidential information concerning the Yukos Group and its litigation strategy to parties having an interest adverse to the Yukos Group in the PNS Litigation."  (Compl. 158). However, during oral argument on October 21, Plaintiffs tacitly admitted that their Complaint allegations were baseless at the time they were asserted:

> MS. FLYNN:  So the reason why we have brought the TRO is
> because, although we had evidence of misconduct that Mr.
> Feldman had engaged in while he was still a director, we didn't
> have any actual physical evidence of something going on right
> now.

(Oct. 21, 2015 Trans. 8:22-9:1).  Based on this alleged scenario, Plaintiffs principally relied on the fact that seven sets of Foundation I and Foundation II meeting minutes were submitted by non-party PNS to a Netherlands court as the basis for a request for interim injunctive relief in this proceeding.  (Id. at 9:15-18).

14

Looking at these minutes with the short time it had prior to oral argument, the Court questioned whether any of the information contained in the minutes was, in fact, confidential. (See id. at 19:8-16 (noting that, at the time, the analogous and hypothetical note identified that the Mets led the Cubs 3-0); id. at 27:2-9 (identifying that there has been "[a] lot of water over the dam since 2008" when presented with alleged confidential information contained in minutes from 2008)).  Presumably based on Plaintiffs' failure to specifically or adequately identify even one "nugget" from the minutes submitted, the Court identified that it was not willing to entertain a restraining order request "for the whole outdoors."  (Id. at 20:16).  Instead, the Court granted a much more narrow restraining order based on the perceived lack of harm to Mr. Feldman.  (See id. at 24:4-25).

With respect to Plaintiffs' request to seal the minutes, the Court denied Plaintiffs the relief based on the lack of proof that anything in the minutes was confidential.

> [THE COURT:]  All right.  I am not going to seal those exhibits now because I have given you an ample opportunity to show me something that really ought to be sealed and I am not persuaded.

(Id. at 27:10-13).   While a party traditionally does not need expedited discovery after a preliminary injunction hearing, Plaintiffs stated during the October 21, 2015 hearing that they were not going to pursue the request for expedited discovery at that hearing, but instead would wait for some time after the preliminary injunction hearing.  (Id. at 31:19-24).

## ARGUMENT

## I.   PLAINTIFFS COMPLETELY FAILED TO DEMONSTRATE THAT THEY ARE ENTITLED TO INTERIM INJUNCTIVE RELIEF

As presented in their Opening Brief, Plaintiffs rely on what this Court has characterized as the Winter standard for a preliminary injunction. Vringo, Inc. v. ZTE Corp., 2015 WL 3498634, at *4 (S.D.N.Y. June 3, 2015) (citing Winter v. NRDC, 555 U.S. 7, 20 (2008)).  Under the Winter standard, the party seeking a preliminary injunction must show that "he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Id.  The threat of irreparable injury is a *sine qua non* of any application for interim injunctive relief.  Naden v. Numerex Corp., 593 F. Supp. 2d 675, 680 (S.D.N.Y. 2009) (citing Buffalo Forge Co. v. Ampco–Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981)).  "[I]f there is no irreparable injury, there can be no preliminary injunction."  Markowitz Jewelry Co. v. Chapal/Zenray, Inc., 988 F. Supp. 404, 406 (S.D.N.Y. 1997).   "[T]here must be 'a clear showing that the moving party is entitled to the relief requested, or [that] extreme or very serious damage will result from a denial of preliminary relief.'"  Cedar Swamp Holdings, Inc. v. Zaman, 472 F. Supp. 2d 591, 594 (S.D.N.Y. 2007) (quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33-34 (2d Cir. 1995)). The threatened irreparable harm "must be ... actual and imminent, not remote or speculative." Naden, 593 F. Supp. 2d at 680 (quoting Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002)).   Stated differently, "a possibility of irreparable injury is not enough; a likelihood is required."  Id. (citing JSG Trading Corp. v. Tray–Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990)).

As identified herein, Plaintiffs fail to make an adequate showing on any element required to obtain the preliminary injunction they seek.  As a result, Plaintiffs' request for a preliminary injunction should be denied and the temporary restraining order dissolved.

