# EXHIBIT 2

1

FAL8YUKC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   YUKOS CAPITAL SARL, et al.,

 4                 Plaintiffs,

 5             v.                        15 Cv. 4964 (LAK)

 6   DANIEL CALEB FELDMAN,

 7                 Defendant.

 8   ------------------------------x

 9                                       October 21, 2015
                                         11:30 a.m.
10
     Before:
11
                        HON. LEWIS A. KAPLAN
12
                                         District Judge
13
                           APPEARANCES
14
     SCHWARTZ & BALLEN LLP
15        Attorneys for Plaintiffs
     BY:  JEFFREY D. BROOKS
16
     MORRISON COHEN, LLP
17        Attorneys for Plaintiffs
     BY:  MARY E. FLYNN
18
     BAILEY & GLASSER, LLP (by telephone)
19        Attorneys for Defendant
     BY:  DAVID A. FELICE
20        RUSSELL M. SOLOWAY

21

22

23

24

25
```

FAL8YUKC

1          (Case called)

2          THE DEPUTY CLERK:  Plaintiff, are you ready?

3          MS. FLYNN:  Yes, I am.  Thank you.

4          Your Honor, good morning.  Mary Flynn from Morrison

5     Cohen.  I am counsel to of the plaintiffs in this case.  We are

6     here today to seek a --

7          THE COURT:  Hold on for a second.

8          As I understand it, we have Mr. Felice and Mr. Soloway

9     on the telephone, is that right?

10          MR. SOLOWAY:  That's correct, your Honor.  Russell

11     Soloway.

12          THE COURT:  Did Mr. Felice say something?

13          MR. FELICE:  Good morning, your Honor.

14          THE COURT:  Where are you located, Mr. Felice?

15          MR. FELICE:  Your Honor, I am located in Bailey &

16     Glasser's Wilmington, Delaware office.

17          THE COURT:  Mr. Soloway, where are you?

18          MR. SOLOWAY:  I am in Bailey & Glasser's Washington,

19     D.C. office.

20          THE COURT:  Ms. Flynn, did you provide defendant's

21     counsel with copies of these papers?

22          MS. FLYNN:  I did not, your Honor.  We provided them

23     with notice that we would be here this morning and had a copy

24     ready for them.  We were not aware that they were not going to

25     appear.

3

FAL8YUKC

1          THE COURT:  Did you tell them what relief you were

2     going to be seeking?

3          MS. FLYNN:  Yes, your Honor.  In our e-mail notifying

4     them 24 hours in advance that we would be here at the clerk's

5     office at 10:00 a.m. this morning, we cut and pasted from the

6     proposed order to show cause the relief that we were seeking

7     and told them that we were not yet finished with our papers,

8     which was the case.

9          THE COURT:  Mr. Soloway, did you receive such an

10    e-mail?

11         MR. SOLOWAY:  We did receive that notice, but then we

12    never received the papers.  So we didn't know that it had been

13    filed or not and what was going to be going on.

14         THE COURT:  And I take it you still haven't seen them?

15         MR. SOLOWAY:  We still have not received the papers,

16    that's correct, your Honor.

17         THE COURT:  There is a request for a temporary

18    restraining order so I will let Ms. Flynn say her piece, I will

19    let you say whatever you care to say, if anything, and we will

20    take it from there.

21         Ms. Flynn, go ahead.

22         MS. FLYNN:  Thank you, Judge.

23         The plaintiffs are entities comprising what is

24    referred to in our papers as the Yukos Group.  These entities

25    control assets of the former Yukos Oil, which had been Russia's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

FAL8YUKC

1    largest exporter of crude oil.

2            In 2006, the Russian government forced Yukos Oil into

3    bankruptcy by imposing what the plaintiffs contend were bogus

4    taxes and penalties.  Then the Russian authorities appointed a

5    receiver over the assets of Yukos Oil who conducted an auction

6    that the plaintiffs allege was a fixed auction with a

7    predetermined winner.  And the plaintiffs have submitted

8    documents in other litigations that confirm this fixed winner.

9    The fixed winner was a company called Promneftstroy, which also

10   was affiliated and an agent of the Russian state.

11           The plaintiffs have challenged the auction, or

12   portions of the plaintiffs have challenged the auction in the

13   Netherlands.  And in 2007, the Netherlands court determined

14   that it could not recognize the Russian bankruptcy order in the

15   Netherlands because it violated Dutch public order.  Since

16   then, for almost a decade, Promneftstroy and the Yukos Group

17   have been litigating in the Netherlands and elsewhere over

18   control of the assets of the former Yukos Oil.

19           The Yukos Group contends that the restructuring of the

20   Yukos Group and its companies, which created the Foundations,

21   which are two of the entities that are the plaintiffs, was a

22   proper exercise to protect the legitimate shareholders of the

23   former assets of Yukos Oil.  And Promneftstroy contends that

24   there was nothing wrong with the bankruptcy, there was nothing

25   wrong with the auction, and that this restructuring has

5

FAL8YUKC

1    deprived Promneftstroy of control over these assets, which it

2    contends it has the right to.

3            The defendant Feldman was a director of the plaintiff

4    corporations, a trustee of the plaintiff trust, and the

5    corporate secretary of the Foundation plaintiffs.  He was also

6    a lawyer and referred to himself in correspondence as in-house

7    counsel to the plaintiffs, and that's attached as Exhibit F to

8    my declaration.

9            Mr. Feldman was terminated from his last association

10   with any of the plaintiffs in 2014 for misconduct.

11   Specifically, it was learned that he conspired --

12           THE COURT:  Could we get to what you are about today

13   instead of the history?

14           MS. FLYNN:  Sure.

15           One of the causes of action in the complaint against

16   the former director, lawyer, etc. was a preliminary injunction

17   to enjoin Mr. Feldman from sharing confidential information

18   concerning the Yukos Group with Promneftstroy.  Obviously, that

19   would be greatly to the plaintiffs' detriment in the

20   Netherlands litigation.  Mr. Feldman had access to this

21   confidential information.  And in addition to having fiduciary

22   duties concerning it, he entered into a contract where he

23   agreed to keep information concerning the plaintiffs

24   confidential from all third parties even after he was

25   terminated.

6

FAL8YUKC

1          THE COURT:  I read about that in your brief, and I

2    think you have took some liberties with that.

3          MS. FLYNN:  It's attached as Exhibit B.  The provision

4    I am specifically referring to --

5          THE COURT:  Is paragraph 7.

6          MS. FLYNN:  Right.

7          THE COURT:  And in your quotation of it at page 5 of

8    your brief there is an illision, right, the first one?

9          MS. FLYNN:  There is.  "At any time thereafter, except

10   as may be proper, and/or lawful, and/or obligatory in the

11   ordinary course of business of the company."  That's not

12   applicable here.

13         THE COURT:  That's what?

