UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
YUKOS CAPITAL S.A.R.L., et al.,

                        Plaintiffs,

                   -against-                             15-cv-4964 (LAK)

DANIEL CALEB FELDMAN,

                       Defendant-Third Party Plaintiff,

                   -against-

DAVID GODFREY, et al.,

                       Third-Party Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

Appearances:

                 Mary E. Flynn
                 MORRISON COHEN LLP
                 *Attorney for Plaintiffs*

                 Glenn E. Summers
                 BARTLIT BECK HERMAN PALENCHAR & SCOTT
                 *Attorney for Thirrd Party Defendant Marc Fleischman*

                 Rishi Bhandari
                 MANDEL BHANDARI LLP
                 *Attorney for Defendant-Third Party Plaintiff*

2

Lewis A. Kaplan, *District Judge.*

This case arises out of the forced break up of the Yukos Group ("Yukos Oil"), which at one point was among the largest and wealthiest privately held corporate groups in the Russian Federation and that nation's largest exporter of crude oil.  The matter is before the Court on the motion of defendant Daniel Feldman for summary judgment dismissing the amended complaint.

*Facts*

This case's full back story is long, complicated, and in some respects much disputed.[1] For present purposes, it suffices to say only the following.

*The Break Up of Yukos Oil*

In 2006, Yukos Oil was forced into bankruptcy due to various taxes, fees, and penalties imposed by the Russian government – penalties which, in the view of Yukos Oil, were wrongful.  A receiver was appointed for the assets of Yukos Oil.  He sold many of these to a Russian company, OOO Promnefstroy ("Promnefstroy"),[2] and others to a Russian state-owned entity, Rosneft.[3]  Among those assets were a wholly-owned Dutch subsidiary, Yukos Finance B.V. ("Finance"), which the receiver purported to sell to Promnefstroy, and Yukos CIS ("CIS"), which the receiver purported to sell to Rosneft.  The sale of Finance to Promnefstroy was challenged in the Netherlands and has been the subject of litigation there since 2007.

---

[1] See, e.g., *Yukos Capital Sarl v. OJSC Rosneft Oil Co.*, [2012] EWCA Civ 855 (C.A.).

[2] Am. Compl. ¶ 19; Answer ¶ 19.

[3] Am. Compl. ¶ 21; Answer ¶ 21.

The plaintiffs in this case are direct or indirect subsidiaries of Finance and CIS as well as two foundations and a trust established to protect assets of one or more of the corporate plaintiffs. They here sue Daniel Feldman who, from approximately 2007 to 2014, was a director of several of the plaintiff entities and previously had been employed by the now-defunct Yukos Oil. Plaintiffs claim that Feldman breached his fiduciary duties to them by, *inter alia*, misappropriating monies for personal gain and disclosing confidential information to plaintiffs' adversary, Promnefstroy.

*The Present Motion*

The amended complaint details a series of alleged schemes whereby Feldman – in many cases while he occupied positions of trust as an officer or director of plaintiffs and in some instances after he ceased serving in those positions – is said to have breached his fiduciary and other duties to the plaintiffs by conveying plaintiffs' confidential information to its adversary Promnefstroy, helping or attempting to help himself to money and other property of the plaintiffs by a variety of means, diverting or attempting to divert corporate opportunities of the plaintiffs for his own benefit, overbilling for travel expense reimbursement, and other means.

One thread running through much of Feldman's position on this motion is that most if not all of the alleged inappropriate behavior resulted in no demonstrable damage to the plaintiffs.[4] But the parties' positions here may be likened to ships passing in the night.

Plaintiffs for the most part do not seek to recover damages proximately caused by the alleged misconduct. They instead rest principally on the faithless servant doctrine, which holds that an agent who betrays the agent's principal typically is entitled to no compensation, at least for the

---

[4] Def. Mem. [DI 200] at 7, 10, 12, 13, 16.

4

period of the agent's disloyalty.  Thus, apart from seeking to recover alleged overcharges for travel expense reimbursement, the monetary relief they desire is principally disgorgement of Feldman's compensation for the relevant period.[5]  Accordingly, we begin with Feldman's "no damages" argument and then pass to the details of the parties' other contentions with respect to specific alleged schemes.

