**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

YUKOS CAPITAL S.A.R.L., et al.,

                Plaintiffs,

     -against-

DANIEL CALEB FELDMAN,

             Defendant.

Case No: 15 Civ. 4964 (LAK)

**DEFENDANT'S TRIAL MEMORANDUM OF LAW**

MANDEL BHANDARI LLP
Rishi Bhandari
Robert Glunt
80 Pine Street, 33rd Floor
New York, NY 10005
T:  (212) 269-5600

*Attorneys for Daniel Feldman*

## TABLE OF CONTENTS

BACKGROUND FACTS ................................................................................................ 1

FACT DISPUTES ........................................................................................................ 1

    I.      THE SO-CALLED "PROMNEFSTROY SCHEME" ................................. 4

         A.      Alleged Disclosures in 2008 and 2009 ....................................... 5

         B.      Alleged Disclosures in 2015 ...................................................... 5

    II.     THE SO-CALLED "BONUS SCHEME" .................................................. 6

    III.   THE "INTELLIGENT ENERGY SCHEME" ............................................ 7

    IV.   THE SO-CALLED "TRUST SCHEME" ................................................... 8

         A.      Feldman's Compensation As Trustee ......................................... 8

         B.      The UFG Investment ................................................................... 9

    V.     PAYMENTS TO CLEANTHIS GEORGIADES ..................................... 10

         A.      The So-Called Campaign Contribution .................................... 10

         B.      Georgiades Indemnification ...................................................... 11

    VI.   THE SO-CALLED "YHIL COMPENSATION OVERPAYMENT" ................. 11

    VII.  THE SO-CALLED "EXPENSE REIMBURSEMENT SCHEME" .................... 12

LEGAL DISPUTES ................................................................................................... 13

    I.      EVIDENTIARY DISPUTES ................................................................. 13

    II.    APPLICATION OF THE FAITHLESS SERVANT DOCTRINE ..................... 13

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. Dry Goods Refolding Co.*,
166 N.Y.S. 771 (1st Dep't. 1917) ........................................................................ 12

*Feiger v. Iral Jewelry, Ltd.*,
41 N.Y.2d 928 (1977) .......................................................................................... 11

*Hamlet at Willow Creek Dev. Co., LLC v. Ne. Land Dev. Corp.*,
26 Misc. 3d 1227(A), 907 N.Y.S.2d 437, 2010 WL 669241
(N.Y. Sup. Nassau Co. Feb. 16, 2010)................................................................. 12

*Herman v. Branch Motor Exp. Co.*,
67 Misc. 2d 444, 323 N.Y.S.2d 794
(N.Y. Civ. Ct. 1971) ............................................................................................ 13

*Murray v. Beard*,
102 N.Y. 505 (1886) ............................................................................................ 12

*Musico v. Champion Credit Corp.*,
764 F.2d 102 (2d Cir. 1985) ............................................................................... 12

*Phansalkar v. Andersen Weinroth & Co., L.P.*
344 F.3d 184 (2d Cir. 2003) ............................................................................... 11

*Sanders v. Madison Square Garden, L.P.*,
Case No. 06 CIV 589 GEL, 2007 WL 1933933
(S.D.N.Y. July 2, 2007) ....................................................................................... 13

*Schanfield v. Sojitz Corp. of Am.*,
663 F. Supp. 2d 305 (S.D.N.Y. 2009) ................................................................ 13

*Sundland v. Korfund Co.*,
260 A.D. 80 (1st Dep't. 1940) ............................................................................. 12

*Torres v. Gristede's Operating Corp.*,
628 F. Supp. 2d 447 (S.D.N.Y. 2008) ................................................................ 13

*Turner v. Konwenhoven*,
100 N.Y. 115 (1885) ............................................................................................ 12

*Wechsler v. Bowman*,
285 N.Y. 284 (1941) ............................................................................................ 11

**Treatises**

RESTATEMENT (SECOND) OF AGENCY (1958) ............................................................. 11

Defendant Daniel Feldman respectfully submits the following summary of the factual and legal issues remaining to be tried.

## BACKGROUND FACTS

Founded in 1993, Yukos Oil was a large energy company based in Moscow.  In 2003, the Russian Federation alleged that Yukos Oil had underpaid its taxes by billions of dollars through the misuse of sham companies located in tax advantaged administrative districts.  Yukos Oil became bankrupt and its assets were sold at auction.  Some of the foreign assets of Yukos Oil, located principally in Armenia, were purchased by Rosneft, another Russian oil company.  Other foreign assets, held by a Dutch company, were purchased by OOO Promneftstroy ("Promneftstroy"), a special purpose vehicle owned by a consortium of financial investors.

