UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YUKOS CAPITAL S.A.R.L., et. al., | |
| Plaintiffs, | Case No. 15-4964-LAK |
| -against- | |
| DANIEL CALEB FELDMAN, | |
| Defendant. | |
| DANIEL CALEB FELDMAN, | |
| Counterclaim-Plaintiff, | |
| -against- | |
| YUKOS CAPITAL S.A.R.L., et al., | |
| Counterclaim-Defendants. | |
| DANIEL CALEB FELDMAN, | |
| Third-Party Plaintiff, | |
| -against- | |
| DAVID GODFREY, et al., | |
| Third-Party Defendants. | |

## **PLAINTIFFS' PRE-TRIAL MEMORANDUM**

Mary E. Flynn
Jeffrey Brooks
MORRISON COHEN LLP
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ............................................................................................1

PROCEDURAL STATUS......................................................................................................2

BACKGROUND FACTS .......................................................................................................3

    A.    The Expropriation of Yukos Oil and the Ensuing Litigations .......................................3

    B.    Feldman's Position within the Yukos Group ...............................................................5

PLAINTIFFS' CLAIMS.........................................................................................................6

    I.    PLAINTIFFS' FIRST CLAIM FOR BREACH OF FIDUCIARY DUTY .................6

        A.    The Law .................................................................................................6

            1.    The Faithless Servant Doctrine .......................................................6

            2.    Approval of Feldman's Breaches by His Co-Directors Is No Defense ......................................................................................8

            3.    Feldman Was Required To Act in the Best Interests of the Plaintiffs .....................................................................................9

        B.    The Evidence ..........................................................................................10

            1.    The Promneftstroy Scheme...........................................................12

            2.    The Russian Federation Scheme ...................................................14

            3.    The Bogus Bonus Scheme .............................................................14

            4.    The Intelligent Energy Scheme.....................................................16

            5.    The Trust Scheme .........................................................................17

            6.    The Cleanthis Georgiades Schemes..............................................18

**Page**

(a)    The Unauthorized Political Contribution ..............18

(b)    The $1 Million "Indemnification Fund" to Georgiades ............................................19

7.    Other Schemes .................................................19

C.    Damages ........................................................19

II.    PLAINTIFFS' SECOND CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY .......................................................20

A.    The Law – The Elements of Aiding and Abetting a Breach of Fiduciary Duty ...............................................................20

B.    The Evidence .......................................................21

III.    PLAINTIFFS' THIRD CLAIM FOR BREACH OF CONTRACT .....................21

A.    The Law – The Elements of a Breach of Contract Claim .........................21

B.    The Evidence .......................................................22

IV.    PLAINTIFFS' FOURTH CLAIM FOR FRAUD .................................23

A.    The Law – The Elements Of A Fraud Claim .............................23

B.    The Evidence – The Expense Reimbursement Scheme ...........................24

1.    Fraudulent Airfare Expenses ........................................24

2.    Fraudulent Expenses .................................................25

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Abbott Redmont Thinlite Corp. v. Redmont*,
  475 F.2d 85 (2d Cir. 1973) ...........................................................................................10

*Am. Fed. Grp., Ltd. v. Rothenberg*,
  136 F.3d 897 (2d Cir. 1998) .........................................................................................10

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
  375 F.3d 168 (2d Cir. 2004) .........................................................................................22

*Hanson Trust PLC v. ML SCM Acquisition, Inc.*,
  781 F.2d 264 (2d Cir. 1986) ...........................................................................................8

*Johnson v. Nextel Commc'ns, Inc.*,
  660 F.3d 131 (2d Cir. 2011) ...........................................................................................6

*Norlin Corp. v. Rooney Pace Inc.*,
  744 F.2d 255 (2d Cir. 1984) ...........................................................................................8

*Phansalkar v. Andersen Weinroth & Co., L.P.*,
  344 F.3d 184 (2d Cir. 2003) ...........................................................................................8

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
  813 F. Supp. 2d 489 (S.D.N.Y. 2011) .............................................................................7

*Shamrock Power Sales, LLC v. Scherer*,
  No. 12-CV-8959 (KMK), 2015 U.S. Dist. LEXIS 133650 (S.D.N.Y. Sept. 30, 2015) ......9

*Sharp Int'l v. Corp v. State St. Bank & Trust Co.*,
  403 F.3d 43 (2d Cir. 2005) ...........................................................................................21

*Webb v. Robert Lewis Rosen Assocs., Ltd.*,
  No. 03 Civ. 4275 (HB), 2003 U.S. Dist. LEXIS 23160,
  2003 WL 23018792 (S.D.N.Y. Dec. 23, 2003) ...............................................................7

iii

**Page**

## STATE CASES

*Barrett v. Freifeld,*
    64 A.D.3d 736 (2d Dep't 2009) ........................................................................7

*Boettcher v. Means,*
    201 S.W.2d 255 (Tex. Civ. App. Galveston 1947) ........................................18

*Feiger v. Iral Jewelry, Ltd.,*
    41 N.Y.2d 928, 394 N.Y.S.2d 626 (1977) .......................................................7

*Lama Holding Co. v. Smith Barney,*
    88 N.Y.2d 413, 646 N.Y.S.2d 76 (1996) .......................................................23

*Ross v. Louise Wise Servs., Inc.,*
    8 N.Y.3d 478, 836 N.Y.S.2d 509 (2007) .......................................................23

*Slay v. Burnett Trust,*
    187 S.W.2d 377 (Tex. 1945) ..........................................................................18

## STATE STATUTES

N.Y. Bus. Corp. Law § 717(a) .................................................................................9

N.Y. Bus. Corp. Law § 120(1) .................................................................................9

## MISCELLANEOUS

Restatement (Second) of Agency, § 396 (1958) .....................................................10

Plaintiffs[1] respectfully submit this Pre-Trial Memorandum.