### A.      Plaintiffs Argue the Wrong Merits and Those Arguments They do Present are not Well-Founded

As identified in Mr. Feldman's Declaration testimony, he did not provide the Foundation meeting minutes that form the basis of Plaintiffs' motion to PNS.  Lacking any discernable measure of proof other than arguing that Mr. Feldman was the source of the disclosure through an imprecise and incomplete process of elimination, Plaintiffs are unable to surmount the hurdle presented by Mr. Feldman's Declaration testimony.  Even if Plaintiffs had a scintilla of direct evidence specifically identifying Mr. Feldman as the source of the disclosure, Plaintiffs' Opening Brief is incapable of proving likelihood of success on the merits because they apply the wrong law to the alleged facts.  Just as important, the Foundations' meetings and meeting minutes were not confidential and are, as a result, incapable of serving as a basis for a breach of contract or breach of fiduciary duty claim.  Therefore, the Court should find that Plaintiffs fail to demonstrate that they are likely to succeed on the merits of their claims.

### 1.      Mr. Feldman Was Not the Source for the Meeting Minutes

As identified in his Declaration, Mr. Feldman was not the disclosure source for the Foundation meeting minutes used by PNS in the Netherlands litigation.  (Feldman Dec. ¶ 14). Nor did his attorneys have prior access to or provide the minutes to PNS prior to their public filing.  (Felice Dec. ¶ 8).  Compare this direct, first-hand evidence with Plaintiffs' proposed circumstantial case of proof by process of elimination.  (Op. Brf. 8; Oct. 21, 2015 Trans. 9:19-10:3).  The conclusion becomes inescapable.  Plaintiffs cannot and will not succeed on the merits of their claims for breach of contract or breach of fiduciary duty arising from Mr. Feldman's alleged disclosure of confidential information.

Unlike this Court's recent decision in Vringo, Inc. v. ZTE Corp., Plaintiffs' present application is premised on circumstantial evidence regarding disclosure and unfounded

speculation and innuendo gleaned from an attorneys' email.  (Op. Brf. 7-8).  In <u>Vringo</u>, the Court recognized that a prior grant of a motion for judgment on the pleadings already established "the existence and terms of the NDA and defendants breach thereof."  <u>Vringo</u>, 2015 WL 3498634, at *4.  As a result, the <u>Vringo</u> plaintiff was able to demonstrate its likelihood of success on the merits with near certainty.[1]  <u>Id.</u> at *9.

On this basis alone, Plaintiffs' motion should be denied and the restraining order dissolved.

### 2.    <u>Plaintiffs Apply the Wrong Law to their Claims</u>

In spite of the facts that Plaintiffs expressly asserted that British Virgin Islands law applies to Mr. Feldman's service as an YHIL director and the Foundations are Dutch Foundations, Plaintiffs failed to even consider the required choice of law analysis in their Opening Brief.   Instead, Plaintiffs improperly relied on New York law to support their application.  This is a shortcoming that cannot and should not be remedied in their Reply Brief. <u>Internat'l Elec., Inc. v. Media Syndication Global, Inc.</u>, 2002 WL 1897661, at *2 n.2 (S.D.N.Y. Aug. 17, 2002) (recognizing that "[a]rguments first advanced in reply memoranda are not properly considered").  The Court should deny Plaintiffs' motion on this basis alone.

"To determine whose law applies, a federal court sitting in diversity must apply the conflict-of-laws rules of the state in which the federal court sits."  <u>Cantor Fitzgerald Inc. v. Luntnick</u>, 313 F.3d 704, 710 (2d Cir. 2002) (citing <u>Klaxon v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941)).  New York applies separate choice-of-law approaches to contract and to tort

---

[1] There are several other distinguishing factors that make the <u>Vringo</u> decision unpersuasive when applied to the facts of this case.  First and foremost is the fact that the Court's <u>Vringo</u> decision was premised on a contractual choice of law provision that allowed the Court to apply New York law to the parties' dispute.  <u>Vringo</u>, 2015 WL 3498634, at *2, *7.  Moreover, there was direct, documentary evidence that the <u>Vringo</u> defendant breached the terms of the NDA.  <u>Id.</u> at *2. None of these facts find harbor under the facts of this proceeding.