14         MS. FLYNN:  That's not applicable here.

15         THE COURT:  So you thought you would just leave it out

16   just in case somebody else came to a different conclusion.

17         MS. FLYNN:  No, your Honor.  I was trying to cut to

18   the chase to what was actually the issue.  There is no business

19   of the company that he is conducting now at all.  He is no

20   longer associated with the company.  And the actions that we

21   are concerned about are the actions that he is conducting now

22   as a former director of the company.

23         What we were concerned about, your Honor, and the

24   reason why we have brought the temporary restraining order, as

25   opposed to just seeking the preliminary injunction in the case

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

FAL8YUKC

1    in the ordinary course, is because on October 6 --

2            THE COURT:  The problem with your little argument is

3    that it's just not consistent with the language you left out.

4            It says, "The director" -- and now I am going to track

5    as far as you quoted -- "shall not, during the period of his

6    appointment, or at any time thereafter" -- that's the part you

7    quoted.  Then what you left out was, "Except so far as may be

8    proper, and/or lawful, and/or obligatory in the ordinary course

9    of the business of the company as contemplated herein."

10            MS. FLYNN:  Correct.

11            THE COURT:  Now, at least one reading of this is that

12    paragraph 7 imposes no obligation of confidentiality to the

13    extent that the disclosure is either proper or lawful or

14    obligatory in the ordinary course of the business of the

15    company.

16            I understand that you will argue that the phrase about

17    "in the ordinary course of the business of the company"

18    modifies "proper" and modifies "lawful," but it is not even

19    remotely self-evident that you would be right in that argument.

20    It is an argument.  And so I am really actually a little

21    troubled by the fact that you decided not to face up to the

22    problem, but rather to sweep it under the rug.

23            MS. FLYNN:  To be frank, I didn't perceive that

24    problem until you just mentioned it, to be perfectly frank.

25    Because I also don't think, even if you look at the term

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

FAL8YUKC

1    "proper" by itself, it certainly is not proper for a corporate

2    officer to share confidential board minutes --

3             THE COURT:  I agree with you, if indeed they are truly

4    confidential, but let's assume for the moment that they are.

5    But the consequence of the acceptance of that reading, if

6    that's the right reading, is that the contract adds nothing to

7    whatever the obligations would be, as inherent in the office of

8    the director or whatever the particular position in question

9    might be.

10            MS. FLYNN:  The reason why we cited it, and what I

11   thought it added, was to the extent that there would be an

12   argument that whatever confidentiality obligation he owed to

13   the company terminated upon his termination as a director, I

14   was citing this for the fact that it did not, and that it

15   extended beyond his termination because of the language "at any

16   time thereafter."

17            To tell you the truth, that's why I was citing this,

18   because I agree with you, it doesn't really change anything,

19   except I thought perhaps the timing.  That's why I was focusing

20   on that language.

21            THE COURT:  OK.  Go ahead.

22            MS. FLYNN:  So the reason why we have brought the TRO

23   is because, although we had evidence of misconduct that Mr.

24   Feldman had engaged in while he was still a director, we didn't

25   have any actual physical evidence of something going on right

9

FAL8YUKC

1    now.  And on October 6, Promneftstroy submitted in the Dutch

2    courts -- and those are not public so it's not something that

3    is available online --

4         THE COURT:  Are you saying that they are not online,

5    or are you saying that they are not public, or are you saying

6    both?

7         MS. FLYNN:  I am saying both.  My understanding from

8    Maarten Drop, who submitted two declarations in support of this

9    application, is that those documents are not made public; they

10   are given to the court, but they are not in a public file.  In

11   any event, it's not so much --

12        THE COURT:  Where will I find that nugget?

13        MS. FLYNN:  My colleague is going to look for that.  I

14   would like to just continue while he looks for that.

15        The point isn't so much the minutes themselves.  The

16   point with regard to the minutes is that we know now that

17   confidential Yukos Group information has gotten to

18   Promneftstroy because they have used it in the Netherlands.

19        We contacted everyone else who had access to these

20   minutes.  They all submitted declarations attesting to the fact

21   that they kept them confidential and didn't distribute them.

22   That left only the person who took the minutes, which was Mr.

23   Feldman, who was the secretary, and in this case he is being

24   represented by the U.S. counsel for Promneftstroy.  So

25   connecting the dots, we think the only possible result here is

FAL8YUKC

1   that Mr. Feldman gave those minutes to Promneftstroy, either

2   through his counsel or some other way, but that's how they got

3   them.

4           We were using those, your Honor, as an example of

5   confidential information that we know has already been

6   disclosed.  What we are seeking here, pending your Honor's

7   holding of a preliminary injunction hearing, is a TRO

8   prohibiting him from sharing -- Mr. Feldman and anyone acting

9   in concert with him -- from sharing additional confidential

10  information concerning the plaintiffs with third parties,

11  specifically, Promneftstroy.

12          THE COURT:  Do you have specific information in mind?

13          MS. FLYNN:  The problem, your Honor, is that Mr.

14  Feldman was a very trusted member of the team.  He was an

15  attorney.  He had access to outside counsel.  These are very

16  high-stakes litigations.  They have been going on for ten

17  years.  He was privy to all of the litigation strategy, all of

18  the information concerning the assets that are in dispute, the

19  financial plans, the reasons why certain actions were taking

20  place, why others weren't, and future plans.  This is all going

21  on in realtime.  The concern is that he is in a position to

22  share these confidential memos, e-mails, minutes, everything

23  that he had access to, with Promneftstroy.

24          THE COURT:  What evidence, apart from these minutes of

25  seven meetings, is there that he still has any of these

11

FAL8YUKC

1    documents?

2           MS. FLYNN:  Well, we know that he has e-mails.  We

3    have started our conversations with opposing counsel concerning

4    trying to negotiate an ESI order.  We know that he has e-mails.

5    He was working at the company up until a year ago so he still

6    has his e-mails.  And everything now is done electronically.

7    He has copies of things.  That's presumably how he got the