*Discussion*

A.     *The Faithless Servant Claim*

Feldman argues that plaintiffs' failure to adduce evidence of "damages . . . allegedly suffered as a result of [his] conduct" "is fatal to [many of] Plaintiff's [*sic*] claims."[6]  But he is mistaken in light of plaintiffs' reliance on the faithless servant doctrine.

The law on this point is well settled.  As the Second Circuit has written:

> "New York law with respect to disloyal or faithless performance of employment duties is grounded in the law of agency, and has developed for well over a century. . . .
>
> "Under New York law, an agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties. One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary. * * * *It does not make any difference* that the services were beneficial to the principal, or *that the principal suffered no damage as a result of the breach of fidelity by the agent.*"[7]

---

[5]     Joint pretrial order [DI 258] at 4-5.

[6]     Def. Mem. [DI 200] at 7.

[7]     *Phansalkar v. Andersen Weinroth & Co.,* 344 F.3d 184, 200 (2d Cir. 2003) (internal quotation marks and citations omitted) (emphasis added) (quoting for the last point *Feiger v. Iral Jewelry, Ltd.,* 41 N.Y.2d 928, 928-29 (1977)).  *Accord, e.g., Design Strategy, Inc. v. Davis,* 469 F.3d 284, 300-01 (2d Cir. 2006); *X-Med, Inc. v. Western New York Spine, Inc.*, 74 A.D.3d 1708, 1711, 903 N.Y.S.2d 215, 217 (4th Dept. 2010).

Accordingly, any failure by plaintiffs to adduce competent evidence of damages caused by the breaches of duty complained of would be entirely immaterial to their attempt to obtain disgorgement of compensation paid to Feldman during any periods in which he was in breach.[8]

B.     Promnefstroy – 2008-09

The amended complaint alleges that Feldman in 2008-09 was charged with acting as liaison on behalf the Yukos Group (a term that includes subsidiaries of Finance[9] as well as plaintiffs Yukos Capital, YHIL, the Foundations and Luxtona[10]) in settlement discussions with managers of Promnefstroy.[11]  He is said to have had numerous meetings for that purpose, "ostensibly acting as a broker of a possible Yukos Group-Promnefstroy settlement and negotiating for the benefit of the Yukos Group."[12]  In fact, however, plaintiffs allege that he actively sought a secret cash payoff from Promnefstroy for attempting to broker a deal and secretly shared Yukos Group confidential

---

[8]     Feldman's contention that *"Phansalkar* and every other case to apply the faithless servant doctrine" involved a "substantial" breach of duty (Def. Reply Mem. [DI 226] at 11) is – not to put too fine a point on it – inaccurate.  In fact, *Phansalkar* discussed at length some tension in the New York cases – some applying the doctrine regardless of the substantiality of the breach and others doing so only in more limited circumstances.  344 F.3d at 201-03.  It declined, however, to come down on one side or the other in view of the fact that the conduct at issue in that case warranted application of the doctrine on either standard.  It is unnecessary to venture into this doctrinal question at this stage of the case, as Feldman's actions, depending upon the proof at trial, might warrant application of the doctrine on any standard.

[9]     Am. Compl. ¶ 18.

[10]     *Id.* ¶¶ 7, 22.

[11]     *Id.* ¶¶ 46-48.

[12]     *Id.* ¶ 50.

information with Promnefstroy and its managers in an effort to procure the payoff.[13]

Feldman argues that this claim should be dismissed because (1) there is no evidence that Feldman actually conveyed any confidential information and, in any case, (2) any claims for breach of contract or breach of fiduciary duty are time barred.[14]

The first of these contentions is rejected on the basis of the faithless servant doctrine.

The second contention fails as well.  The determination of the prescriptive period applicable in New York to claims of breach of fiduciary duty and of the time at which such a claim accrues can be complex undertakings, undertakings that none of the parties has even approached.[15] Fortunately, no complex analysis is necessary here.  The applicable prescriptive period is not less than six years.[16]  Feldman did not cease to be a director of YHIL until September 2012, a director of Yukos Capital until October 2014, and an officer of the Foundation until 2014.  Insofar as the running of the prescriptive period with respect to earlier breaches of duty otherwise might have begun, it was tolled

---

[13]

    *Id.* ¶ 51, 53.