Prior to the bankruptcy, a cadre of Yukos executives, including Bruce Misamore, David Godfrey, and Steven Theede, created Plaintiffs Stichting Administratiekantoor Yukos International and Stichting Administratiekantoor Financial Performance Holdings (the "Foundations"), Dutch entities that purportedly took title to billions of dollars in international assets belonging to Yukos Oil and its subsidiaries. Along with Marc Fleischman and Michel de Guillenchmidt, Misamore, Godfrey, and Theede served as the Board of Directors for the Foundations until at least 2015.  The stated purpose of the Foundations was to challenge the legitimacy of the Yukos Oil bankruptcy auction and protect the legitimate stakeholders in the now-defunct Yukos Oil.

Defendant Daniel Feldman previously served as the Secretary to the Foundations and as the director of numerous Yukos-affiliated entities under the Foundations' control, including Yukos Hydrocarbons Investments Limited ("YHIL"), Luxtona Limited ("Luxtona"), and Fair Oaks Invest and Trade ("Fair Oaks").  He also served as the trustee of the 2004 Security Trust,

another Yukos-affiliated entity that was not directly owned by the Foundations.  This collection of former Yukos Oil entities, some under common control, some not, is often called the "Yukos Group."

For many years, Feldman worked very closely with Godfrey to advance litigation against Rosneft and protect Yukos Group assets against confiscation.  In connection with his work for Plaintiffs, Feldman traveled to over 35 countries and offered testimony in proceedings throughout the world.  He served as the sole director of Yukos Capital, a position that other employees declined because of the personal risks involved.  In part because of Feldman's efforts, Plaintiffs secured hundreds of millions of dollars in judgments against Rosneft and successfully defended the property controlled by the Yukos Group against repeated seizure efforts.

GML is a former Yukos Oil shareholder.  Prior to the bankruptcy, it held approximately 60 to 70% of the outstanding equity in Yukos Oil.  In a June 2011 letter to Misamore, GML proposed a scheme by which it would receive a direct payment of monies held by the Foundations, bypassing any other Yukos Oil shareholders, creditors, or potential claimants.  In return for putting it at the head of the line, GML offered to pay Theede, Misamore, Godfrey, Fleischman and Guillenchmidt a personal 10% kick-back on any Yukos Group monies that the Foundations distributed to GML.  The parties to the GML letter specifically allocated the 10% kick-back among the Director Defendants: 32.5% to Godfrey, 32.5% to Misamore, 20% to Theede, 7.5% to Fleischman and 7.5% to Guillenchmidt.

Feldman stumbled upon the secret GML Letter Agreement after a Foundations Board Meeting.  Afterwards, he began asking questions about the propriety of the arrangement and discussing whether other Yukos Group employees also deserved compensation for their work for the group.  Their plan uncovered, Feldman's relationship with the Foundations Board rapidly

2

deteriorated.  The Foundations Board began making plans to eliminate Feldman from the Yukos Group and punish him for his perceived disloyalty.

By October of 2014, Feldman had either resigned or been terminated from his positions with all Yukos entities.  Following his separation from the Yukos Group, Feldman engaged in discussions concerning a potential severance agreement.  In the course of those discussions, Plaintiffs offered Feldman a cash payment and a general release.  Plaintiffs threatened that if Feldman would not accept the Yukos Group proposal that they would find a way to ruin him through litigation.[1]  However Feldman declined Plaintiffs' offer.

Bypassing all other creditors and stakeholders, including minority shareholders, on June 15-19, 2015, the Foundations Board approved a $260 million distribution to GML.  After this distribution was complete, the Board personally received $26 million in kick-backs from GML.

This lawsuit was filed on June 25, 2015, less than a week after the distributions were complete.  The purpose of filing this case was to harass Feldman and intimidate other Yukos employees and former employees.  Indeed, at his deposition on June 7, 2016, Godfrey, an experienced lawyer who also serves as general counsel for various Yukos entities, said as much:

> Q.   Why did you initiate the idea of suing
> Daniel Feldman?
> A.   Because we were unable to come to the
> amicable settlement that we had hoped for and we
> had come to a dead end in the negotiations and so
> we sought to, one, recoup monies that we believe
> we were owed.  And two, to prevent Daniel from
> working for our adversaries in ongoing
> litigation.