## PRELIMINARY STATEMENT

The evidence Plaintiffs will offer at trial will demonstrate that Defendant Feldman collected millions of dollars by serving as a director, secretary or trustee of Plaintiffs and their affiliates, that he owed fiduciary duties to them, and that he breached his fiduciary and contractual duties over and over, in a continuous series of schemes.  The evidence will also show that Feldman's remaining defenses are unavailing.  This Court already held that Plaintiffs' claims are not barred by the statute of limitations, and that Feldman is not relieved of liability because his co-conspirators approved certain of his actions.  There will be no evidence at trial to support acquiescence, estoppel or any of Defendant's other boilerplate legal defenses.

The evidence at trial will show that Feldman's factual defenses fare no better.  The evidence will show that Feldman – a former in-house lawyer for Plaintiffs – took active steps to provide Plaintiffs' information to Promneftstroy, Plaintiffs' adversary in ongoing litigation.  The evidence will also show that Feldman tried to create an unauthorized bonus pool for himself and his hand-picked beneficiaries, that he recruited others to the scheme, he billed the company for expenses incurred to promote the scheme, and that the scheme collapsed only when it became clear that Feldman could not get away with it because his collaborators backed out.  The evidence will also show that, while a Trustee of the Plaintiff Trust, Feldman made an investment in his friend's private equity fund in his personal capacity, rather than in the name of the Trust.

---

[1]     The Plaintiffs are Yukos Hydrocarbons Investments Limited ("Yukos Hydrocarbons"), Stichting Administratiekantoor Yukos International ("Foundation I"), Stichting Administratiekantoor Financial Performance Holdings ("Foundation II", with Foundation I, the "Foundations"), and Marc Fleischman, as trustee of the 2015 Security Trust, as successor in interest to the 2004 Security Trust (the "Trustee" and the "Trust") (collectively, the "Plaintiffs"). Former Plaintiffs Yukos Capital S.A.R.L and Luxtona Limited have been dismissed from the case.

The evidence will show that Feldman kept a double salary payment to which he knew he was not entitled.   He arranged for company money to be paid to his colleague Cleanthis Georgiades (for both an unsecured million dollar "indemnity fund" and for a political campaign contribution) that was unauthorized. The evidence will show that while serving as the Yukos designated director of Intelligent Energy, a company in which Yukos held a large block of shares, Feldman was charged with trying to sell the shares, but rather than simply try to find a buyer, Feldman cooked up another scheme to enhance himself.  He decided to find a group of investors to buy the stock, pay him a fee for managing the group, and buy the Yukos stock for less than the going rate.  This fell apart when Intelligent Energy demanded his resignation.  And, the evidence will show that Feldman's misconduct even extended to outright fraud:  Feldman knowingly submitted expense reimbursement claims that were more than what he actually incurred, pocketing the difference, which totaled at least $187,000.

That Feldman's schemes were often unsuccessful does not mean that he did not breach his duties.  Feldman was a faithless fiduciary, and Plaintiffs are entitled to recover from him the director salaries and trustee fees he received from the date he breached his duties.   Plaintiffs are also entitled to recover all other damages caused by Feldman's wrongdoing.

## **PROCEDURAL STATUS**

Plaintiffs filed their initial Complaint in this action on June 25, 2015.  (Dkt. # 1).  Attached as Exhibit 1 is a detailed procedural history of this action.   After dismissal of Defendant's counterclaims and third party claims, the following claims by Plaintiffs are left to be

tried by the jury:  breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, and fraud.

## BACKGROUND FACTS

### A.    The Expropriation Of Yukos Oil And The Ensuing Litigations

Two Yukos Group witnesses will testify to certain of the following facts.  Yukos Oil Company ("Yukos Oil") had been Russia's largest exporter of crude oil.  It was a privately-owned company, owned by over 50,000 shareholders, including many of its employees.  As part of a scheme to expropriate its assets, the Russian government imposed unjustified taxes, interest and penalties upon Yukos Oil and forced it into bankruptcy in 2006. The Russian authorities then appointed a receiver over the Yukos Oil assets (the "Yukos Receiver").

Aware that the Russian Federation was attempting to expropriate the assets of Yukos Oil and deprive its shareholders of the value of their stock, the Board of Directors of Yukos Oil approved the implementation of the "Foundation" – or trust – structure to try to protect those Yukos Oil assets capable of protection:  to wit, the assets outside Russia.

Key foreign (non-Russian) assets of Yukos Oil were Yukos Finance B.V. ("Finance"), a Dutch company, and Yukos CIS ("CIS"), an Armenian company.  Finance and CIS held a number of other Yukos Oil group entities as wholly-owned subsidiaries (such entities collectively, the "Yukos Group").  The Yukos Receiver purported to sell Finance to a Russian company named Promneftstroy, owned by a consortium of investors.  The Yukos Group challenged the powers of the bankruptcy trustee of Yukos Oil in a Dutch court, which found on October 31, 2007, that the bankruptcy of Yukos Oil could not be recognized in the Netherlands,

as it conflicted with public order there (the "Dutch Judgment").   The result of the Dutch Judgment is that Promneftstroy never validly acquired title to the Finance shares.   Attached collectively as Exhibit 2 are organizational charts of the entities relevant to this action in the Finance (Dutch) and CIS (American) structures of the Yukos Group.   These charts will be presented as Demonstrative Evidence at trial.

Since the Dutch Judgment, Yukos-related entities and individuals and Promneftstroy-related entities and individuals have been involved in numerous actions pending in the Netherlands (the "Netherlands Litigation") and elsewhere over the ownership and management of Finance and the fate of its assets.   The Netherlands Litigation continues today and involves the Plaintiffs and its affiliates.   Just last month, Promneftstroy's appeal of the Dutch Judgment was denied.