claims.  "In contract cases, New York courts apply, '[t]he 'center of gravity' or 'grouping of contacts' choice of law theory.'"  <u>Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.</u>, 414 F.3d 325, 336 (2d Cir. 2005) (quoting <u>Matter of Allstate Ins. Co. (Stolarz)</u>, 81 N.Y.2d 219, 226, 613 N.E.2d 936, 939 (1993)).  YHIL is the Plaintiff for the breach of contract arising from the Directors Agreement.  Here, the Court need venture no further than Plaintiffs' own Complaint where they expressly asserted that British Virgin Islands laws applies to Mr. Feldman's service as an YHIL director.  (Compl. ¶¶ 28-29).  This conclusion is largely academic for purposes of the instant motion because the meeting minutes were all from the Foundations' meetings.  Plaintiffs cannot argue that the YHIL Directors Agreement is applicable to Mr. Feldman's position as the recording Secretary for the Foundations.[2]

The Foundations' breach of fiduciary duty claim requires a different conflict of law analysis because New York applies separate analyses to contacts and torts.  Breach of fiduciary duty claims "sound in tort law rather than contract law."  <u>Zorbas v. US Trust Co. N.A.</u>, 48 F. Supp. 3d 464, 479 (E.D.N.Y. 2014).  "Generally, New York law requires that claims related to corporate affairs—i.e., issues involving the rights and liabilities of a corporation—are governed by the internal affairs doctrine."  <u>In re BP P.L.C. Deriv. Litig.</u>, 507 F. Supp. 2d 302, 307 (S.D.N.Y. 2007).  Under this doctrine, "issues relating to the internal affairs of a corporation are to be governed by the law of its state of incorporation because application of such a body of law 'achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation.'"  <u>In re Hydrogen, LLC</u>, 421 B.R. 337, 347 (Bankr. S.D.N.Y. 2010) (<u>quoting NatTel, LLC v. SAC Capital Advisors, LLC</u>, 2006 WL 957342, at *2 (2d Cir. 2006)).  A claim for a breach of fiduciary duty brought against a

---

[2] Similarly, Plaintiffs cannot allege that Mr. Feldman owed YHIL equitable fiduciary duties when the alleged obligations were set forth in a written contract.

purported corporate officer raises issues relating to the internal affairs of a corporation and therefore should be governed by the law of the state of incorporation of the relevant corporation. Id. (citing Walton v. Morgan Stanley & Co., Inc., 623 F.2d 796, 798 n.3 (2d Cir. 1980)). Thus, under the internal affairs doctrine, Dutch law would apply because this where the Foundations were formed and exist.

Even if the Court were to apply the conflict of law analysis for tort claims in general, this conclusion would not change. In tort cases, New York courts resolve the conflict of law through interest analysis. See Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 199 (N.Y. 1985). "Interest analysis, adopted by New York in the landmark case of Babcock v. Jackson is the bedrock principle that underlies New York's entire choice-of-law regime. . . ." Finance One, 414 F.3d at 336-37 (citing Babcock v. Jackson, 12 N.Y.2d 473 (N.Y. 1963)). This type of analysis is a "flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issues raised in the litigation." Id. (quoting Cooney v. Osgood Mach., Inc., 595 N.Y.S.2d 919, 922 (N.Y. 1993)). Here, the Foundations had continually advanced, in this litigation and elsewhere, that Dutch law applies to the Foundations – to the exclusion of other countries' laws, including Russian law.

Giving Plaintiffs the benefit of the doubt on an expedited order to show cause (which they had 2 weeks to prepare), at best Plaintiffs' Opening Brief demonstrates an exceedingly undisciplined application of both the law and the facts. The Directors Agreement has absolutely no application to the principal basis for Plaintiffs' motion. The meeting minutes were all Foundations' meeting minutes. The GML Letter Agreement was an agreement between GML

and the Foundations to secretly enrich the Foundations' directors through a kick-back scheme.[3] Again, this had nothing to do with YHIL.  To the extent Plaintiffs argue that the focus should be placed on Mr. Feldman's alleged improper disclosure of the GML Letter Agreement, Plaintiffs expressly alleged that they knew of this disclosure in 2011.  (*See* Compl. ¶¶ 58-62).  In any event, Plaintiffs fail to argue how such allegations would be treated under British Virgin Islands law.  The same holds true for the alleged breach of fiduciary duty claim.  Mr. Feldman was not a director for the Foundations.  He was merely its recording Secretary.  Plaintiffs make absolutely no attempt to identify whether or to what extent a recording Secretary has fiduciary duties to a Stichting under Dutch law.