8    minutes to Promneftstroy, that he had copies of them

9    electronically.

10          THE COURT:  Slow down.  You say he has e-mails.

11          Now, this is e-mail traffic between him on whose

12   e-mail account?

13          MS. FLYNN:  That's the other issue about this.  The

14   Yukos Group, the individuals who were running the Yukos Group

15   and the various companies -- and he was one of them, he was the

16   director of a number of these -- they used their own e-mail

17   accounts.

18          THE COURT:  I am just shocked.

19          MS. FLYNN:  They didn't use a Yukos Group server.

20   Much to my chagrin, it makes ESI much more difficult.  They

21   didn't use a Yukos Group server.  My understanding of the Yukos

22   Group server is that it was only used by administrative

23   personnel, and that the people who were not support staff, but

24   were the ones who were actually managing the business, managing

25   the assets and investments and the litigation, which is a big

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAL8YUKC

1    part of their business, frankly, all used their own accounts.

2    So this is on Mr. Feldman's, I believe his was a Gmail, and his

3    correspondence would be from his Gmail account and to his Gmail

4    account.

5           THE COURT:  Now, can you enlighten me on how long

6    e-mail traffic in a personal Gmail account would remain

7    accessible to the account holder?

8           MS. FLYNN:  My understanding from talking to counsel

9    is that the more recent e-mails are accessible; the more

10   historical e-mails are not.  There was a period of time when,

11   particularly Mr. Feldman's Gmail account, his inbox I suppose,

12   was too large and things were deleted, but that those were long

13   ago, and that the more recent e-mails he still has.

14          THE COURT:  Define more recent.

15          MS. FLYNN:  Certainly within the last few years.  We

16   were talking in our discussion about ESI going back to, I think

17   it was 2006 or 2007.  So those earlier years, 2006, '07, I

18   can't recall at what point counsel said he would not have

19   e-mails, but I don't think that it was after 2009 or '10.  So I

20   think in terms of what he still has, it's probably within the

21   last five years.

22          THE COURT:  Are you confident that the cat is not out

23   of the bag already?

24          MS. FLYNN:  I am not, Judge.  That's not part of the

25   TRO, but in my motion for the preliminary injunction I also

13

FAL8YUKC

1    seek expedited discovery to get very, very limited document

2    discovery from Mr. Feldman, specifically, about documents he

3    has given to Promneftstroy, and a limited deposition of Mr.

4    Feldman to determine the same thing.  Without that, I am

5    completely in the dark, and we have then clients in the

6    Netherlands who are litigating against an adversary who may

7    know everything about their litigation strategy from one of the

8    lawyers.

9              THE COURT:  Who has been gone for almost two years.

10             MS. FLYNN:  I understand that, Judge.  This is when I

11   found out that I have got evidence that things have gotten

12   leaked.  I couldn't make a TRO application before now.  We

13   filed the motion for preliminary injunction as soon as we

14   could.

15             THE COURT:  How do you square the terms of the TRO

16   you're looking for with Rule 65(d), which says that an order

17   granting a restraining order must state its terms specifically

18   and describe in reasonable detail the act or acts restrained?

19             MS. FLYNN:  The acts that we have sought to restrain

20   are defendant Feldman, and anyone acting in concert with him,

21   to be temporarily restrained and enjoined from disclosing

22   plaintiffs' confidential information to third parties,

23   including Promneftstroy and its agents and conduits.

24             THE COURT:  What differentiates so clearly

25   confidential from nonconfidential information as to leave

14

FAL8YUKC

1    someone subject to your proposed restraining order in a

2    position to know whether or not a given disclosure of a given

3    fact is or is not restrained?

4             MS. FLYNN:  Well, I would take a page from the

5    director's agreement that Mr. Feldman signed.  Certainly, in

6    that agreement, the information was described as:  Any

7    information which may come to his knowledge in the course of

8    his appointment, any information relating to the company or

9    business, etc.

10            So, if you're just looking at the director's

11   agreement, I think it can have a very expansive view.  But what

12   is confidential and what is not confidential, Mr. Feldman is an

13   attorney.  If information came to him in his capacity as an

14   attorney, that's clearly confidential.

15            THE COURT:  When does it come to him in his capacity

16   as an attorney?  Does he have to have a particular hat on at

17   the moment?

18            MS. FLYNN:  No.  When he was working for the company.

19   In his own words, he was one of two U.S. lawyers at the

20   company.

21            THE COURT:  But you know full well that not all

22   communications to an attorney employed by a company, even one

23   who is employed on an in-house legal staff, are subject to

24   attorney-client privilege.  Stuff that's communicated to him or

25   her in a different capacity, such as communicated in his

FAL8YUKC

1    capacity as a director, is not privileged.

2            MS. FLYNN:  I agree, your Honor, and so does he.  He

3    is a New York licensed attorney.  He is in as good a position

4    as I am to know what is confidential and what is not.

5            THE COURT:  So if you're both blind, then we have a

6    problem.

7            MS. FLYNN:  I think, Judge, if you're seeking to

8    modify the terms of the TRO to be more specific and give

9    instruction to this lawyer as to what is confidential and what

10   is not, it would be anything concerning the litigation

11   strategy, asset protection, business and affairs, the

12   descriptions that we give in our papers for the subjects that

13   are raised in those minutes that he already disclosed to

14   Promneftstroy.

15           THE COURT:  I have looked at those minutes.  I didn't

16   look at every word of course, time has been short, but give me

17   the three nuggets from those minutes that you think are the

18   clearest examples of confidential, super-sensitive information.

19           MS. FLYNN:  I think certainly, your Honor, the ones

20   that I have cited, I didn't quote the whole quotes because we

21   were seeking to file those minutes under seal.

22           THE COURT:  I have got them in front of me.  Give me

23   an exhibit number and a page.

24           MS. FLYNN:  OK.  Frankly, your Honor, in Exhibit 2 --

25   that was just the first one I flipped to -- where it says in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

FAL8YUKC

 1   Section 2.1, "Glendale/Yukos Capital Attachments on the Yukos
 2   Finance shares," where it says, "Even if Promneftstroy is
 3   ultimately held not to have validly acquired the shares in
 4   Yukos Finance, Yukos Finance cannot distribute the money from