[14]

    Def. Mem. [DI 200] 6-7

    We have disposed above of his further contention that plaintiffs have failed to prove any damages.

[15]

    *See generally Whitney Holdings, Ltd. v. Givitovsky,* 988 F. Supp. 732, 741-46 (S.D.N.Y. 1997).

[16]

    N.Y. CPLR § 213, subd. 7 (six year prescriptive period for actions "by or on behalf of a corporation against a present or former director [or] officer . . . for an accounting . . . or to enforce a liability, penalty or forfeiture . . ."); *Whitney Holdings, Ltd.,* 988 F. Supp. at 742 & n.62 (§ 213, subd. 7 applies "uniformly to all claims brought by or on behalf of corporations against directors, officers or shareholders") (citing SEN. FIN. COMM. REP., LEG. DOC. NO.. 8, 90–91 (1962) (stating that the elimination of the exception to § 213(7) will "make the same period applicable to all actions against a director, officer or stockholder of a corporation"); 1 JACK B. WEINSTEIN ET AL., NEW YORK CIVIL PRACTICE ¶ 213.23, at 2–371 (rev. ed.1997)).

with respect to each of these entities until Feldman's respective positions of trust with each ended.[17]
As this action was brought less than six years after the date of each of those terminations, Feldman's
limitations defense is entirely without merit.

C.    *Promnefstroy – 2015*

By the time this action was commenced on June 25, 2015, Feldman had left or been
ousted from all of his positions with the plaintiffs and their affiliates.[18]  Almost immediately after he
was sued here, he allegedly entered into a cooperation agreement with Promnefstroy and affiliates.
Under that agreement, Promnefstroy provided Feldman with the law firm of Bailey & Glasser – which
represented Promnefstroy, then and earlier including in one instance in a proceeding against Feldman
– to defend Feldman in this case and agreed to pay Feldman's legal fees in this action.  Feldman
promised (with certain exceptions) to "provid[e] complete and truthful information regarding his role
and actions related to the Various Yukos Entities" and allegedly provided privileged and confidential
information to Bailey & Glasser.[19]  Indeed, the cooperation agreement contemplated that Feldman
would assert counterclaims against the plaintiffs here and gave Promnefstroy the right to terminate its
agreement with Feldman in the event Feldman dropped any counterclaims against plaintiffs without

---

[17]
    *Golden Pac. Bancorp v. FDIC,* 273 F.3d 509, 518-19 (2d Cir. 2001) ("Under New York law,
    the limitations period for claims arising out of a fiduciary relationship does not commence
    until the fiduciary has openly repudiated his or her obligation or the relationship has been
    otherwise terminated.") (internal quotation marks and citation omitted); *Marchig v. Christies,
    Inc.,* 430 Fed. Appx. 22, 23 (2d Cir. 2011) (same).

[18]
    *See* Am. Compl. ¶¶ 24, 32, 33, 37, 40.

[19]
    *Id.* ¶¶ 55-65.

8

its consent.[20]  Thus, the essence of plaintiffs' position is that Feldman agreed to convey privileged and confidential information to Promnefstroy by means of turning it over to Promnefstroy's counsel and, moreover, agreed to serve as something of a cat's paw to assert litigation pressure against plaintiffs in order to serve Promnefstroy's interests.  To this it must be added that plaintiffs moved to disqualify Bailey & Glasser, which then withdrew as counsel of record for Feldman.  Under a revised cooperation agreement, Promnefstroy provided Feldman with his current counsel of record.[21]

Promnefstroy now seeks summary judgment dismissing plaintiffs' claims with respect to these events, essentially on the theory that Bailey & Glasser "did not even have time to review the materials it had collected  from Feldman before turning them over to Feldman's new counsel" and, in any case, did not provide documents concerning Yukos to Promnefstroy.[22]  It points to the testimony of a Bailey & Glasser 30(b)(6) witness and, in addition, of an executive of one of the owners of Promnefstroy, who denied that Promnefstroy had received any documents from Feldman's attorneys.