---

[1]   This sort of threat is consistent with Godfrey's manner of behavior.  Godfrey has said that he models his leadership style on Joseph Stalin.  Indeed, his email address is comradekoba@******.com, which is a reference to one of Stalin's nicknames.  He has also used the nickname, without irony, in other capacities.

In short, Plaintiffs sued Feldman because he would not agree to a confidential settlement on the terms they hoped for, which involved a substantial payment *to* Feldman.  Since he rejected their offer, Plaintiffs have sought to make an example of him, drumming up litigation for the sake of litigation.  There is no economic logic to Plaintiffs' conduct in this case; they have spent lavishly litigating claims, which, even if proven, have little monetary value.  They have made no settlement demands and appear uninterested in anything short of bankrupting Feldman through protracted litigation.  Indeed, many of the allegations brought against Feldman are for business decisions authorized by entire boards of directors.  Tellingly, Plaintiffs have brought no comparable claims against the other directors and have resisted facilitating their appearance as witnesses in this action.

Motivated to punish, not prevail, Plaintiffs' legal claims are baseless will be shown at trial to be wholly unsupported by the evidence.  The specific factual disputes that underlie the claims are set forth below.

## FACT DISPUTES

In their Amended Complaint, Plaintiffs assert claims for breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and fraud, all relating to seven so-called "schemes."  Defendant anticipates that the lion's share of disputed facts to be adjudicated at trial will pertain to these "schemes." The alleged factual bases for Plaintiff's claims and Feldman's responses are described below.

## I.       THE SO-CALLED "PROMNEFSTROY SCHEME"

Plaintiffs accuse Feldman of providing confidential information to Promneftstroy, an entity that purported to purchase certain assets of Yukos Oil in the Russian bankruptcy auction.  A frequent litigation opponent of the Yukos Group, Promneftstroy has claimed, in various legal

proceedings throughout the world, to be the true owner of much of the wealth currently under the control of the Foundations.

While captioned as a single "scheme," the Plaintiffs allege two sets of disclosures by Feldman, timed many years apart.  For clarity, we set forth each in turn.

A.      **Alleged Disclosures in 2008 and 2009**

Plaintiffs allege that in "the second half of 2008 and early 2009" Feldman, while "ostensibly acting as a broker of possible Yukos Group-Promnefstroy settlement" was, in actuality, "sharing confidential Yukos Group information with Promnefstroy and the Consortium Parties in an effort to obtain remuneration from the Consortium Parties."  Am. Compl. ¶¶ 48-51.

In discovery, Plaintiffs were unable to identify any allegedly confidential information disclosed to Promnefstroy by Feldman in 2008 - 2009.  Despite this, Plaintiffs continue to claim that Feldman sought improper remuneration from Promnefstroy in exchange for brokering a settlement, and that in so doing he breached his duties to the Plaintiffs.

The evidence will show that all of Feldman's settlement discussions with Promnefstroy were done at the behest of the Foundations Board and that the substance of his communications, including any requests for remuneration, were disclosed to, and approved by, David Godfrey.  In fact, numerous contemporaneous communications between Feldman and Godfrey or Yukos Group counsel report the substance of his communications with Promnefstroy.  Def. Exs. F, J-M, O, Q-V, AA, CC.   Simply put, Feldman did as he was told, and violated no duties whatsoever while attempting to settle Yukos Group litigation with Promneftstroy.

B.      **Alleged Disclosures in 2015**

Plaintiffs further allege that Feldman shared confidential information with Promnefstroy via his counsel after commencement of this litigation, charging that "[i]t is suspected that Bailey

& Glasser LLP provided privileged and confidential information belonging to Plaintiffs to Promnefstroy." Am. Compl. ¶ 62.

There is no evidence that Feldman ever shared confidential information with Promnefstroy. Acknowledging this, Plaintiffs argue that such sharing can be inferred, based upon (i) the existence of a Cooperation Agreement between Feldman and Promnefstroy (Pl. Ex. 224); (ii) the payment of Feldman's legal expenses by Promnefstroy pursuant to that agreement; and (iii) the fact that Promnefstroy obtained confidential Foundations Board meeting minutes many months after Feldman was terminated.