In addition to the Netherlands Litigation, members of the Yukos Group were also engaged in years of litigation in various jurisdictions with Rosneft, a Russian state-owned oil company.   The Yukos Receiver purported to sell CIS to Rosneft and since then, Yukos-related entities and individuals and Rosneft-related entities and individuals had been involved in numerous actions pending in the Netherlands and elsewhere over the ownership and management of CIS and the fate of its assets (the "Rosneft Litigation").   The Rosneft Litigation was settled in 2015.

In addition, Yukos Capital is engaged in a proceeding against the Russian Federation over rights pursuant to The Energy Charter Treaty.   The Energy Charter Treaty ("ECT") claim asserted by Plaintiff Yukos Capital against the Russian Federation while Feldman was its director is still pending.   The factual basis for Yukos Capital's ECT claim overlaps in large part

with the factual basis for ECT claims brought against the Russian Federation by former Yukos Oil majority shareholder GML.

**B.**     **Feldman's Position Within The Yukos Group**

Yukos witnesses will testify that The Foundations – one for the Dutch structure and one for the American structure – run the group of Yukos companies.  They do not operate an oil company.  Their sole purpose is to preserve assets for the rightful shareholders of Yukos Oil through the litigations, to sell off assets owned by the Yukos Group companies for fair prices, collect the proceeds and ultimately distribute the proceeds to the rightful owners when the same is permitted by the appropriate courts.

Feldman, a qualified lawyer, was Secretary to the Board at Yukos Oil.  He is fluent in Russian.  Feldman was a director of Yukos Hydrocarbons from June 2006 to September 2012.  Yukos Hydrocarbons and its then subsidiary, Fair Oaks (of which Feldman was also a director), owned various valuable Yukos Oil assets.  (Fair Oaks was merged into Yukos Hydrocarbons in 2014).  Feldman was the sole director of Yukos Capital from February 6, 2007, to October 10, 2014, and a director of Luxtona, another Yukos Group company from September 20, 2012, to February 10, 2014.  At various times, Feldman also served as a director of other Yukos Group entities.

Feldman also served as corporate secretary for the Foundations from their inception to 2014.  The Foundations are managed by their respective Board of Directors, which are identical.  The Foundations' Board met quarterly, discussed the litigation and business of the Yukos Group and required confidentiality by its members.  The stakes of the litigation between the Yukos Group and Promneftstroy were very high.  Billions of dollars of shareholder money was at stake.

5

Testimony at trial will establish that Feldman was responsible for meeting minutes for these Foundation Board meetings at which these litigations were discussed, and that Feldman also worked with outside counsel on the litigations, as one of two lawyers in the group.

Feldman was appointed trustee of the Trust on November 30, 2006, and served as trustee until he was removed on October 3, 2013.  The Trust was, essentially, a fund created to fund ongoing litigation and to assist Yukos Oil personnel who had suffered at the hands of the Russian regime.  Feldman will testify that Trust assets were used for bail money, for example, when Yukos Oil personnel were arrested by the Russian authorities.

As a director, Feldman owed the entities he served, including Yukos Hydrocarbons, Yukos Capital and Luxtona, a fiduciary duty to act in their best interests based on common and statutory law.  As an officer, Feldman owed the Foundations, under common and statutory law, a fiduciary duty to act in their best interests.  As trustee of the Trust, Feldman owed the Trust that same fiduciary duty.

But the evidence will show that Feldman betrayed the trust reposed in him.  Feldman engaged in a continuous course of conduct in which he acted against the interests of the Plaintiffs, as discussed in more detail in the summary of Plaintiffs' claims below.


**PLAINTIFFS' CLAIMS**

I.   **PLAINTIFFS' FIRST CLAIM FOR BREACH OF FIDUCIARY DUTY**

   A.   **The Law**

      1.   **The Faithless Servant Doctrine**

The elements of a claim for breach of fiduciary duty are: "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v.*

*Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (*citing Barrett v. Freifeld*, 64 A.D.3d 736, 739, 883 N.Y.S.2d 305, 308 (2d Dep't 2009)).  Pursuant to the faithless servant doctrine, a company suffers damages by paying a faithless employee or agent even if the disloyal acts themselves caused no damages.  Under the faithless servant doctrine, a principal may recover for a breach of fiduciary duty even where it cannot show that it "'suffered … provable damage as a result of the breach of fidelity by the agent.'"  *Pure Power Boot Camp, Inc. v. Wa rrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 524-25 (S.D.N.Y. 2011), *quoting Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928,  929, 394 N.Y.S.2d 626, 626 (1977); *Webb v. Robert Lewis Rosen Assocs., Ltd.*, No. 03 Civ. 4275 (HB), 2003 U.S. Dist. LEXIS 23160, at *23, 2003 WL 23018792, at *6 (S.D.N.Y.  Dec.  23,  2003) ("[W]hile [proving] a breach of fiduciary duty claim requires a showing of damages …. the faithless servant doctrine [ ] provides an additional mechanism for relief, notwithstanding that [the principal] suffered no damage.").

As this Court held in denying Defendant's motion for summary judgment:

> The law on this point is well settled.  As the Second Circuit has written:
>
> "New York law with respect to disloyal or faithless performance of employment duties is grounded in the law of agency, and has developed for well over a century …
>
> "Under New York law, an agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.  One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary … *It does not m ake any differen ce that the ser vices were beneficial to the principal, or        that the principal suffered no provable damage as a result of the breach of fidelity by the agent.*"

> Accordingly, any failure by plaintiffs to adduce competent evidence of damages caused by the breaches of duty complained of would be entirely immaterial to their attempt to obtain disgorgement of compensation paid to Feldman during any periods in which he was in breach.