Based on Plaintiffs' complete failure to address the controlling law applicable to its claims, the Court should find that they failed to demonstrate a likelihood of success on the merits of their claims.

### 3. The Foundations' Board Meetings and Minutes Were Not Confidential and do not Contain Confidential Information

While the Court need not reach the substance of the meeting minutes, if it were to consider the meetings and the minutes, the logical conclusion is inescapable.  There is nothing confidential about the Foundations' meetings, the control of minutes from those meetings or the substance of the actual meeting minutes.  The indisputable fact is that the Foundation meetings were not sealed, secret meetings.  When Mr. Feldman recorded the minutes, they were widely disseminated.  Finally, the substance of the meeting minutes demonstrates that there is nothing confidential about the stale facts recited therein.

---

[3] As identified above, Dutch law expressly identifies that Stichtings cannot be operated to benefit their directors.  Dutch Civil Code (*Burgerlijk Wetboek*) Article 2:285 (unofficial translation available at http://www.dutchcivillaw.com/civilcodebook022.htm ) (last visited Oct. 26, 2015). As a result, the GML Letter Agreement was an improper undertaking by the Foundation board members.

As an initial matter, the Foundations' meetings were not closed-door, secret meetings. This is confirmed by the Foundations' Articles of Association.  Specifically, the Foundations' Articles of Association identify that "Members of the board shall be admitted to board meetings as well as any other person granted admission by the board members present at that meeting." (Flynn Aug. 21, 2015 Dec. (Dkt. 28) Exhibit F at Article 6:5 and Exhibit G at Article 6:4) (emphasis added).  Moreover, the Articles of Association contain no express obligation that meeting minutes be kept private or that they be maintained as confidential.  Feldman was not aware of any non-director individuals being required to sign non-disclosure agreements before being able to attend the Foundations' board meetings.  (Feldman Dec. at ¶ 7).  This lack of a confidential basis for the meetings is confirmed by what actually transpired.  As identified in the meeting minutes submitted, it is plainly apparent that numerous non-director individuals attended the Foundations' meeting.  (Drop Oct. 17, 2015 Dec. at Exhibits 1-7); (Feldman Dec. ¶ 5).  If the meetings themselves were not conducted in a confidential manner, the resulting minutes cannot be said to be confidential.

Once Mr. Feldman completed his first draft of the Foundations' meeting minutes, the draft was widely circulated outside the Foundations' directors for input and revision.  (Feldman Dec. ¶ 9).  Once the minutes were finalized, they were distributed to Foundation directors and non-directors alike.  (Id. at ¶ 9).  In fact, Mr. Feldman confirms that the Foundations' meeting minutes were sent to GML's Tim Osborne even after he left the Foundations' boards in 2008. (Id. at ¶ 12).  When the Foundation boards wanted to maintain confidences, they went into director-only executive sessions.  (Id. at ¶ 6).  The very minutes Plaintiffs submit identify such an executive session and that separate minutes were maintained.  (Drop Oct. 17, 2015 Dec. at Exhibit 4, § 2.6).  Given the Foundations' failure to maintain the alleged secrecy of their meeting

minutes, those same documents cannot serve as the basis for a claim that Mr. Feldman breached his duties of confidentiality.

Even if Plaintiffs were able to surmount all the obstacles necessary to establish that the Foundations' meeting minutes were confidentially maintained and Mr. Feldman had a duty to maintain those confidences, the simple fact remains that nothing in the actual meeting minutes submitted is confidential – then or now.   As identified in their Articles of Association and in reality, Plaintiffs are simply sitting on a pile of cash and assets with the stated objective of administering the Foundations for the benefit of the rightful Yukos Oil stockholders and creditors.   There are no ongoing business interests to protect.   The Foundations and their directors should be indifferent to the competing interests of the alleged stockholder and creditors. As the GML Letter Agreement evidences, they are not.   The Foundations' directors (the Third-Party Director Defendants) have a vested interest to prefer GML over any other stockholder or creditor.   Maturations such as this by the conflicted and self-dealing board do not make its meeting minutes confidential.   Similarly, the actual contents of the meeting minutes demonstrate that the information is mainly factual and completely stale.   Given the lack of analysis in their Opening Brief and as confirmed during the October 21 show cause hearing, Plaintiffs are unable to clearly identify specific "nuggets" of confidential information within the meeting minutes.   As the Court recognized, just because something is written on a piece of paper and allegedly maintained in a location that has restricted access does not necessary translate into a finding that the contents of the note are confidential.   (Oct. 21, 2015 Trans. 19:8-16).   When Plaintiffs identified a single sentence from the seven sets of minutes that could potentially contain confidential information, the Court correctly identified that the information was stale.   (Id. at