 5   the so-called Dutch structure as long as these attachments
 6   remain in place."
 7             You have got examples here of instructions briefing
 8   from the in-house lawyers.  If you look at the list of who is
 9   attending, there are lawyers who are attending here who are
10   making presentations about the pending litigations, and they
11   are giving instructions on what can be done and what can't be
12   done.
13             THE COURT:  Who is DG?
14             MS. FLYNN:  David Godfrey.  He is a lawyer and he is
15   on the board of directors of the two foundations.
16             THE COURT:  It appears to me from reading this
17   paragraph that he is the source of the sentence to which you
18   referred.  You agree with that?
19             MS. FLYNN:  Yes, I agree with that.
20             THE COURT:  Is he the other person you say is also an
21   in-house lawyer?
22             MS. FLYNN:  He was the other lawyer.  There were two
23   U.S. lawyers, one was Mr. Godfrey and one was Mr. Feldman.  Mr.
24   Godfrey was essentially Mr. Feldman's boss, I guess you would
25   say.

FAL8YUKC

1          THE COURT:  Is there anything confidential about that

2     sentence?  If there is an attachment, it's there, it's

3     presumably public, but in any case, the other side would know

4     about it, right?

5          MS. FLYNN:  I think in all of these, Judge, in terms

6     of a legal update, where he is briefing the nonlawyer members

7     of the board and instructing them what various orders mean and

8     what they can and what they can't do, these are just examples.

9     I am not saying that this is the extent of what we want --

10          THE COURT:  I understand.  You're giving me these

11     minutes.  You have got all excited about these minutes.  And I

12     am asking you to show me the three worst examples.  And I

13     understand your point about the one you have referred to, but I

14     am somewhat less than swept off my feet by it.

15          MS. FLYNN:  In tab 3 -- your Honor, is this transcript

16     going to be sealed?

17          THE COURT:  We will get to that.

18          MS. FLYNN:  I am a little uncomfortable quoting in a

19     potentially public transcript the statements that you're asking

20     me for.

21          THE COURT:  Just point me to it.

22          MS. FLYNN:  All right.  In Tab 3, Exhibit 3, Section

23     2.1 is a legal update.

24          Turn to the next page, which is page 3.

25          THE COURT:  There are five paragraphs.  Which one or

FAL8YUKC

1    ones?

2              MS. FLYNN:  On page 3 of those minutes, the second

3    paragraph.

4              THE COURT:  Why would I be wrong in concluding that

5    there is nothing sensitive about any but conceivably the last

6    sentence?

7              MS. FLYNN:  The second to last sentence is also -- one

8    of the issues is, understanding the background --

9              THE COURT:  But that sentence makes clear that that

10   particular horse is already out of the barn, right?

11             MS. FLYNN:  Yes.  Of course, all of this is already

12   out of the barn, Judge, because these are the minutes that they

13   already have in the Netherlands.  I agree with you.  We

14   wouldn't have wanted Promneftstroy to have this information in

15   the Netherlands.

16             THE COURT:  But they have got it.

17             MS. FLYNN:  They have it now.  I am not seeking to

18   enjoin this.  I am enjoining anything else --

19             THE COURT:  Slow down.  First of all, you want it

20   sealed.  We will get to sealing.  That's a whole other story.

21             But, second of all, you want an injunction in

22   extremely broad terms, arguably terms that are sufficiently

23   vague, that in the last analysis it's debatable whether an

24   alleged violation, a contempt charge, could prevail against an

25   argument of lack of fair notice.  And that is Rule 65(d).

FAL8YUKC

1    That's what I am worried about.

2           MS. FLYNN:  These are examples that information that

3    was clearly treated as confidential by everyone else at the

4    company --

5           THE COURT:  That's an overstatement.

6           MS. FLYNN:  By everyone who had access to them.  I

7    have submitted their declarations.

8           THE COURT:  In some respects, that's kind of like

9    saying that if I have a piece of paper on my desk that says,

10   the Mets are ahead three games to none over the Cubs, and I

11   have never shown that piece of paper to anybody, and I don't

12   let people rifle through the papers on my desk, that that is

13   confidential information.  Well, look, I understand that the

14   fact that I have such a piece of paper, that I have something

15   that says the Mets are ahead three games to none, that's really

16   something nobody else knows, but who cares?

17          MS. FLYNN:  I agree.  But the reason why we should

18   care about this type of information is because these companies

19   are in a knock-down, drag-out fight over these assets and over

20   where is the money, who has the money, and what are they

21   permitted to do, what are they not permitted to do.  Mr. Drop's

22   declaration talks about 11 injunction motions filed by

23   Promneftstroy recently over all of these issues.  These minutes

24   talk about what is happening in the litigation, what the

25   various rulings mean, what they can and what they can't do,

20

FAL8YUKC

1    where the money is.

2         THE COURT:  As to point number one, what is happening

3    in the litigation, your adversary knows that.

4         MS. FLYNN:  I know.  That's what I am saying.  That's

5    the backdrop for it.  Because they said, here is what is

6    happening.  Here is what the ruling means, what we can do, what

7    we can't do, legal advice.  Here is where the money is.  Here

8    is what has been moved, here is what has not been moved.  These

9    are the things that they are litigating over in the

10   Netherlands, and they are shown here because they are examples

11   that we are concerned because this individual had all of this

12   information about litigation strategy and asset protection that

13   he could share with our litigation adversary.

14        THE COURT:  If I said to you that I would be prepared

15   possibly to entertain a restraining order that was more

16   specific and narrower than the "give me the whole outdoors"

17   that you have asked for, how would you formulate it?

18        MS. FLYNN:  I would formulate it as:  Any information

19   concerning plaintiffs' litigation strategy, legal advice, asset

20   protection, asset location, and strategy concerning financial

21   assets.

22        What I am talking about is there are discussions about

23   moving money to prevent the Russian government from

24   expropriating non-Russian assets.  Information concerning where

25   the money is going and what the plans are for shielding the

FAL8YUKC

1    asset, I guess that would come within asset protection, so I

2    think I have exhausted those very specific areas.

3         THE COURT:  All right.  I realize there are other

4    requests here, but let me hear from Mr. Soloway, if he wishes

5    to be heard, on the TRO part of this.

6         MR. SOLOWAY:  I do, your Honor.