In view of the fact that these events all post-dated the end of Feldman's employment by the plaintiffs, the legal position here is somewhat different.  There is no evidence of the payment of any compensation to Feldman post-employment so the faithless servant doctrine has no bearing. Plaintiffs, in order to recover, therefore bear the burden of proving injury caused by  a breach of duty. Moreover, as these are issues on which plaintiffs would bear the burden of proof at trial, plaintiffs must adduce admissible evidence sufficient to raise a genuine issue of fact for trial in order to withstand

---

[20]     *Id.* ¶¶ 66-67.

[21]     *Id.* ¶¶ 64-65.

[22]     Def. Mem. [DI 200] at 8-9.

9

summary judgment.[23]

The circumstances here persuade the Court that plaintiffs have raised a genuine issue of material fact.  Plaintiffs and Promnefstroy long have been engaged in a struggle over control of former overseas (*i.e.,* non-Russian) assets of Yukos Oil.  They have been at sword's point.  Upon Feldman's being terminated and sued by plaintiffs, Promnefstroy came to his rescue by agreeing to pay for his legal defense in exchange for information and, indeed, by designating its own lawyers, Bailey & Glasser, to represent Feldman.  The legal defense obviously was something of value to Feldman, giving rise to the inference that Feldman delivered, or promised to deliver, something of value to Promnefstroy in return.  The evidence, given Feldman's history as an insider with the plaintiffs, permits the inference that the value that Feldman had to transfer to Promnefstroy was inside information of the plaintiffs.  Thus, it is reasonable to infer that transmission of whatever he knew and any interesting documents he possessed was at least part of the consideration for Promnefstroy's agreement to provide him with a defense.  Promnefstroy's designation of Bailey & Glasser as Feldman's counsel makes that inference even more persuasive than otherwise would have been so.  And while a trier of fact might credit the denials of Bailey & Glasser and Promnefstroy, it would not be obliged to do so.  Accordingly, summary judgment with respect to this claim will be denied.

D.     *The Bonus Scheme*

Feldman mounts a series of often fact-specific attacks on the other schemes plaintiffs allege.  Some fail for reasons to which the Court already has alluded.  But there is another problem

---

[23]

*E.g.*, *Salahuddin v. Goord,* 467 F.3d 263, 267 (2d Cir. 2006); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 94, 123-24 (2d Cir. 2001); *Raskin v. Wyatt Co.,* 125 F.3d 55, 65-66 (2d Cir. 1997).

with at least some of those attacks, and it is illustrated by Feldman's position with respect to what plaintiffs call the Bonus Scheme.

The starting point for the plaintiffs' so-called bonus scheme allegations are the facts that one of the foundation plaintiffs is the sole shareholder of YHIL and Feldman was one of YHIL's directors from 2006 until September 2012.[24]  In or about 2011, Nelson English, a director of certain Yukos Group entities, made a presentation to the foundations' board in support of his effort to obtain a multimillion dollar bonus for his role in developing and selling a Yukos Group asset.  The foundations decided to award English a much smaller bonus than he sought, to delay making the award, and to keep the relatively small size of the intended future award from him for some time.  In the same time frame, Feldman, secretary to the foundations' board, became privy to the fact that an entity called GML, which had been the majority shareholder in Yukos Oil prior to its expropriation, had given the foundations a letter in which it offered to pay the foundations a share of the value of any assets GML might recover through litigation.  The money was intended for use by the foundations as a bonus pool for persons who contributed to the success of the litigation.

Feldman, in breach of his obligations to the foundations, allegedly disclosed the foundations' action with respect to English and the substance of the GML letter concerning bonuses to fellow YHIL directors including Martin Parr, as well as others (together, the "Non Foundation Group"), and promoted the idea that the Non Foundation Group, like English, might well be treated unfairly by the Foundations.  Accordingly, he proposed to the Non Foundation Group that it set up a bonus pool for itself.  Among other things, he retained New York counsel and, through the New York lawyers and on an anonymous basis, British Virgin Islands ("BVI") counsel to advise with respect to

---

[24] Am. Compl. ¶¶ 5, 24.

the possible establishment of a trust into which the Non Foundation Group could divert $50 to $75 million from YHIL and its subsidiaries without the foundations' knowledge or approval and then cause the trust to distribute money to themselves.  He initially paid over $30,000 in legal fees out of his own pocket.