However, all evidence is to the contrary. Feldman categorically denies providing confidential Yukos Group information to Promnefstroy. Athanasios Basdekis, the corporate representative of Bailey & Glasser LLP, will testify via deposition designations that no such sharing ever took place. Richard Deitz, a principal for Promnefstroy will also testify via deposition designations that Feldman did not provide him with confidential Yukos Group documents. In addition, Godfrey himself will testify that (i) other individuals left the Yukos Group under bad terms just prior to the release of the meeting minutes; and (ii) other leaks of confidential Yukos Group information have occurred since Feldman's termination, including data that was generated after Feldman was removed and to which he did not have access.

Feldman never leaked Yukos Group information to Promneftstroy and any inference or assumption to the contrary is totally at odds with the facts.

## II. THE SO-CALLED "BONUS SCHEME"

Plaintiffs accuse Feldman of conspiring with other unspecified Yukos Group employees to "siphon funds from YHIL and its subsidiaries" and create a "bonus pool" from which distributions could be made to certain Yukos Group employees. Plaintiffs charge that

6

"Feldman's scheme involved utilizing a trust, into which $50 to $75 million would be funded from YHIL and its subsidiaries without the Foundations' knowledge or approval."  Am. Compl. 68-95.

It is undisputed that no such trust was ever created, no such funds were ever siphoned from YHIL or its subsidiaries, and no bonuses were ever paid.  Plaintiffs claim that the planning itself, as well as the payment of legal fees to certain professional advisors constitutes a breach of Feldman's duty as a director.

This is incorrect.  Feldman's conduct was entirely proper and did not breach any legal duty.  The YHIL Board, of which Feldman was a member, had the authority to pay bonuses and to seek legal advice concerning what bonuses would be appropriate to pay.  Multiple witnesses will testify that other Yukos entities, including the Foundations themselves, have taken similar actions, engaging outside compensation experts and lawyers to determine what payments can or should be made to directors.  Moreover, there is no evidence that Feldman ever intended to conceal the payment of bonuses from the Foundations Board.  To the contrary, David Godfrey, a Foundations Board member, was one of the planned recipients of bonuses under the plan. Finally, the corporate representative of YHIL at trial is Martin Parr, who will testify that he both participated in bonus pool discussions and knowingly approved the payment of the legal expenses associated with researching the bonus plan.  Tellingly, Plaintiffs have neither fired nor sued Mr. Parr for his part in this alleged "misconduct."

III.    THE "INTELLIGENT ENERGY SCHEME"

Plaintiffs allege that Feldman engaged in misconduct while serving as a representative on the board of Intelligent Energy, a company that was not controlled by the Yukos Group, but in which a former affiliate of Yukos Oil held a minority interest.  Plaintiffs accuse Feldman of

disclosing confidential Intelligent Energy information to third parties.  Plaintiffs further accuse Feldman of seeking to purchase shares of Intelligent Energy for himself at a discounted price and negotiating a secret side deal with the consultant hired to market the shares on behalf of Plaintiff. Plaintiffs claim that because of Feldman's conduct, they lost their seat on the Intelligent Energy Board.

Feldman's conduct as an Intelligent Energy Board member was appropriate and he categorically denies improperly using confidential information or cutting any improper "side deal" with respect to Intelligent Energy shares.  In fact, Feldman explicitly disclosed to Plaintiffs that he wished to buy the shares of Intelligent Energy (Def. Ex. BB) and never sought to buy them at a discount to actual market prices.

With respect to the loss of the Board seat, Feldman repeatedly told Plaintiffs that they risked dilution if they did not invest more money in Intelligent Energy and was repeatedly told that no further investments would be made. Def. Exs. H, X.  Plaintiffs actually lost their seat on the Intelligent Energy Board because their holdings were diluted below 10%.  Def. Ex. DD.

## IV.    THE SO-CALLED "TRUST SCHEME"

Plaintiffs accuse Feldman of two types of misconduct during his service as Trustee of the 2004 Security Trust.  We address each in turn.

### A.    Feldman's Compensation As Trustee

Plaintiffs claim that, as Trustee, Feldman "agreed to accept remuneration at the same level received by the outgoing trustee" and that "he misrepresented the level of compensation received by the outgoing trustee, alleging that the former trustee was paid $37,500.00 per year." Am. Compl. ¶¶ 119, 121.  In essence, Plaintiffs claim that Feldman hoodwinked David Godfrey into approving a $37,500 salary for him when the prior trustee had made less.