(Dkt. # 266 at 4-5) (emphasis in original) (*quoting Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003)).  The Court further explained:

> The facts that the trust was ultimately not created and that the proposed bonuses were not paid are entirely beside the point given that Feldman's activities were undertaken for the purpose of diverting funds from Yukos Hydrocarbons for the personal benefit of Feldman and the Non Foundation Group.  If plaintiffs prove their case, they may prove entitled to recover whatever compensation was paid to Feldman during the period of his disloyalty.

(Dkt. # 266 at 11).

## 2. Approval Of Feldman's Breaches By His Co-Directors Is No Defense

A director cannot escape the consequences of his breach of fiduciary duty by claiming, "But the other guys did it, too.  As this Court held:

> Directors owe their corporations duties of due care and, pivotal for present purposes, loyalty.  "[T]he business judgment doctrine is misapplied when it is extended to provide protection to corporate board members where there is an abundance of evidence strongly suggesting breach of fiduciary duty," including self-dealing. "Once a prima facie showing is made that directors have a self-interest in a particular transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders."

(Dkt. # 266 at 12) (*quoting Hanson Trust PLC v. ML SCM Acquisition, Inc.* , 781 F.2d 264, 274 (2d Cir. 1986), and *Norlin Corp. v. Rooney Pace, Inc.*, 744 F.2d 255, 264 (2d Cir. 1984)).

### 3.   Feldman Was Required To Act In The Best Interests Of The Plaintiffs

As a director of Plaintiffs Yukos Hydrocarbons, an officer of the Foundations and a Trustee of the Trust, Feldman owed fiduciary duties to Plaintiffs.  As a fiduciary, Feldman was required to act in good faith and with due care for the entities he served.  *N.Y. Bus. Corp. Law §* 717(a).  The BVI Companies Act of 2004 (the "BVI Act")[2] provides similarly:  "A director . . . shall act honestly and in good faith and in what the director believes to be in the best interests of the company."  (*Id.* at § 120(1)).  Feldman's Director's Appointment Agreement with Yukos Hydrocarbons [3] requires this and more, including "comply[ing] with all the rules and regulations promulgated by the Company."   In addition, the Director's Agreement provides that "the Director shall devote his best efforts to advance the interests of the Company" and that:

> "[t]he Director shall not during the period of his appointment or at any time thereafter, except so far as may be proper and/or lawful and/or obligatory in the ordinary course of the business of the Company as contemplated herein, in any way divulge or make known any information relating to the Company or the business or any other information which may come to his knowledge in the course of his appointment … to any … third party without the prior written consent of the Board of Directors of the company."

The fact that Feldman had been terminated does not matter.  A fiduciary duty "may continue after termination of the employment relationship."  *Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959 (KMK), 2015 U.S. Dist. LEXIS 133650, at *73 (S.D.N.Y. Sept. 30, 2015) (citation omitted).  An ex-employee has a "continuing duty" "not to exploit to the former employer's detriment specific information obtained during the employment that was either

---

[2]     Yukos Hydrocarbons is a BVI company.

[3]     This agreement was executed in 2011, but Feldman had been a director of Yukos Hydrocarbons since 2006.   Feldman's duties and obligations as a director of Yukos Hydrocarbons remained the same throughout his tenure as director.

technically confidential or that was available to the fiduciary only because of the employment."

*Am. Fed. Grp., Ltd. v. Rothenberg* , 136 F.3d 897, 914 (2d Cir. 1998), (*citing Abbott Redmont Thinlite Corp. v. Redm ont*, 475 F.2d 85, 88-89 (2d Cir. 1973) and *Restatement (Second) of Agency,* § 396 (1958) (after termination of the agency, the agent "has a duty to the principal not to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty")).

### B. __The Evidence__

The evidence that Plaintiffs will offer at trial will establish that Feldman engaged in a continuous course of conduct in which he acted against the interests of the Plaintiffs over many years.   The evidence will establish the following timeline:

2007:        · Feldman authorizes a $1 million payment to his Yukos Hydrocarbons co-director Cleanthis Georgiades without seeking or obtaining Foundation approval for this payment.  When later asked why he did this, Feldman does not even <u>try</u> to offer an explanation.

2008:        · Feldman secretly seeks payment from Yukos' litigation adversary, Promneftstroy, while purportedly trying to broker a settlement of the litigation.

2009:        · While serving as the Yukos representative on the Intelligent Energy board of directors, Feldman tries to assemble a group of investors to purchase Yukos' Intelligent Energy shares for less than they are worth and conditions a purchase on their agreement to pay Feldman personally to manage the investment.

· While serving as a Yukos Hydrocarbons director, Feldman submitted requests for, and obtained reimbursement for, flights he did not take.

2010:        · While serving as the Trustee of the Trust, Feldman took $500,000 of the Trust's assets and invested it in a hedge fund in his own name.

10

• While serving as a Yukos Hydrocarbons director, Feldman submitted a request for, and obtained reimbursement for, flights he did not take.

2011:    • After having been paid by Yukos Hydrocarbons a one year lump sum director's salary of $240,000 in advance for the period June 2010 to June 2011, Feldman sought and obtained a raise to $500,000 a year in January 2011, but failed to acknowledge that he had already been paid over $110,000 toward his 2011 salary.  He then refused to pay it back.

• Feldman secretly engaged the services of a BVI law firm to advise him on his bonus pool scheme, including how to fend off a claim for breach of fiduciary duty and even had Yukos Hydrocarbons reimburse him for the legal fees.

• While serving as a Yukos Hydrocarbons director, Feldman submitted requests for, and obtained reimbursement for, flights he did not take.

2012:    • Feldman lied to his superior about having approved an unauthorized campaign contribution to his co-director, Cleanthis Georgiades.