27:2-9) (identifying that there has been "[a] lot of water over the dam since 2008" when presented with alleged confidential information contained in minutes from 2008)).

Given a consideration of the access accorded non-directors to the Foundation board meetings, the wide dissemination of the meeting minutes and the contents of the minutes themselves, the Court should find that Plaintiffs are unlikely to succeed on the merits of their claims that Mr. Feldman breached any applicable confidentiality obligations allegedly owed.

### B.  Plaintiffs Fail to Make an Adequate Showing of Irreparable Harm

Plaintiffs have not and cannot demonstrate that they will suffer irreparable harm in the absence of injunctive relief for three main reasons.  First, Plaintiffs failed to provide sufficient, direct evidence that Mr. Feldman was the source for the disclosure of the Foundations' meeting minutes to PNS.  Instead, Mr. Feldman presents undisputed, direct evidence that he was not the source of the alleged disclosure.  (Feldman Dec. at ¶ 14).  Against this factual record, Plaintiffs cannot show that they would suffer irreparable harm if Mr. Feldman were not precluded from doing something he did not do in the first place.

Second, Plaintiffs cannot maintain that they would suffer irreparable harm when their stated objective it to administer and distribute cash and assets to the rightful Yukos Oil stockholders and creditors.  Assuming these alleged improper disclosures could bring about a wrongful distribution of cash or assets to a stockholder or creditor, the touchstone for the harm suffered is money damages.  As a result, there should not be any basis to invoke the Court's equitable powers to stop alleged irreparable harm that is just not present.

Finally, there is no threat of actual and imminent irreparable harm.  As Plaintiffs identified at the October 21 hearing, the horse is already out of the barn with respect to the seven sets of meeting minutes.  From June 2015 until Plaintiffs learned of the existence of the meeting

minutes being used in the Netherlands litigation on October 6, 2015, there was nothing that aroused Plaintiffs' litigious propensities such that they were inclined to act on their request for a preliminary injunction.  Given the fact that it took Plaintiffs four months to muster allegations that are based on a flawed process of elimination and innuendo, it is not likely that they can credibly argue that there is an actual and imminent threat of continued irreparable harm.  See Vringo, 2015 WL 3498634, at *9 (recognizing that the alleged irreparable harm must not be remote or speculative, but actual and imminent and cannot be a harm that could remedied by an award of monetary damages).

For these reasons, the Court should find that Plaintiffs have not adequately proved that they would suffer irreparable harm in the absence of injunctive relief.

### C.     The Balance of Equities and the Public Interest Favor Mr. Feldman

The balance of the equities and public interest favor Mr. Feldman for two reasons.  First, Plaintiffs' other vague and conclusory references to Mr. Feldman's alleged breaches of contract and fiduciary duty are not only substantively insufficient to support preliminary injunctive relief but they are barred by the doctrine of laches because Plaintiffs have sat on many of the allegations since at least 2009 and 2011.  (See, e.g., Compl. ¶¶ 53, 58-62, 86).  Plaintiffs' delay in moving for injunctive relief for allegedly improper disclosures outside the Foundations' meeting minutes renders the presumption of irreparable harm inoperative and directs that the application be barred under the equitable doctrine of laches.  "Laches 'bars injunctive relief where [a] plaintiff unreasonably delays in commencing [an] action." Nat'l Council of Arab Americans v. City of New York, 331 F. Supp. 2d 258, 265 (S.D.N.Y. 2004) (citing Merrill Lynch Inv. Mgrs. v. Optibase, Ltd., 337 F.3d 125, 132 (2d Cir. 2003).  "The doctrine reflects the principle that 'he who comes into equity must come with clean hands.'"  Id. (quoting Hermes

Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000)).  A movants' "delay is one of the equities that argues strongly against granting a preliminary injunction."  Id. (citing Irish Lesbian and Gay Org. v. Giuliani, 918 F. Supp. 732, 749 (S.D.N.Y. 1996)).   Here, Plaintiffs' Complaint expressly identified that they knew of Mr. Feldman's allegedly improper acts dated back to 2009 and 2011.  (See, e.g., Compl. ¶¶ 53, 58-62, 86).  Plaintiffs cannot now rely on those same alleged facts and their knowledge of those alleged facts as a basis for preliminary injunctive relief.