7         Your Honor, as you pointed out, a TRO should only be

8    granted -- and the Second Circuit case law bears this out --

9    should only be granted on a demonstration of irreparable harm.

10        THE COURT:  They have made a pretty good case that

11   your guy is leaking by virtue of the appearance in the

12   Netherlands of these minutes, arguably, in breach of his

13   fiduciary duties and his contract.  That, plus the fact that

14   there is some reason to think he has most assuredly changed

15   sides, gives some reason to think that he is going to leak some

16   more.  What is wrong with that chain of argument?

17        MR. SOLOWAY:  What is wrong with it is, first of all,

18   it's an assumption that these documents came from him.  They

19   have not shown that the documents came from him.

20        THE COURT:  Well, there is evidence before me that

21   shows that they didn't come from anybody else.

22        MR. SOLOWAY:  No.  There is evidence before you that

23   shows that they didn't come from those specific people, not

24   that it didn't come from anybody else.

25        THE COURT:  What is the distinction?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

FAL8YUKC

1              MR. SOLOWAY:  We believe that there are others who

2    have had access to this information as well.

3              THE COURT:  You believe or you can prove?

4              MR. SOLOWAY:  Well, I can't prove without having seen

5    the papers that they filed.  It's kind of hard to argue --

6              THE COURT:  That's a very fair point.

7              MR. SOLOWAY:  -- in a void.

8              But, your Honor, we are not dealing with a company

9    that this Court frequently sees with temporary restraining

10   orders and emergency actions.  We are not dealing with a

11   company with trade secrets or with patents or with a client

12   list or other sort of immediate threat or imminent harm.  We

13   are not even dealing, frankly, with a company that does

14   anything in production.  What we are dealing with are assets

15   that exist and are held in trust.  That's what we are dealing

16   with.  And there is an argument between sides as to who owns

17   those assets.  Those assets aren't going anywhere.  There is no

18   harm, there is no imminent harm to the company, there is no

19   legally cognizable harm that that pile of money or that asset

20   can suffer, and therefore a TRO is not appropriate, your Honor.

21             Second of all, when you asked counsel, Ms. Flynn, to

22   kind of zero in on what she was looking to restrain, now that,

23   as you pointed out, the things that she brought initially,

24   which are the minutes, the horse is out of the barn, she used

25   these kind of very overly broad, nonspecific, non-informative

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAL8YUKC

1    categories that frankly could include any document.

2            To clarify for the Court, Mr. Feldman was never

3    general counsel, he was never on a legal staff for any of these

4    companies, yet he is a licensed attorney.  He went to law

5    school and he is a licensed attorney, but he was not acting as

6    an attorney.  Frankly, the action is not brought against him as

7    an attorney.  The action is brought against him as a director

8    and in his capacity as a director/former director and

9    secretary, not in a legal capacity.  So it's somewhat

10   misleading to bring up the fact that he went to law school so

11   he should know better.

12           Also, your Honor the complaint was filed on June 25th

13   of 2015.  In that complaint they asserted in, I believe, Count

14   Four, they asserted and sought a preliminary and permanent

15   injunction, and yet now they are representing to the Court that

16   they only became aware of this problem in October.  Well,

17   months previous, in June, when they filed the complaint, they

18   apparently were aware of it because they made the allegation,

19   and of course Rule 11 would have required a basis for that

20   allegation, regarding breaches of Mr. Feldman.  So to me that

21   strikes as a little disingenuous as well.

22           Finally, your Honor, we are asking before the Court

23   make a decision for, at the very least, some procedural

24   fairness and an opportunity for us to view the documents and to

25   be able to respond intelligently to them so that the Court has

FAL8YUKC

1    before it our arguments and our response to something as

2    opposed to responding in a void, which is what we are doing

3    now.

4            THE COURT:  How would your client be harmed, if at

5    all, by a temporary restraining order along the narrow terms

6    that Ms. Flynn suggests for the interim while you are having

7    your opportunity to be heard fully on papers?

8            MR. SOLOWAY:  Well, your Honor, I disagree that it was

9    a narrowing.

10           THE COURT:  Whether it's narrow or broad or an

11   elephant or a giraffe, how would your client be harmed?

12           MR. SOLOWAY:  Our client would be harmed simply

13   because there would be an injunction against him and there

14   would be a legal action that then they will use as leverage and

15   they will use as a weapon against my client.

16           THE COURT:  How are they going to do that?

17           MR. SOLOWAY:  Frankly, I believe they are using this

18   injunctive relief as kind of an affirmative action against him.

19   Frankly, also, the initial application was to keep that

20   information from his attorneys.

21           THE COURT:  I didn't understand what you said.

22           MR. SOLOWAY:  He would be harmed in the ability to

23   present and prepare his attorneys for his defense.

24           THE COURT:  All right.  Anything else that you care to

25   say?

25

FAL8YUKC

 1          MR. SOLOWAY:  Your Honor, it's simply that under

 2   Second Circuit law, a TRO is an extraordinary remedy, shouldn't

 3   be granted lightly, and, frankly, Ms. Flynn has not met the

 4   burden of irreparable and imminent harm.  So we don't believe

 5   that a TRO should be granted in that respect.

 6          Thank you.

 7          THE COURT:  Thank you.

 8          Let's go on to the subject of the sealing of the

 9   historical minutes.

10          MS. FLYNN:  Judge, the issue with the sealing of the

11   historical minutes is that, although Promneftstroy has them, it

12   would be certainly preferable that they not be publicly filed.

13          THE COURT:  Why is that?

14          MS. FLYNN:  Because the litigations that are going on

15   in the Netherlands involve various purported stakeholders.  The

16   biggest stakeholders are Promneftstroy and another company that

17   is referred to in the papers throughout as GML.  There are

18   other minority shareholders.  This information, if it is out

19   there on the Internet -- that's the biggest issue, anyone can

20   go on Pacer and get this information -- it's only going to make

21   matters worse in the Netherlands.

22          THE COURT:  How?

23          MS. FLYNN:  Because all of those other parties are

24   going to have the same information now that Promneftstroy has.

25          THE COURT:  So what?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAL8YUKC