In the end, some of those whom Feldman approached declined to go along with the scheme, which therefore failed.  Feldman then billed and obtained reimbursement from YHIL for the legal fees, allegedly under false pretenses.

Feldman now seeks dismissal of the claim relating to these events essentially on three grounds.  First, no bonuses of the sort that Feldman proposed ever were paid and the proposed trust never was created.  Second, the retention of the law firms Feldman hired for the purpose of obtaining advice concerning the use of a trust was approved by the entire YHIL board.[25]  Third, the YHIL board approved the reimbursement of at least some of the legal fees with knowledge of their purpose. Finally, Feldman, he argues, may not be held legally responsible for conduct approved by the entire board.  None of these contentions has merit.

As an initial matter, the arguments ignore the fact that plaintiffs' claim rests principally on the faithless servant doctrine. The facts that the trust ultimately was not created and that the proposed bonuses were not paid are entirely beside the point given that Feldman's activities were undertaken for the purpose of diverting funds from YHIL for the personal benefit of Feldman and the Non Foundation Group.  If plaintiffs prove their case, they may prove entitled to recover whatever compensation was paid to Feldman during the period of his disloyalty.

Second, Feldman's attempt to invoke the alleged approvals by the YHIL directors –

---

[25]     Ketcha Decl. [DI 202] ¶ 5.

in substance, an invocation of the business judgment rule – is wide of the mark.  It is true of course that the management of corporations is entrusted to their boards of directors and that directors enjoy both broad discretion in the management of the businesses and material protection against liability for the proper exercise of their responsibilities.  But the business judgment rule is not entirely without limits. Directors owe their corporations duties of due care and, pivotal for present purposes, loyalty.  "[T]he business judgment doctrine is misapplied when it is extended to provide protection to corporate board members where there is an abundance of evidence strongly suggesting breach of fiduciary duty," including self dealing.[26]  "Once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders."[27]

Here, the amended complaint alleges in substance that Feldman and the Non Foundation Group were engaged in collusive action for the purpose of diverting YHIL assets to their personal benefit and, moreover, to do so without the knowledge of YHIL's sole shareholder, one of the foundations.  Their self interest, assuming the truth of the allegations of the complaint, is patent. Certainly the amended complaint does not allege facts, and Feldman has offered no evidence, that would demonstrate that the scheme was fair to YHIL and would have served the best interests of that company and its shareholder. Nor has Feldman demonstrated that his actions were approved by a disinterested majority of the YHIL board.  And the fact that some of the group ultimately backed away, resulting in the abandonment of the scheme, does not save Feldman from potential liability, at least at the summary judgment stage.

---

[26]

*Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 274 (2d Cir. 1986).

[27]

*Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984).

*E.      The Intelligent Energy Scheme*

Feldman's motion with respect to this aspect of the amended complaint is an example of his setting up of a straw man by mischaracterizing plaintiffs' claim and they attempting to tear it down.

Yukos International U.K. B.V. ("UKBV"), a subsidiary of the foundations, owned about 15 percent of the shares of Intelligent Energy ("IE").  Feldman served as the foundations' representative on the IE board.  And Feldman characterizes plaintiffs' claim with respect to IE as being merely that Feldman disclosed confidential information concerning IE to potential purchaser.[28]  They attack that claim on the ground, among others, that any such claim belongs to IE, which is not even a party to this case.[29]  But Feldman's premise is entirely incorrect.

In the briefest scope, plaintiffs assert that they had decided to sell UKBV's IE shares and retained an investment firm named Turquoise Associates to find potential buyers.  Unbeknownst to plaintiffs, Feldman made a side deal with Turquoise pursuant to which Turquoise in certain circumstances would split with him a success fee it stood to earn in the event of a favorable sale.  As time went by, Feldman, rather than simply seeking to find a buyer for the IE share block, secretly attempted to put together a special purpose vehicle and raise money from investors to enable him to buy UKBV's interest in IE. Eventually he disclosed his plan to plaintiffs and suggested that his proposed special purpose vehicle would pay them £0.80 per IE share.  But he did not reveal that IE just the day before had set a value on its shares of £1.00 per share – 25 percent more than the price Feldman offered.