This is nonsense.  Godfrey, acting as Protector of the Trust, explicitly approved a specific dollar amount for Feldman's Trustee compensation, as documented in email.  Def. Ex. N.  When Feldman and Godfrey were negotiating his compensation, Feldman did believe that Lewis Linn, the former trustee, was paid $37,500 in 2004.  But records from Mr. Linn show that he, in fact, did receive such compensation.  Def. Exs. C, D, E.

Both Feldman and Godfrey will testify that Godfrey had access to the same records showing what Mr. Linn was paid when he approved a salary of $37,500 for Feldman.  *See also* Def. Ex. P.  Even if the records Feldman relied upon were inaccurate or misunderstood, he cannot be blamed for relying upon them in good faith when negotiating the terms of his remuneration with Godfrey.  Doing so was not a breach of duty.

In addition, Godfrey and Marc Fleischman, who replaced Feldman as trustee, will testify that Fleischman receives $37,500 as his compensation and that merely accepting such compensation for the services that the Trustee performs is not itself a breach of duty.

### B.    The UFG Investment

Plaintiffs allege that "[i]n or about 2008, Feldman used his position as trustee of the Trust to withdraw $500,000.00 from the Trust and invest it in an investment fund run by a friend of Feldman's, called the UFG Private Equity Fund II, L.P" and that "Feldman signed all of the subscription documents for the UFG Investment and opened the investment account using his own name, not the Trust's, so Feldman personally held title to the investment."  Am. Compl. ¶¶ 125.

This investment was a reasonable and responsible use of Trust assets that was fully disclosed to David Godfrey.  Documents show that Godfrey was aware of the investment.  Def. Ex. PP.  To the extent that the investment was improperly denominated in Feldman's name

rather than the Trust's name, Feldman will testify that he did not do so to harm or prejudice the Trust or to improperly realize a personal benefit.  Indeed, it is undisputed that the Trust was not harmed by the UFG investment.  Fleischman, the current Trustee, will testify that the Trust realized a significant return on the UFG investment and that the rate of return exceeded any prior or subsequent investment made by the Trust.

## V.   PAYMENTS TO CLEANTHIS GEORGIADES

Plaintiffs accuse Feldman of authorizing two improper payments to Cleanthis Georgiades, a YHIL director, by YHIL.  Am. Compl. ¶¶ 131-146.  We address each in turn.

### A.   The So-Called Campaign Contribution

Plaintiffs claim that "[i]n early 2011, Georgiades was raising money for his political campaign for office in Cyprus" and that "Feldman, with his fellow YHIL directors, caused YHIL to provide an indirect contribution of $99,000.00 to Georgiades' campaign in the first quarter of 2011." *Id.* ¶¶ 133, 135.  Plaintiffs charge that this contribution was a breach of fiduciary duty, as the Foundations Board had already denied the request.  The only evidence suggesting that any "indirect contribution" was given to Mr. Georgiades's campaign is a single email from Mr. Georgiades to the YHIL Board where he alludes to certain "indirect financial support" made to his campaign.  Pl. Ex. 65.

In reality, no campaign contribution was ever made and Plaintiffs are – perhaps intentionally – misreading Mr. Georgiades's email.  After the Foundations Board refused to approve a donation to his political campaign, Mr. Georgiades instead requested that certain fees owed to him be paid in advance so that he could self-fund.  Requests for lump sum payments of salary were not uncommon among YHIL directors and were regularly approved.  Indeed, YHIL documents show that directors were routinely paid their annual compensation in a "lump sum"

manner.  Def. Exs. G, I, EE, HH, II.  Since Mr. Georgiades did not receive any compensation beyond what he was already entitled to, Feldman breached no duty for participating in this routine accommodation.

> **B.      Georgiades Indemnification**

Plaintiffs allege that Feldman authorized a $1 million indemnity fund for Mr. Georgiades when his contract was up for review in 2007 and that this indemnity fund was somehow inappropriate.  Am. Compl. ¶ 145.  *See also* Pl. Ex. 63.  Plaintiffs will doubtlessly note that when asked about this indemnity years later, Feldman could not recall why he had authorized it and stated that he did not "have a good explanation." *Id.*

Parr, the YHIL corporate representative will testify that "indemnification is generally appropriate" for directors such as Mr. Georgiades and that YHIL had the right to retrieve the entire $1 million from the indemnity fund in question.  Numerous other indemnity agreements were authorized by Yukos Group entities, and Mr. Georgiades has, at times, been the recipient of them.  Feldman will testify that, to the extent that the creation of the indemnity fund was a mistake, it was not a breach of duty.  Rather it was – at worst – an honest mistake that did not harm the company.  Feldman gained nothing by authorizing the indemnity fund, appropriate or not, and did not breach his duty in doing so.