• While serving as director of Yukos Hydrocarbons and secretary to the Foundations, Feldman disclosed confidential Foundation business to other Yukos personnel, recruited them to participate in a secret scheme to siphon funds to create an unauthorized bonus pool, held clandestine meetings with his cronies, interviewed, with Georgiades, a trustee in Switzerland to preside over the Trust he was to create with the siphoned money, and even billed Yukos for the trip to Switzerland.

• While serving as a Yukos Hydrocarbons director, Feldman submitted requests for, and obtained reimbursement for, flights he did not take.

2013:    • Feldman lied to his superior about the legal fees he had Yukos Hydrocarbons pay for the bonus scheme advice and his reasons for not wanting to use a company credit card for his airline ticket purchases.

• Feldman submitted requests for and received reimbursement from, Yukos Hydrocarbons for flights he did not take.

2014:    • Feldman demanded $5,000,000 from Yukos, with a thinly-veiled threat to sell out to Yukos' adversaries if he did not get a prompt response.

· Feldman met with Promneftstroy principal Deitz, and discussed Yukos' alleged business intelligence activities directed to Promneftstroy in the Dutch litigation, among other Yukos business.

· While a director of Yukos Capital, Feldman submitted requests for and received reimbursement from Yukos Group management company Mojave East Management ("Mojave"), for flights he did not take. Yukos Hydrocarbons paid for 30% of the expenses.

2015:  · Feldman negotiated to serve as a "consultant" to the Russian Federation in exchange for a payment of $5,000,000 prior to being sued by Yukos.

· Feldman "hired" Promneftstroy's U.S. attorneys to represent him in this action and entered into Cooperation Agreements to provide Yukos information in order to assist Promneftstroy against Yukos. Promneftstroy agreed to pay Feldman's legal fees in this action, and Feldman agreed not to withdraw or settle counterclaims he would assert in the action without Promneftstroy's consent.

· Feldman met again with Deitz in his office, provided Deitz with Yukos documents, and at about the same time that Feldman met with Deitz in his office, Foundation board meeting minutes "mysteriously" appeared in Deitz's office. Feldman provided non-public Yukos' files to Promneftstroy's Netherlands counsel, Clifford Chance, that they otherwise could not obtain.

As demonstrated by this timeline, Feldman breached his fiduciary duty of loyalty to the Plaintiffs in numerous ways over numerous years. For ease of discussion, Plaintiffs reference these various breaches as a series of "schemes," each of which is discussed further below.

### 1.    The Promneftstroy Scheme

The evidence will show that in the Fall of 2008, with confidential knowledge of the Yukos Group's strategic plans, Feldman ostensibly acted as a broker for a possible Yukos-Promneftstroy settlement, supposedly negotiating for the benefit of the Yukos Group.

The evidence will show that more recently, Feldman met with Promneftstroy's Richard Deitz in 2014 (before Yukos sued Feldman) and, according to Deitz, detailed Yukos' alleged

business intelligence activities directed to Promneftstroy, as well as other Yukos business.  Once he was sued, Feldman approached Deitz about Feldman providing information in exchange for Promneftstroy paying for his defense. Feldman "retained" Promneftstroy's lawyers to defend him in this case, and Feldman signed two Cooperation Agreements in which he agreed to give Yukos information to Promneftstroy.  Entering into these agreements alone constitutes a breach of fiduciary duty, they constituted a promise by Feldman to provide information that belonged not to Feldman, but to Yukos.

The evidence will show that Feldman provided the Promneftstroy lawyers with all of his Yukos emails.  Feldman himself met separately with Deitz before this lawsuit to discuss Yukos business.  Feldman met with Deitz again in Deitz's office in September 2015, and Feldman gave him Yukos documents. Deitz's deposition testimony will be introduced at trial.  Deitz alleges that Foundation meeting minutes that were kept confidential by the Yukos Group and possibly "other Yukos papers" mysteriously turned up in his office, which Deitz then sent to Clifford Chance, Promneftstroy's counsel in the Netherlands.  Deitz claims he does not have a copy of what he sent them.  Some of these documents subsequently appeared in Promneftstroy pleadings in the Netherlands Litigation against Yukos.  Deitz testified that he did not ask anyone in his office or elsewhere, including Feldman, where the mysterious Yukos documents came from.

Defendant will attempt to show that it could have been some other employee or former employee who provided Promneftstroy with the confidential documents used by Promneftstroy in the Netherlands litigation.  But he will fail.  There will be no evidence supporting the notion that the culprit was someone else.  The only inference supported by the evidence is that the

person who gave information to Promneftstroy was the person who literally signed a written agreement to give information to Promneftstroy: Daniel Feldman.

Feldman also provided an entire non-public Yukos court file to Promneftstroy's counsel, Clifford Chance, in the Netherlands. Deitz explained that these Dutch court documents were not available publicly, and he could not otherwise have gotten them.

### 2. The Russian Federation Scheme

The evidence will demonstrate, since Feldman himself has admitted, that "in 2015" he negotiated with Rashid Sharipov, an attorney for the Russian Federation, to be paid $5 million in exchange for providing documents and "consulting services" to the Russian Federation in connection with claims against the Russian Federation asserted by GML, the former majority shareholder of Yukos Oil. GML's claims against the Russian Federation were "Energy Charter Treaty" claims, and Yukos Capital, while Feldman was director, had itself asserted Energy Charter Treaty claims against the Russian Federation, which were pending in 2015 when Feldman was having these negotiations and which are still pending today.

Feldman spuriously claims that he was only going to assist the Russian Federation with *GML's* claims, not *Yukos Capital's*. But, as the factual basis for Yukos Capital's ECT claims overlap in very large part with the factual basis for GML's ECT claims, Feldman's claimed distinction is illusory.