Second, Mr. Feldman must be permitted to defend himself against Plaintiffs' allegations of wrongdoing.  Plaintiffs' requested relief would effectively preclude Mr. Feldman pursuing several of his defenses to Plaintiffs' claims.  As set forth in his affirmative defenses, many of the alleged injuries Plaintiffs claim result from their own directors' disloyalty and self-dealing. While Plaintiffs have publicly filed and are intent to litigate claims that allege misdeeds by Mr. Feldman in the public arena, when Mr. Feldman wants to defend himself against those claims, Plaintiffs and the Third-Party Defendants want to litigate those issues in secret.  This request for disparate treatment cannot stand.  Plaintiffs placed these facts and dealings at issue and now must be willing to face a full and public adjudication of their claims and Mr. Feldman's defenses on the merits.

For these reasons, the Court should find that the balance of the equities and public interest favor Mr. Feldman and weigh against the entry of any preliminary injunctive relief.

## II.    PLAINTIFFS' REQUEST TO SEAL WAS DENIED AND, IF CONTESTED AGAIN, SHOULD BE SIMILARLY DENIED

Plaintiffs originally argued that "the confidential information [in the meeting minutes] should be sealed."  (Op. Brf.  15).  More specifically, Plaintiffs argued that the minutes attached as Exhibits 1-7 to Maarten Drop's October 17, 2015 Declaration should be sealed because of

their allegedly "privileged and proprietary contents."   (Id.).   Plaintiffs' argument should be rejected for two reasons.   First, the Court already considered this argument in connection with the October 21, 2015 oral argument and rejected it.

> [THE COURT:]   All right. I am not going to seal those exhibits now because I have given you an ample opportunity to show me something that really ought to be sealed and I am not persuaded.

(Oct. 21, 2015 Trans. 27:10-13).   Moreover, when the Court issued its ruling on the motion for temporary restraining order, it specifically crossed out the paragraph in which Plaintiffs sought a ruling for the minutes to be filed under seal and kept confidential.   (Dkt. 60 at p. 4).   Plaintiffs had proposed the following language in their proposed order:

> **ORDERED** that in light of the confidential business and litigation strategy contained in them, Plaintiffs are hereby permitted to file confidential exhibits 1-7 to the Declaration of Maartin J. Drop, dated October 14, 2015, with the clerk of the court under seal . . . .

(Id.).   However, the language was specifically crossed out by the Court in its Order, and thus the Plaintiffs were not, and are not, entitled to file the minutes under seal.   As a result, the minutes are not deemed to be confidential and were, in fact, already publicly filed.   (See Dkt. 64).

Second, there is no reason to revisit the Court's ruling on this point.   As explained in Section I.A.3., supra, there are no grounds to keep these minutes confidential, given their widespread dissemination and other factors weighing against sealing and confidentiality.   Thus, Plaintiffs' request for sealing and confidentiality should be denied it its entirety.

## III.   **PLAINTIFFS ARE NOT ENTITLED TO EXPEDITED DISCOVERY**

In Section III of their Opening Brief Plaintiffs argue that they are entitled to expedited discovery.   (Op. Brf. 18).   More specifically, Plaintiffs argue that they should be entitled to obtain discovery documents within seven days and conduct Mr. Feldman's deposition within fourteen days.   (Id. at 18-22).   Plaintiffs' argument should be rejected for at least four reasons.

First, Plaintiffs' entire argument is premised on the incorrect "fact" that Mr. Feldman provided the meeting minutes at issue to PNS.  As explained above, Mr. Feldman provided direct and clear Declaration testimony that he did not provide the minutes at issue to PNS.  (See Section I.A.1, supra; Feldman Dec. at ¶ 14).