```
 1              MS. FLYNN:  Now they will be in a position to use it

 2    against the plaintiffs in the Netherlands as well.

 3              THE COURT:  Show me something that anybody can use in

 4    any material way in those minutes.  That's another way of

 5    asking you what I asked you before.

 6              MS. FLYNN:  I think that there were certainly minutes

 7    that talked about certain actions that weren't being taken at

 8    the present time.

 9              Your Honor, could you turn, please, to Exhibit 5?

10              THE COURT:  OK.

11              MS. FLYNN:  On page 6 of Exhibit 5, under legal

12    update.

13              THE COURT:  Page 5?

14              MS. FLYNN:  Under legal update.

15              THE COURT:  I don't see such a heading.

16              MS. FLYNN:  I'm sorry.  Page 6.  Where it says legal

17    update.  Steps are currently being taken.

18              THE COURT:  I see that sentence.

19              MS. FLYNN:  The debtors in Russia are other third

20    parties.  We are not talking about Promneftstroy.

21              THE COURT:  This is minutes of a meeting that took

22    place seven years ago.

23              MS. FLYNN:  I understand that, Judge.  And you would

24    think that this whole litigation wouldn't be where it is now

25    after all this time, but it is.  All of these issues are still
```

27

FAL8YUKC

1      being dealt with in the Netherlands.

2              THE COURT:  It's very simple.  What you have pointed

3      me to is a statement that says certain steps are presently

4      being taken as of the 11th of December 2008.  Now, either they

5      were taken or they weren't taken then.

6              MS. FLYNN:  That's true.

7              THE COURT:  Steps were being taken then to inaugurate

8      the president, but time has gone by.  He was inaugurated.  He

9      was reelected.  A lot of water over the dam since 2008.

10             All right.  I am not going to seal those exhibits now

11     because I have given you an ample opportunity to show me

12     something that really ought to be sealed and I am not

13     persuaded.

14             Now, the next problem tendered by your application,

15     Ms. Flynn, is what if Mr. Feldman wants to file in this case

16     stuff that you regard as confidential.  Why isn't the sensible

17     way to deal with that to require that Mr. Feldman will not file

18     anything in this case for some stipulated period of time before

19     he has shown it to you?

20             MS. FLYNN:  That will be fine, your Honor.

21             THE COURT:  Mr. Soloway, what is wrong with that?

22             MR. SOLOWAY:  Could you repeat that one more time?

23             THE COURT:  The idea would be that you and your client

24     would not file any papers in this case that you have not given

25     to Ms. Flynn at least X hours -- and we will come back to what

28

FAL8YUKC

1    X is -- or days before you file it, and she has the opportunity

2    then to read them, and if she finds something that she thinks

3    ought to be filed under seal, she will tell you.  And if you

4    can't resolve it, she will come to court.

5            MR. SOLOWAY:  I think that would be a reasonable

6    agreement to reach.

7            THE COURT:  So here is what we will do about that one.

8            The language isn't in the order to show cause that I

9    have, but I will make an oral direction on the record, and it

10   will be enforceable by contempt.  But let's talk about what X

11   is.

12           Ms. Flynn, how much advance notice do you want?

13           MS. FLYNN:  48 hours electronic, 48 hours e-mail.

14           THE COURT:  Is 48 hours OK with you, Mr. Soloway?

15           MR. SOLOWAY:  It's unfortunately running into a

16   lawyer's creed of doing things up until midnight.

17           THE COURT:  I know, but you just have to adjust the

18   schedule.

19           MR. SOLOWAY:  I understand, your Honor.  I am smirking

20   as I am saying that.

21           THE COURT:  I hope it was a good-natured smirk.

22           MR. SOLOWAY:  It was.  I assure you it was a

23   good-natured smirk.

24           Yes, your Honor.  I think that would be fine.

25           THE COURT:  So it is hereby ordered that the

29

FAL8YUKC

1    defendant, Daniel Caleb Feldman, and his counsel, shall file no

2    papers in this action less than 48 hours after the papers have

3    been sent by electronic means to Ms. Flynn and her associate.

4    They may then file them to the extent there is no objection,

5    that is to say, if there is no objection within 48 hours, they

6    are to free to file it.  If there is an objection, you are to

7    work it out before filing it or else, if you can't work it out,

8    Ms. Flynn will have to get to the Court within 48 hours and

9    seek appropriate relief, but once the 48-hour period is up, Mr.

10   Feldman and his counsel are free to act absent the contrary

11   order from the Court.

12          MS. FLYNN:  Just to clarify because I was confused

13   about the two 48 hours.

14          THE COURT:  There is only one 48 hours.  They can't

15   file for 48 hours.

16          MR. SOLOWAY:  The one issue, simply because of the

17   timing of this, is that we have an answering brief to a motion

18   to dismiss that's due on Friday and that has not been fully

19   drafted at this point.

20          THE COURT:  I will extend it to Monday.

21          MR. SOLOWAY:  OK.

22          THE COURT:  So just to be absolutely clear how the 48

23   hours works.  You can't file anything, that is to say, the

24   defendant can't file anything until the papers have been sent

25   electronically to Ms. Flynn and her associate.  At the end of

30

FAL8YUKC