---

[28]      Def. Mem. [DI 200] at 12.

[29]      *Id.*

In the final analysis, Feldman's machinations came to plaintiffs' attention and Feldman was removed from the IE board, so plaintiffs arguably did not suffer economic damage as a proximate consequence of Feldman's alleged breaches of fiduciary duty. Nevertheless, Feldman in this instance too fails to come to grips with the plaintiffs' faithless servant theory of recovery and thus is not entitled to summary judgment on this series of events either. Moreover, as the foregoing demonstrates, the true nature of plaintiffs' claim bears only faint resemblance to Feldman's inaccurate and incomplete characterization.

F.     The "Trust Scheme"

Feldman served for a period as the trustee of plaintiff 2004 Security Trust, which was created under a trust agreement dated March 13, 2004 (the "Security Trust").[30] The Security Trust, under the rather inaccurate heading "Trust Scheme," alleges two different breaches of fiduciary duty by Feldman in his role as trustee. First, although it apparently is common ground that the parties agreed that Feldman's annual compensation as trustee would be the same as that of his predecessor, Feldman allegedly misrepresented what that compensation had been and thus obtained excessive compensation. Second, he is said to have used $500,000 that belonged to the Security Trust to purchase in his own name and for his own benefit an interest in a private equity fund.

Feldman challenges the first of these claims, essentially on the ground that David Godfrey, the protector of the trust, had access to books and records that would have revealed the actual compensation of the preceding trustee and therefore either knew or should have known that the compensation that Feldman received exceeded that which had been agreed upon. He points to the facts

---

[30]     Am Compl. ¶¶ 8, 39-40.

that Godfrey apparently knew the amount of Feldman's compensation and that Feldman's successor knowingly was paid just what Feldman had taken. He describes this claim as "highly dubious,"[31] as perhaps it is. Nevertheless, he ignores the Security Trust's fundamental allegation – that Feldman misrepresented the compensation of the prior trustee and that Godfrey took his word for it.[32] Summary judgment dismissing that claim would be inappropriate.

The same is true with respect to the second of these claims. It is undisputed that Feldman used $500,000 of trust money to purchase in his own name an interest in a private equity fund. Feldman seeks to defend this by asserting that he disclosed the investment to Godfrey at the outset, that the investment ultimately was turned over to the Security Trust, and that the Security Trust eventually made a good deal of money on it. But Godfrey denies that Feldman disclosed the investment contemporaneously, let alone that it was made in Feldman's name rather than the Security Trust's.[33] Feldman, moreover, admitted at his deposition that he did not do so before he made the investment.[34] In all the circumstances, genuine issues of material fact foreclose summary judgment here as well.

---

[31]   Def. Mem. [DI 200] at 14.

[32]   Godfrey Decl. [DI 210] ¶ 6.

[33]   Godfrey Decl. [DI 210] ¶ 6.

Plaintiffs concede that Feldman some years later owned up to what he had done. They assert, however, that his disclosure was motivated by the facts that he faced personal tax liability for income on the investment, asked the hedge fund to change the Form K-1 to indicate that the gain was taxable to the Security Trust, and was met with a demand by the hedge fund to provide the passport and proof of residence of the trust protector, Godfrey. In other words, plaintiffs contend that Feldman admitted what he had done when he eventually was faced with a Hobson's choice of paying substantial tax personally or making the admission in order to shift the tax to the Security Trust.

[34]   Feldman Dep. [DI 209-3] at 198:23-199:4.

G.      *The Georgiadis Payments*

Plaintiffs claim that Feldman breached his fiduciary duties to YHIL in connection with transfers and/or improper concealment of transfers of YHIL funds to Cleanthis Georgiadis: (1) $99,000 for use in a Georgiadis political campaign in Cyprus, and (2) $1 million to secure payment of funds to which Georgiadis might have become entitled pursuant to an indemnity agreement between Georgiadis and YHIL, $400,000 of which was not returned.