## VI.     THE SO-CALLED "YHIL COMPENSATION OVERPAYMENT"

Plaintiffs claim that Feldman received an "overpayment" while serving as a director of YHIL.  They claim that Feldman received a $240,000 lump sum payment in June of 2010 that was intended to compensate him for his services until June of 2011.  Def. Ex. II.  They further claim that, later in 2011, Feldman received a raise to $500,000 per year, effective at the beginning of 2011.  Def. Ex. JJ.  This money was to be paid in monthly installments of

$41,666.67 beginning in January of 2011.  *Id.*  Plaintiffs claim that this was a mistake and that Feldman's $500,000 compensation should have been reduced by $110,000 to reflect the money he already received.

But there was no mistake, as Feldman was paid in strict accordance with his contract, as approved by the YHIL Board.  *Id.*  Nor was executing the contract itself a mistake, as it precisely mirrored an instruction issued by David Godfrey.  Def. Ex. KK.  Feldman breached no duty by accepting money paid to him pursuant to validly executed contract approved with full knowledge by the YHIL and Foundations Board.  Defendant will also introduce testimony from Parr, YHIL's corporate representative, who was unable to cogently explain precisely when or how Feldman was overcompensated or why the YHIL contract should be ignored.

## VII.   THE SO-CALLED "EXPENSE REIMBURSEMENT SCHEME"

Plaintiffs accuse Feldman of receiving improper reimbursements for his travel and other business expenses.  ***First***, Plaintiffs claim that Feldman was improperly compensated for airline travel at business class rates when he actually flew on economy or premium economy tickets.  ***Second***, Plaintiffs claim that Feldman put personal expenses on a corporate credit card.  ***Third***, Plaintiffs claim that Feldman, in a few cases, submitted reimbursements for expenses already covered on his corporate card.

Feldman's expenses were authorized and appropriate.  With respect to the flight claims, it is undisputed that Feldman was permitted to fly business class while travelling on Yukos Group business. Perhaps because of this, David Godfrey gave Feldman his permission to "downgrade" to premium economy or coach while still submitting for reimbursement at business class fares. With respect to the other expenses, Feldman will show that his reimbursement requests were legitimate and that his corporate expenditures were proper.  Defendant has also moved *in limine*

12

to exclude certain categories of expenses, on several grounds including (i) that Plaintiffs failed to identify them in discovery; and/or (ii) they were paid either by dismissed parties or companies that have never been party to the case.

## LEGAL DISPUTES

### I.      EVIDENTIARY DISPUTES

Contemporaneous with this brief, Defendant has submitted a motion *in limine* requesting pre-trial ruling on the admissibility of certain exhibits and witness testimony.  As the legal issues concerning those rulings are fully set forth in those papers, they are not repeated here.

### II.     APPLICATION OF THE FAITHLESS SERVANT DOCTRINE

As identified by the Court in its ruling on Defendant's motion for summary judgment [Dkt. 266], the primary remaining legal dispute concerns the Faithless Servant Doctrine.

Under New York law, "[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." *Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 928 (1977) (citing RESTATEMENT (SECOND) OF AGENCY (1958), § 469).  In addition, a "principal is entitled to recover from his unfaithful agent any commission paid by the principal."  *Wechsler v. Bowman*, 285 N.Y. 284, 292 (1941).  On the basis of this doctrine, Plaintiffs seek forfeiture of $2,912,976.00 paid to Daniel Feldman by multiple Yukos-affiliated entities, representing compensation for over seven years of employment.  [Dkt. 274 at 14].

Plaintiffs' proposed jury instructions would order forfeiture upon any finding of a breach of fiduciary duty.  *Id.*  However, as recognized by the Court [Dkt. 266 at n.8], and more fully articulated in *Phansalkar v. Andersen Weinroth & Co., L.P.*  "New York courts have used two different standards to determine whether an employee's misbehavior warrants forfeiture."  344

F.3d 184, 201 (2d Cir. 2003).  Under the more severe *Murray* standard, any employee who "acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment" automatically "forfeit[s] any right to compensation for services."  *Murray v. Beard*, 102 N.Y. 505, 508 (1886).  But under the more nuanced *Turner* standard, forfeiture is inappropriate absent "misconduct and unfaithfulness which substantially violates the contract of service."  *Turner v. Konwenhoven*, 100 N.Y. 115, 120 (1885).