### 3. The Bogus Bonus Scheme

The evidence at trial will demonstrate that Feldman secretly conspired with certain other Yukos Group personnel to divert $50 to $75 million in corporate funds without the Foundations' approval to create a bonus pool from which to pay themselves. Feldman admits to being the ringleader of the bonus scheme. Witness Martin Parr will testify that the participants held

meetings in secret, and he believed if they got caught they would all be fired.  The evidence will show that Feldman showed the group legal memos he had obtained from a BVI law firm he secretly retained to give advice on the bonus scheme – and a statute of limitations defense to a claim for breach of fiduciary duty.  Parr will testify that Feldman also wanted some sort of tie-in amongst this group so that if people dropped out of the scheme, they would suffer some penalty. Feldman had meetings about setting up a trust to hold money they would siphon from Yukos Hydrocarbons or its subsidiary Fair Oaks, to be used for the bonuses.  Feldman will testify that he even traveled to Switzerland with co-director Cleanthis Georgiades to meet with a prospective trustee.  Adding insult to injury, the evidence will show that Feldman and his co-conspirator billed Yukos, and were reimbursed for their flights to Switzerland.

The evidence will show that Feldman was even secretive about the bonus scheme with his lawyers.  Feldman retained the BVI law firm, Forbes Hare, through a friend of his, a lawyer at a New York law firm, Thompson Hine. Feldman kept the name of the Yukos entities secret, even from Forbes Hare.  He had Thompson Hine officially engage them, asked for legal advice on a "no names" basis, and redacted the company name from Yukos Hydrocarbons' articles of association sent to Forbes Hare.

The evidence will also show that Feldman paid $35,500 for these legal fees personally, and then sought and obtained reimbursement from Yukos Hydrocarbons for the fees.  Feldman misrepresented to his superior the reason for the payments to Forbes Hare.  He said they were related to his "history of problems traveling," and "Yukos related issues".  Nothing in the Thompson Hine and Forbes Hare memoranda addressed Feldman's purported travel issues.

Feldman will assert three defenses at trial.  The first is that a director is free to engage counsel to advise him on the discharge of his duties.  But Feldman himself will concede that awarding bonuses was clearly not one of his Yukos Hydrocarbons duties.  Feldman's second defense at trial will be that, because he never actually siphoned the funds, his scheming to do so does not constitute a breach of his fiduciary duties.  But the fact that Feldman's scheme fell apart because his co-conspirators backed out does not excuse Feldman's breach of his duties to the company.  *See* I.(A) above.  Feldman's final defense at trial will be that his fellow directors at Yukos Hydrocarbons approved what he did.  But, Feldman will not show that his schemes were approved by a disinterested majority of the Yukos Hydrocarbons board or that the schemes themselves were fair to Yukos Hydrocarbons and would have served the bests interests of Yukos Hydrocarbons and its shareholders (ultimately, Foundation I).  *See* I.A.(2) above.

### 4.    <u>The Intelligent Energy Scheme</u>

The evidence will show that Feldman also breached his duty of loyalty to Plaintiffs in connection with Intelligent Energy Holdings Plc ("IE").  IE was a privately-held clean power systems company.  Yukos International U.K B.V., a wholly-owned subsidiary of Foundation I, owned over 10% of the issued shares of IE, and the Foundations had appointed Feldman to be Yukos' director on the IE board of directors in 2006.

Instead of serving Plaintiffs' interests, Feldman sought to use the position for personal gain.  By 2006, Plaintiffs had decided to attempt to sell their shares of IE, and Feldman was tasked with looking for buyers.  The evidence will show that, rather than look for a potential buyer of the shares, Feldman instead schemed to find "investors" to provide him with funds to personally acquire Plaintiffs' IE shares himself.  Feldman contacted his "friend" Richard Deitz and Charles Ryan of UFG about IE.  But instead of simply offering to sell them Plaintiffs' IE

shares, which would have been consistent with his fiduciary duties to Plaintiffs, Feldman instead tried to convince them to invest in his own "special purchase vehicle" through which Feldman himself would purchase Plaintiffs' IE shares.  And then after 3 years of sneaking around, the evidence will show that Feldman proposed to his Yukos superiors that he would pay Plaintiffs 0.80 GBP per share for the stock, while failing to disclose that, in connection with the issuance of new shares, IE itself had just one day prior set the value of its shares at 1 GBP per share – 20% more than Feldman's offer.  Although Plaintiffs were unaware of Feldman's deceptive under-valuation of the shares, Plaintiffs nevertheless rejected Feldman's proposal to buy the shares "himself" as improper.

The evidence will show that later, IE itself complained to Plaintiffs that Feldman was improperly disclosing confidential IE information.  Evidence establishes that Feldman indeed improperly disclosed to third parties that IE was in secret, confidential talks with Apple about possible joint business arrangements.  On July 22, 2009, IE sent a letter to Plaintiffs requesting Feldman's resignation from the IE Board.

### 5. The Trust Scheme

The evidence will show that, in or about 2010, Feldman used his position as trustee of the Trust to withdraw $500,000 from the Trust to invest it under his own name in an investment fund run by a friend of Feldman's, called the UFG Private Equity Fund II, L.P. (the "UFG Investment").  The protector of the Trust, David Godfrey, did not know that Feldman made the investment, let alone that Feldman signed all of the subscription documents for the UFG Investment and opened the investment account using Feldman's own name, not the Trust's.

Feldman personally held title to the investment for 3 years – until he learned that he faced personal tax liability for the gain.  Feldman then asked UFG to amend the K-1s for 2010, 2011

and 2012 in the name of the Trust.   To do so, the administrator demanded that Feldman submit a copy of David Godfrey's (the Trust protector) passport and proof of residence.   It was only because of this requirement that Feldman – 3 years after the fact – told the Trust protector that Feldman had invested the Trust assets in his own name.   Godfrey demanded that the UFG investment be redeemed and the funds returned to the Trust's account, and removed Feldman as Trustee.