Second, expedited discovery is generally granted, if at all, during the interim period between a temporary restraining order hearing and a preliminary injunction hearing, in order for an expanded evidentiary hearing to be held on the preliminary injunction.  However, Plaintiffs have not made such a request here.  Instead, Plaintiffs have specifically withdrawn any potential request for information between the period of the temporary restraining order and the preliminary injunction hearing.  This was set forth during the October 21, 2015 oral argument:

> THE COURT:  What about expedited discovery?
>
> MS. FLYNN:  What we have sought is very limited document discovery and the deposition of Mr. Feldman to determine what information he has given to Promneftstroy since 2014.  Very simple.  It can be very short. But I think we are entitled to know so that we are prepared in the Netherlands to know what confidential information our litigation adversary has that we believe they should not have.  So we have asked for very limited discovery, and we have attached, as a matter of fact, the proposed deposition notice and document requests to my papers.
>
> That is actually not an interim – it's not expedited relief that I am requesting today.  That's actually in the motion. So that's what counsel would be responding to as part of our PI motion.
>
> THE COURT:  So I don't have to decide that.
>
> MS. FLYNN:  You don't have to decide that today.
>
> THE COURT:  Oh, I see.
>
> MS. FLYNN:  That's not interim relief.  That's the relief I am seeking in the motion. Unless you want to give it to me today, Judge, and then we will take the deposition.
>
> THE COURT:  Not passionately, counsel.

28

(Oct. 21, 2015 Trans. 31-32) (emphasis added).  Thus, Plaintiffs have made clear that they are not seeking interim discovery between the time of the temporary restraining order and preliminary injunction hearings.

Third, the timeframe for the requested discovery is wholly unreasonable.  To date, the parties have not agreed to an ESI protocol.  (Felice Dec. at ¶ 7).  This in spite of Mr. Feldman's efforts to explore an ESI protocol since September 29, 2015.  (Id. at ¶ 7).  Moreover, no protective order has been agreed to or entered in this case.  (Id. at ¶ 7).  Given the potential volume of ESI and hard copy material in this case, it is unreasonable to expect counsel for Mr. Feldman to be able to meet the 7-day deadline for document requests and the 14-day deadline for a deposition, given that the deposition would not occur until after the discovery documents and ESI information has been collected and exchanged.

Finally, given Plaintiffs' explicit withdrawal of any discovery requests between the time of the temporary restraining order hearing on October 21, 2015 and the preliminary injunction hearing on November 4, 2015, there is no need for expedited discovery because either the preliminary injunction will be denied (in which case there is no need for expedited discovery), or the preliminary injunction will be granted (in which case Plaintiffs are protected and discovery can proceed on a routine schedule).  The Court's Consent Scheduling Order provides that "[a]ll discovery, including any discovery of experts, shall be completed on or before May 2, 2016." (Dkt. 40 at p. 2).  That deadline is more than six months away.  As a result, there is no need to conduct an expedited deposition of Mr. Feldman now.  If the preliminary injunction is granted, then the injunction is in place, and the relevant inquires can be made of Mr. Feldman during one deposition.  It would be a waste of money and counsel's time to have to potentially conduct two depositions, when one will suffice to cover all relevant matters.

29

In light of the foregoing, Plaintiffs' request for expedited discovery should be denied it its entirety.

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendant, Counterclaim-Plaintiff and Third-Party Plaintiff Daniel Caleb Feldman respectfully requests that the Court deny Plaintiffs' request for a preliminary injunction and that the temporary restraining order be dissolved, with a direction that the bond be released to Mr. Feldman in full.

Dated:  October 29, 2015

BAILEY & GLASSER LLP

/s/ *Athanasios Basdekis*

Brian A. Glasser (admitted *pro hac vice*)
Athanasios Basdekis (AB2574)
David A. Felice (admitted *pro hac vice*)
Russell Soloway (admitted *pro hac vice*)
209 Capitol Street
Charleston, WV 25301
Telephone: 304-345-6555
Facsimile: 304-342-1110
bglasser@baileyglasser.com
tbasdekis@baileyglasser.com
dfelice@baileyglasser.com
rsoloway@baileyglasser.com

*Attorneys for Defendant, Counterclaim-Plaintiff and Third-Party Plaintiff Daniel Caleb Feldman*