1   the 48-hour period, you're free to file, unless there is a

2   Court order requiring filing under seal or you and Ms. Flynn

3   have worked out an agreement about what gets filed under seal

4   and what gets filed publicly.

5          Is that clear all around?

6          MS. FLYNN:  It's clear, your Honor, except I am

7   thinking about a Friday to a Monday.  If we receive the notice

8   on Friday, I can't get to the Court until Monday.

9          THE COURT:  The period is 72 hours if the filing

10  occurs on a Friday or Saturday.

11         I'm sorry.  If the electronic notice is on a Friday or

12  Saturday.  And if the Monday is a holiday, then it's 96 hours.

13         MS. FLYNN:  Thank you, Judge.

14         THE COURT:  Clear all around?

15         MS. FLYNN:  Clear all around.

16         THE COURT:  Clear, Mr. Soloway?

17         MR. SOLOWAY:  Can I clarify something, your Honor?

18         THE COURT:  Yes.

19         MR. SOLOWAY:  In this order are you simply saying we

20  need to show the exhibits, correct, not the actual --

21         THE COURT:  You have got to show everything.  Because

22  your affidavits and papers may contain information that the

23  other side may claim should be filed under seal.

24         MR. SOLOWAY:  Everything?

25         THE COURT:  Yes, it's everything.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAL8YUKC

1          I do earnestly suggest that you very quickly, even

2     today, work out an agreed protective order in the usual form,

3     providing for confidential filings, and you both, I am sure,

4     know how to do this, and get that in.

5          So I am striking out paragraph 3 of the first decretal

6     paragraph of the order to show cause on the ground that we have

7     covered in an oral order.

8          What about expedited discovery?

9          MS. FLYNN:  What we have sought is very limited

10    document discovery and the deposition of Mr. Feldman to

11    determine what information he has given to Promneftstroy since

12    2014.  Very simple.  It can be very short.  But I think we are

13    entitled to know so that we are prepared in the Netherlands to

14    know what confidential information our litigation adversary has

15    that we believe they should not have.  So we have asked for

16    very limited discovery, and we have attached, as a matter of

17    fact, the proposed deposition notice and document requests to

18    my papers.

19         That is actually not an interim -- it's not expedited

20    relief that I am requesting today.  That's actually in the

21    motion.  So that's what counsel would be responding to as part

22    of our PI motion.

23         THE COURT:  So I don't have to decide that.

24         MS. FLYNN:  You don't have to decide that today.

25         THE COURT:  Oh, I see.

FAL8YUKC

1              MS. FLYNN:  That's not interim relief.  That's the

2      relief I am seeking in the motion.

3              Unless you want to give it to me today, Judge, and

4      then we will take the deposition.

5              THE COURT:  Not passionately, counsel.

6              MR. SOLOWAY:  Was something said?

7              THE COURT:  Ms. Flynn said she wasn't seeking that

8      relief today, unless I wanted to give it to her, and I said,

9      not passionately, Ms. Flynn.

10             MR. SOLOWAY:  I apologize, your Honor.

11             THE COURT:  No apology necessary.

12             I am going to require a bond of $5,000.

13             MS. FLYNN:  Thank you, Judge.

14             THE COURT:  I have heard nothing to suggest that

15     anything more than a nominal bond should be posted.  We will

16     say on or before Monday the 26th.

17             MS. FLYNN:  That's fine, Judge.

18             THE COURT:  Can you get these papers down to Mr.

19     Soloway today if you haven't already sent them?

20             MS. FLYNN:  We can e-mail them.  I had hard copies

21     because I thought they would be here today, but we can e-mail

22     them as soon as I get back to my office.  If I had my phone I

23     can do it from here, but I don't.

24             MR. SOLOWAY:  Will the Court be setting a preliminary

25     injunction hearing in the coming weeks?

33

FAL8YUKC

1            THE COURT:  I am going to set a return date for the

2     motion.  Today is October 21.

3            Let's talk about the schedule.  Normally the TRO,

4     unless extended, expires in ten days, which means 14 days the

5     way it's counted.  I may be out-of-date on that, they may have

6     changed the language of the rule, but the practical bottom line

7     is 14 days.

8            They did change the language.  14 days after it's

9     entered, absent consent for an extension.  I think 14 days is

10    November 4.  Everybody agree?

11           Now, I am prepared to set it down for November 4 for

12    argument.  I would accommodate the defense with more time, but

13    I imagine Ms. Flynn would want to consent to the TRO running at

14    least through the conclusion of the argument.

15           MS. FLYNN:  That's correct.

16           THE COURT:  What is your pleasure, Mr. Soloway?  I

17    will give it to you on November 4, but I am going to need the

18    papers filed sufficiently in advance of that for me to make

19    sense of them.  The alternative is, if you want a somewhat more

20    relaxed schedule, I will accommodate, but I think it's

21    reasonable to extend the TRO.

22           MR. SOLOWAY:  Your Honor, I just want to remind the

23    Court that they also filed what we perceive to be a tactical

24    motion to disqualify counsel that was filed yesterday.

25           THE COURT:  I am quite aware of that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAL8YUKC