Feldman first claims that the $99,000 payment was not a campaign contribution, but a compensation advance to Georgiadis of a sort allegedly common between YHIL and its directors and approved by the YHIL board. He relies principally on a declaration of Sergei Ketcha. As the evidence cited in plaintiffs' Rule 56.1 statement demonstrates, however, there is a genuine issue of material fact with respect to this claim.[35]

As for the $1 million indemnity fund, Feldman argues that the indemnity was proper, that the transfer of money to Georgiadis was approved by the YHIL board, and that he had nothing to do with whatever happened in this regard. In fact, however, Feldman has produced no evidence that the $1 million transfer was approved by the board,[36] and plaintiffs have come forward with evidence that Feldman and Ketcha signed the agreement to transfer the $1 million to Georgiadis.[37] Moreover, when Feldman was asked by Godfrey how Feldman had come to sign the agreement to transfer the $1 million to Georgiadis, Feldman did not claim it had been approved by the board – indeed, he said that

---

[35]        Pl. 56.1 St. [DI 212] ¶¶ 187-93.

[36]        Feldman's memorandum cites to paragraph 49 of his Rule 56.1 Statement in support of the claim of board approval. Def. Mem. [DI 200] at 19. Paragraph 49 of the Rule 56.1 Statement in turn cites to paragraph 4 of the Ketcha declaration. DI 201. The Ketcha declaration [DI 202], however, does not address the issue.

[37]        DI 209-46, at 5 of 7 (ECF pagination).

he did not "have a good explanation."[38]  Thus, a trier of fact reasonably could infer that the transfer of the $1 million was an accommodation that Feldman and Ketcha extended to Georgiadis without board approval for reasons satisfactory to themselves.  There are genuine issues of material fact with regard to this as well.

H.      *The Compensation Overpayment Claim*

Plaintiffs claim that YHIL mistakenly overpaid Feldman for the year 2011 to the extent of approximately $110,000 and that his retention of the allegedly excess payment breached fiduciary and contractual duties.  Feldman acknowledges the receipt of the funds in question but asserts that the amounts received were entirely correct.  The record shows the following.

The amended complaint alleges, and Feldman admits, that the YHIL board on May 27, 2010, fixed Feldman's compensation for serving as a YHIL director for the period June 20, 2010 through June 19, 2011 at $240,000.[39]  That $240,000 was paid in a lump sum on July 7, 2010.[40]

On January 17, 2011, the YHIL board increased Feldman's compensation for the year 2011 to $500,000.[41]  He signed also a director's agreement, which provided further that the $500,000 would be payable in monthly installments of $41,667.67.[42]  Those monthly payments were made, so

---

[38]
      *Id.* at 2-3 of 7 (ECF pagination)

[39]
      Am. Compl. ¶ 147; Def. Mem. [DI 200] at 19.

[40]
      Am. Compl. ¶ 148; Answer ¶ 148.

[41]
      Am. Compl. ¶ 149; Def. Mem. [DI 200] at 19-20.

[42]
      Flynn Decl. Ex. 21 [DI 209-21] ¶ 3.

      It is not clear whether the director's agreement was approved by the YHIL board.  Mr. Parr,

18

Feldman ultimately received for his services during the year 2011 $610,465.75 ($500,000 in monthly payments as set forth in the director's agreement plus $110,465.75, the portion of the $240,000 lump sum paid on July 7, 2010 that was referable to the period January 1 thorough June 19, 2011).

Feldman's unsworn memorandum claims that the $110,465.75 actually reflected a raise – that his compensation for 2011 was increased to $610,465.75 by the January 17, 2011 board resolution. Perhaps. But there is no evidence to support the notion that the YHIL board in January 2011 increased Feldman's 2011 compensation not merely to the $500,000 that appears in its resolution (and for that matter in Feldman's director's agreement) but to a substantially higher figure. And there is a perfectly sensible alternative explanation – that the board increased Feldman's compensation for 2011 from $240,000 to $500,000 and that it, and quite possibly Feldman, simply overlooked the fact that Feldman already had been paid $110,465.75 in respect to 2011 and so the monthly payments for 2011 should have been reduced to account for that earlier payment.