As the Second Circuit recognized in *Musico v. Champion Credit Corp.* "the trend in more recent cases has been away from any rigorous adherence to *Murray*'s language." 764 F.2d 102, 113 (2d Cir. 1985).  Indeed, New York's Appellate Division, First Department has further refined the test set forth in *Turner*, finding that an employer seeking recovery of an employee's salary must prove "facts sufficient to show dishonesty and disloyalty on the part of his employe[sic] which permeates the employe's[sic] service in its most material and substantial part."  *Abramson v. Dry Goods Refolding Co.*, 166 N.Y.S. 771, 773 (1st Dep't. 1917).  *See also Sundland v. Korfund Co.*, 260 A.D. 80, 83 (1st Dep't. 1940) ("If defendants should successfully establish upon a trial that plaintiff's services have been permeated with dishonesty and disloyalty in a material and substantial way, then upon reason and authority, plaintiff should be barred from recovering the agreed compensation for services so rendered.").

Trial courts in New York regularly apply the *Turner / Abramson* standard, holding that forfeiture under the faithless servant doctrine is inappropriate absent substantial, material breaches of loyalty, often over a significant period of time.  *See Hamlet at Willow Creek Dev. Co., LLC v. Ne. Land Dev. Corp.*, 26 Misc. 3d 1227(A), 907 N.Y.S.2d 437, 2010 WL 669241, at *3 (N.Y. Sup. Nassau Co. Feb. 16, 2010) ("A common thread running through each of the

14

foregoing cases is systematic and repeated misconduct over a substantial period of time which exhibits fundamental immorality evincing a high degree of disloyalty.") (collecting cases). Indeed, the *Abramson* standard has been characterized as requiring "a default so massive that, for all practical purposes, the master has received no services from the servant." *Herman v. Branch Motor Exp. Co.*, 67 Misc. 2d 444, 445, 323 N.Y.S.2d 794 (N.Y. Civ. Ct. 1971).

Federal district courts in this district have also followed suit, applying the *Turner / Abramson* standard. *See e.g. Sanders v. Madison Square Garden, L.P.*, Case No. 06 CIV 589 GEL, 2007 WL 1933933, at *3 (S.D.N.Y. July 2, 2007) (Lynch, J.) ("To show a violation of the faithless servant doctrine, an employer must show (1) that the employee's disloyal activity was related to the performance of his duties, and (2) that the disloyalty permeated the employee's service in its most material and substantial part.") (internal citations omitted); *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 348 (S.D.N.Y. 2009) (McMahon, J.) ("the employer plaintiff must show (1) that the employee's disloyal activity was related to the performance of his duties, and (2) that the disloyalty permeated the employee's service in its most material and substantial part") (internal citations omitted); *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 466 (S.D.N.Y. 2008) (Crotty, J.) ("An employer is entitled to recover compensation paid to a faithless servant upon a showing (1) that the employee's disloyal activity was related to the performance of his duties, and (2) that the disloyalty permeated the employee's service in its most material and substantial part.").

Defendant respectfully submits that the Court should follow the weight of authority and instruct the jury to determine whether (1) Feldman violated a duty of loyalty; (2) Feldman's violation of duty was related to the performance of his duties; and (3) Feldman's disloyalty "permeated his service in its most material and substantial part." Only if those factual

prerequisites are satisfied should the Faithless Servant Doctrine be applied, requiring the jury to further determine (4) the date of Feldman's first "faithless act"; and (5) the compensation paid to him since that time. *Phansalkar*, 344 F.3d at 188 (2d Cir. 2003) ("We hold that New York's faithless servant doctrine requires Phansalkar to forfeit all compensation received after his first disloyal act.").

**Dated:** New York, NY
June 2, 2017

Respectfully submitted,
MANDEL BHANDARI LLP
80 Pine Street, 33rd Floor
New York, New York 10005
(212) 269-5600

By:    /s/Rishi Bhandari
Rishi Bhandari

*Attorneys for Defendant Daniel Feldman*

16