Again, Feldman will assert his "no harm, no foul" defense at trial.   But like his other failed schemes, the fact that the Trust scheme failed as well does not excuse Feldman from breaching his fiduciary duty as Trustee by investing Trust assets in his own name.   *See Slay v. Burnett Trust*, 187 S.W.2d 377, 387-88 (Tex. 1945) (a trustee must at all times place the interests of the beneficiary above his own).[4]   Moreover, a trustee has a duty to keep trust property separate from other property, and to properly designate it as trust property.   *See Boettcher v. Means*, 201 S.W.2d 255, 257 (Tex. Civ. App. Galveston 1947).

By investing $500,000 of Trust assets in his own name, Feldman violated all of these duties.   Having clearly acted against the interests of the Trust as a fiduciary, the Trust is entitled to disgorgement of the compensation the Trust paid to Feldman, from 2010, when he breached his duty by investing the Trust's assets in his own name.

### 6.  The Cleanthis Georgiades Schemes

Feldman was involved in two breaches of duty with regard to Georgiades.

### (a)  The Unauthorized Political Contribution

The evidence will show that Feldman used his position as a director of Yukos Hydrocarbons to cover up an unauthorized $99,000 payment to Yukos Hydrocarbons director

---

[4]   The Trust was established under Texas law.

Cleanthis Georgiades' election campaign.   The Foundation board refused to permit a contribution to Georgiades' campaign, but Feldman and the board of Yukos Hydrocarbons made the payment anyway.   Feldman will offer no evidence at trial to justify his deception when specifically asked about this expense by his superior.

(b)   <strong><u>The $1 Million "Indemnification Fund" To Georgiades</u></strong>

The Yukos Group funded indemnity trusts for the benefit of directors.   But the evidence will show that Feldman (with his co-director/co-conspirator Sergei Ketcha) signed an agreement to transfer $1 million in cash to Georgiades' company, to "secure" Yukos Hydrocarbons' indemnity to him.   In the end, $400,000 of that cash was not returned.   The evidence will show that the payment was neither authorized by, nor disclosed to the Foundations until years later and that Feldman had no explanation for having made such an extraordinary payment without Foundation approval.

7.   <strong><u>Other Schemes</u></strong>

The evidence will show that Feldman also breached his fiduciary duties to Plaintiffs by failing to return his salary overpayment and by submitting false expense forms for reimbursements.   The evidence regarding those issues is discussed below.

**C.   <u>Damages</u>**

Whether or not his schemes succeeded, Plaintiffs are entitled to recover Feldman's directors' fees and Trustee fees from the time his faithless acts began.   Plaintiffs seek the director fees paid to Feldman from 11 October 2007 (the date of the first provable breach of fiduciary duty) to October 2014 (when Feldman was terminated from the Yukos Group), as detailed in the charts attached collectively as Exhibit 3.   These charts will be introduced as Demonstrative Evidence at the trial.   The Trust seeks the disgorgement of Feldman's $37,500 annual trustee fee

19

from June 2010 through his removal as trustee in 2012.  In addition, Plaintiffs are entitled to recover the direct out-of-pocket losses they have suffered due to Feldman's breaches of fiduciary duty:

- $99,000.00 for the unauthorized campaign contribution to Mr. Georgiades from Yukos Hydrocarbons.

- $400,000.00 for the amount that Mr. Georgiades kept of the $1 million transfer made to him by Yukos Hydrocarbons for the indemnity fund.

- $110,465.00 in directors fees paid to Mr. Feldman in error by Yukos Hydrocarbons which Mr. Feldman refused to return.

- $187,156.00 in airfare expenses reimbursed to Mr. Feldman in excess of his actual expenses for airfare.

- $35,500.00 in legal fees paid by Yukos Hydrocarbons to the lawyers hired by Mr. Feldman to advise him on what Yukos Hydrocarbons refers to as the bonus scheme.

- $10,670.00 in travel expenses charged to Yukos Hydrocarbons for a trip to Switzerland to meet with a potential trustee for the purposes of setting up a trust to use in the alleged bonus scheme.

- $8,305.00 in personal expenses charged by Mr. Feldman on his company credit card.

## II.   PLAINTIFFS' SECOND CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### A.   The Law – The Elements of Aiding And Abetting a Breach of Fiduciary Duty

There are three elements to a claim for aiding and abetting a breach of fiduciary duty under New York law.  "The first element is a breach by a fiduciary of obligations to another, of which the aider and abettor had actual knowledge.  The second element is that the defendant knowingly induced or participated in the breach; and the third element is that plaintiff suffered

damage as a result of the breach.  *Sharp Int'l Corp v. Stat e St. Bank & Trust Co.* , 403 F.3d 43,

49-50 (2d Cir. 2005) (internal citations and quotations omitted).

     **B.**     **The Evidence**

     Yukos Hydrocarbons alleges that Feldman's co-directors violated their duty by

participating in Feldman's schemes to pay unauthorized bonuses, to cover up the unauthorized

campaign contribution of $99,000.00 to Mr. Georgiades and to transfer the $1 million to Mr.

Georgiades from Yukos Hydrocarbons to secure an indemnity obligation.  The evidence will

show that Feldman – an attorney – knew that his fellow directors also owed fiduciary duties to

Yukos Hydrocarbons, and the evidence will show that Feldman knowingly induced or

participated with his fellow directors in these schemes.  Finally, the evidence will show that

Yukos Hydrocarbons suffered damages as a result of Mr. Feldman's aiding and abetting his

fellow directors' breach of fiduciary duty in the following amounts:

- $99,000.00 for the unauthorized campaign contribution to Mr. Georgiades from Yukos Hydrocarbons.