```
 1              MR. SOLOWAY:  So I didn't know if the Court wanted to

 2    deal with those issues.

 3              THE COURT:  I frankly haven't had enough time to focus

 4    on that motion beyond knowing that it's been made and in

 5    general terms what it's about.  So I don't want to make that

 6    decision right now.

 7              MR. SOLOWAY:  Yes, your Honor.

 8              THE COURT:  If you want to work out a schedule between

 9    you that will bring that on at the same time as the preliminary

10    injunction, again, I will accommodate you.

11              MS. FLYNN:  That's fine with me, counsel, if you would

12    like to do that.  So long as the TRO is continued until we

13    actually have the PI hearing, I am happy to consolidate both

14    motions so that you only make one trip.

15              THE COURT:  I have got a suggestion for you.  We are

16    going to put it down for now for November the 4th at 10:00.

17              MR. SOLOWAY:  That will simply be for the PI?

18              THE COURT:  For the moment.  And I am going to want

19    the answering papers October 29, and that includes filing.  So

20    you have got to work in what we talked about a few moments ago

21    about showing them to the other side.

22              MR. SOLOWAY:  We need to provide it to her October 27.

23              THE COURT:  Right.

24              Then reply papers will be filed or before October 31.

25              That can't be.  We will have to make it November 2.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FAL8YUKC

```
 1            MR. SOLOWAY:  If the Court wanted to do it on the
 2    30th, that would probably be appropriate since they will have
 3    those two extra days to look at it prior to the filing.
 4            THE COURT:  What about that, Ms. Flynn?
 5            MS. FLYNN:  I am good with that.
 6            THE COURT:  So then the reply papers will be due
 7    October 31, as I said.  This is issued at 12:25 p.m., and I
 8    have just signed the TRO and the order to show cause.
 9            MR. SOLOWAY:  Your Honor, would it be possible to have
10    a reciprocal arrangement where they also need to show us their
11    papers 48 hours in advance?
12            THE COURT:  What obligations of confidentiality do
13    they owe Mr. Feldman?
14            MR. SOLOWAY:  We have concerns that we certainly want
15    protected, but they don't owe any obligations of
16    confidentiality to him.
17            THE COURT:  I don't see the basis for it.
18            Let me say two more things before we wrap this up.
19            The first is that I really do hope that you two can
20    work out a somewhat more relaxed schedule, and one that will
21    wrap together both the disqualification motion and this one,
22    and I understand that one of the players on the chessboard is
23    the duration of the TRO.  It shouldn't be a big obstacle, even
24    though it seems like it at first blush, because I have the
25    authority to extend it for another 14 days anyway whether there
```

FAL8YUKC

1    is consent or not.  But I would be happier if you worked out a

2    schedule that would suit all of your needs, and then I wouldn't

3    have to do that.  I remember well enough my 25 years in the

4    trenches to know what is involved with something like this over

5    two weeks, and I really don't want to impose burdens on you

6    that I would have been very unhappy about in my own day.

7    That's the first thing.

8              The second thing is that when you see the order to

9    show cause, the terms of the TRO have been narrowed in

10   accordance with what Ms. Flynn suggested, but the first time

11   the language that was modified appears in the document was in

12   the first decretal paragraph, which actually was the order that

13   the defendant show cause why an order barring the disclosure of

14   confidentiality should not be entered.  I mistakenly entered

15   the modified language first in that paragraph.  That was a

16   mistake on my part.  It is an immaterial error because I am

17   construing the motion, in terms of the relief sought, as being

18   the way plaintiffs asked for it.  But the decretal paragraph

19   containing the TRO, the second decretal paragraph is correct

20   with the modification that I talked about, and that's where the

21   restraint on Mr. Feldman is imposed, just so you're all clear

22   about that.

23             MS. FLYNN:  Understood, Judge.

24             THE COURT:  I realize you don't have the paper, Mr.

25   Soloway, but if you have any lack of clarity about what I just

37

FAL8YUKC

1    said, now would be the time.

2              MR. SOLOWAY:  No, your Honor.  I believe once I see

3    the papers in front of me, it will become clear.

4              THE COURT:  I think that is clear.  Just be aware that

5    in the paragraph saying the defendant is directed to show cause

6    why an order shouldn't be entered, my interlineations in that

7    paragraph are inoperative.  My interlineations in the second

8    decretal paragraph, which contains the TRO, are operative.

9    Clear?

10             MS. FLYNN:  Clear.

11             MR. SOLOWAY:  Yes.

12             THE COURT:  All right.  I thank you all.

13             MR. SOLOWAY:  Thank you for letting us attend

14   telephonically.

15             THE COURT:  I would have, of course, preferred if this

16   had been handled in a way that had effectively gotten you here,

17   but I think we did fine.

18             OK.  Thank you very much.

19             (Adjourned)

20

21

22

23

24

25