Of course, it is not for this Court to resolve this matter on a motion for summary judgment. Suffice it to say that a trier of fact reasonably could conclude that the director's agreement imperfectly reflected the parties' agreement in consequence either of mutual mistake or of unilateral mistake by YHIL of which Feldman was aware but which he fraudulently or inequitably failed to call to YHIL's attention in breach of his fiduciary duty as a YHIL director.[43]

---

then a YHIL director, testified that it was not. Parr Dep. [DI 209-8] at 228:23-229:14.

[43] *See, e.g., Amara v. CIGNA Corp.,* 775 F.3d 510, 526 (2d Cir. 2014) (reformation permissible based on unilateral mistake coupled with fraud or inequitable conduct causally related to the mistake); *Am. Home Assur. Co. v. Merck & Co.,* 329 F. Supp.2d 436, 444 (S.D.N.Y. 2004) (unilateral mistake coupled with fraudulent concealment by knowing party).

I.      *The Expense Reimbursements*

The amended complaint alleges that Feldman submitted claims, and obtained reimbursement, for over $1 million in business trip airfare and other purported business expenses.[44] Frequently, plaintiffs assert, he submitted false and inaccurate information that caused plaintiffs to make "reimbursement" payments that exceeded the expenses Feldman actually incurred.[45]  Feldman responds that a few of the instances for which plaintiffs seek damages are time barred and that in at least some instances in which he was "reimbursed" for business class fares when he in fact traveled in lower fare classes and pocketed the difference were fine because (a) plaintiffs had no formal travel policy save a prohibition on first class travel, and (b) Ketcha, a YHIL director, approved Feldman's expense claims.[46]

Feldman's statute of limitations argument is entirely without merit for reasons discussed above.[47]  His other argument is equally flawed.

Feldman conceded during discovery that he submitted in support of at least some of his airfare reimbursement claims screen shots for business class fare quotes he generated during the booking process but then actually flew in other fare classes at considerably lower costs and that he made money in these instances.[48]  Plaintiffs have adduced evidence that the overcharges of this nature

---

[44]    Am. Compl. ¶ 157.

[45]    *Id.* ¶ 158.

[46]    Def. Mem. [DI 200] at 25-26.

[47]    *Supra* at 6-7.

[48]    Feldman Dep. [DI 209-3] at 426:14-427:8, 436:17-437:4

were quite substantial.[49]  Ketcha's vague claim that he approved Feldman's reimbursement claims is no answer to the assertion that YHIL was defrauded, at least for the simple reason that his declaration nowhere states that Feldman disclosed that he was billing for business class airfares, traveling in lower classes at lower rates, and pocketing the difference.[50]  If, as Ketcha implies, Feldman was entitled to travel in business class and to keep the difference when he flew more cheaply as part of his compensation, there arguably would have been no reason to have concealed the amounts actually paid for airfare when seeking reimbursement for business class fares.  Accordingly, issues of fact preclude summary judgment on these claims as well.[51]

J.      *Yukos Capital and Luxtona Claims*

Feldman contends that the amended complaint does not particularize any claim for which either Yukos Capital or Luxtona could obtain any relief.  He argues that the case, insofar as it is brought on behalf of these plaintiffs, should be dismissed.  Plaintiffs have not responded to the this contention in any respect.

Accordingly, Feldman is entitled to summary judgment dismissing the claims of these two plaintiffs.

---

[49]
        *See* Pl. 56.1 St. [DI 212] ¶¶ 214-22 & App. B.

[50]
        Ketcha Decl. [DI 202] ¶ 3.

[51]
        Feldman seeks also to limit the extent of plaintiffs' claims to matters they identified in discovery.  The question whether such a limitation is appropriate is not properly before the Court on this motion, which seeks only to identify claims and issues as to which there are no genuine issues of material fact and as to which Feldman is entitled to judgment as a matter of law.

21

*Conclusion*

    For the foregoing reasons, Feldman's motion for summary judgment dismissing the amended complaint [DI 199] is granted to the extent that the action, insofar as it is brought on behalf of plaintiffs Yukos Capital S.A.R.L. and Luxtona Limited, is dismissed.  The motion is denied in all other respects.

    This case is set for trial June 6, 2017 at 9:30 a.m.

    SO ORDERED.

Dated:   February 6, 2017

                   Lewis A. Kaplan
                 United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)