- $400,000.00 for the amount that Mr. Georgiades kept of the $1 million transfer made to him by Yukos Hydrocarbons for the indemnity fund.

- $35,500.00 in legal fees paid by Yukos Hydrocarbons to the lawyers hired by Mr. Feldman to advise him on what Yukos Hydrocarbons refers to as the bonus scheme.

**III.**     **PLAINTIFFS' THIRD CLAIM FOR BREACH OF CONTRACT**

     **A.**     **The Law – The Elements Of A Breach Of Contract Claim**

     Pursuant to New York law, the elements of a cause of action for breach of contract are:

the existence of an agreement, performance by the plaintiff, breach of contract by the defendant,

and resulting damage.  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.* , 375

F.3d 168, 177 (2d Cir. 2004) (citations omitted).

    **B.**    **The Evidence**

In accepting the position as its director, Mr. Feldman implicitly agreed to act in Yukos

Hydrocarbons' best interests and not for his own gain, or the gain of his fellow director

fiduciaries.  Feldman's Director's Appointment Agreement with Yukos Hydrocarbons[5] requires

this and more, including "comply[ing] with all the rules and regulations promulgated by the

Company."  In addition, the Director's Agreement provides that "the Director shall devote his

best efforts to advance the interests of the Company" and that:

> "[t]he Director shall not during the period of his appointment or at
> any time thereafter, except so far as may be proper and/or lawful
> and/or obligatory in the ordinary course of the business of the
> Company as contemplated herein, in any way divulge or make
> known any information relating to the Company or the business or
> any other information which may come to his knowledge in the
> course of his appointment … to any … third party without the prior
> written consent of the Board of Directors of the company."

The evidence will show that Feldman breached the terms of his implied contract and the

terms of his written Director's Agreement by engaging in conduct that was not in the best

interests of Yukos Hydrocarbons as described in the discussion of the breach of fiduciary duties

claims above.  The evidence will also show that Feldman breached the terms of the written

Director's agreement by refusing to return compensation he received in excess of the amount

called for by that contract.  Finally, the evidence will also show that Feldman breached his

contract by violating the requirement in that agreement that travel expenses had to be reasonably

---

[5]    This agreement was executed in 2011, but Feldman had been a director of Yukos
Hydrocarbons since 2006.  Feldman's duties and obligations as a director of Yukos
Hydrocarbons remained the same throughout his tenure as director.

incurred in order to be reimbursed.  Those facts are discussed further below in discussion of Plaintiffs' fraud claim.

The evidence will show that Feldman's breaches of contract caused Yukos Hydrocarbons damages in the following amounts:

- $99,000.00 for the unauthorized campaign contribution to Mr. Georgiades from Yukos Hydrocarbons.

- $400,000.00 for the amount that Mr. Georgiades kept of the $1 million transfer made to him by Yukos Hydrocarbons for the indemnity fund.

- $110,465.00 in directors fees paid to Mr. Feldman in error by Yukos Hydrocarbons which Mr. Feldman refused to return.

- $187,156.00 in airfare expenses reimbursed to Mr. Feldman in excess of his actual expenses for airfare.

- $35,500.00 in legal fees paid by Yukos Hydrocarbons to the lawyers hired by Mr. Feldman to advise him on what Yukos Hydrocarbons refers to as the bonus scheme.

- $10,670.00 in travel expenses charged to Yukos Hydrocarbons for a trip to Switzerland to meet with a potential trustee for the purposes of setting up a trust to use in the alleged bonus scheme.

- $8,305.00 in personal expenses charged by Mr. Feldman on his company credit card.

## IV.   PLAINTIFFS' FOURTH CLAIM FOR FRAUD

### A.   The Law – The Elements Of A Fraud Claim

The elements of a cause of action for fraud are a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.  *See Ross v.  Louise Wise Servs., Inc.* , 8 N.Y.3d 478, 488, 836 N.Y.S.2d 509, 515 (2007); *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 79 (1996).

B.      **The Evidence – The Expense Reimbursement Scheme**

The clear and convincing evidence will demonstrate that Feldman sought and obtained reimbursement from Plaintiffs purportedly for business expenses in excess of $1 million and that certain of his requests were fraudulent.

1.      **Fraudulent Airfare Expenses**

Feldman will concede at trial that he submitted for reimbursement printouts he made partway through the booking process for his business flights rather than an actual receipt for a purchased ticket.  He did so on 66 occasions.  He will also concede that, on many of these instances, Feldman submitted reimbursement for more expensive flights than he actually traveled, and that he "made money on those travel reimbursement requests."     Although Feldman has failed to produce all the records he was ordered to produce concerning this claim (which is the subject of a pre-trial motion), Plaintiffs have enough records to prove at trial that Feldman defrauded the Plaintiffs of at least $187,156 in fraudulent airfare overcharges.

Feldman will testify at trial that he was entitled to fly business class and pocket the fare difference between that and economy, and that his expenses were approved.  But Feldman's contentions will not be supported by the evidence.  The evidence will clearly show that Feldman intended to and did, in fact, defraud Plaintiffs.

2. **Fraudulent Expenses**

The evidence will also show that Feldman charged personal expenses to his company credit card, charges upon which were paid by the company.  These charges included gym memberships, toys, clothing, and home improvements.

Dated: New York, New York
        June 2, 2017

                        MORRISON COHEN LLP


                        By:_____/s/ Jeffrey D. Brooks_____
                            Mary E. Flynn (MF 4676)
                            Jeffrey Brooks (JB 3109)
                            909 Third Avenue
                            New York, New York 10022
                            (212) 735-8600
                            *Attorneys for Plaintiffs*

25