UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YUKOS CAPITAL S.A.R.L., et al.,

                    Plaintiffs,

          -against-

DANIEL CALEB FELDMAN,

                              Defendant.

Case No. 15-4964-LAK

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
FOR SANCTIONS UNDER RULE 37 AND THE COURT'S INHERENT POWERS**

Mary E. Flynn
MORRISON COHEN LLP
909 Third Avenue
New York, New York 10022
(212) 735-8600
mflynn@morrisoncohen.com

*Attorneys for Plaintiffs*

Glen E. Summers
BARTLIT BECK HERMAN PALENCHAR &
SCOTT LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
glen.summers@bartlit-beck.com

*Attorney for Plaintiff Marc Fleischman*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 3

    A.    Defendant's Systematic Concealment Of The Kick-back Scheme During Discovery ....................................................................................................... 4

        1.    Feldman's Failure To Provide Documents Responsive To Plaintiffs 2015 Requests .......................................................................................... 5

        2.    Feldman's Commission Of Perjury At His 2016 Deposition .................... 8

        3.    Defendant's Failure To Produce Documents Concerning The "Loans"...... 9

    B.    Feldman's Prior Evasions And Acts of Perjury Regarding The Cooperation Agreements And Promneftstroy's Involvement In This Case ............................. 12

    C.    Feldman Asserted His Counterclaims For An Improper Purpose ......................... 15

    D.    Defendant's Violation Of The Court's Order Extending Discovery ................... 18

LEGAL STANDARDS ....................................................................................... 19

ARGUMENT ....................................................................................................... 20

    I.    Feldman's Perjury And Litigation Misconduct Were Intentional And In Bad Faith ...................................................................................................... 21

    II.    Plaintiffs Have Been Prejudiced By Feldman's Misconduct ................................. 21

    III.    Feldman Has Engaged In A Pattern Of Misbehavior ............................................ 22

    IV.    Feldman And His Counsel Never Corrected The Misconduct ............................... 22

    V.    Unless Sanctioned, The Defense Is Likely To Continue To Engage In Misconduct ..................................................................................................... 23

    VI.    In View Of The Above Factors, Litigation Sanctions Are Warranted ................. 23

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Andrades v. Ercole*,
   No. 06 Civ. 2573, 2010 U.S. Dist. LEXIS 79064, 2010 WL 3021252
   (S.D.N.Y. July 21, 2010) ..........................................................................................20

*Arista Records LLC v. USENET.com*,
   633 F. Supp. 2d 124 (S.D.N.Y. 2009)......................................................................20

*Auscape, Int'l v. Nat'l Geographic Soc'y*,
   No. 02 Civ. 6441, 2003 U.S. Dist. LEXIS 561, 2003 WL 139213
   (S.D.N.Y. Jan. 17, 2003)..........................................................................................20

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991)...................................................................................................19

*Jones v. Niagara Frontier Transp. Auth.*,
   836 F.2d 731 (2d Cir. 1987).......................................................................................2

*McMunn v. Mem'l Sloan Kettering Cancer Ctr.*,
   191 F. Supp. 2d 440 (S.D.N.Y. 2002)......................................................................20

*Satcorp Int'l Group v. China Nat'l Import & Export Corp.*,
   917 F. Supp. 271 (S.D.N.Y. 1996) ...........................................................................20

*Skywark v. Isaacson*,
   No. 96 Civ. 2815, 1999 U.S. Dist. LEXIS 23184, 1999 WL 1489038
   (S.D.N.Y. Oct. 14, 1999), *aff'd*, 2000 U.S. Dist. LEXIS 1171, 2000 WL 145465
   (S.D.N.Y. Feb. 8, 2000) ...........................................................................................19

*Solar Turbines, Inc. v. United States*,
   14 Cl. Ct. 551 (Cl. Ct. 1988)....................................................................................20

*United States v. Turns*,
   198 F.3d 584 (6th Cir. 2000) ...................................................................................20

## OTHER AUTHORITIES

Fed. R. Civ. P. Rule 37(e).........................................................................................2, 19

## <u>INTRODUCTION</u>

Plaintiffs initially brought this action against Defendant Daniel Caleb Feldman ("Feldman") on the basis of information indicating that Feldman had breached his fiduciary duties and other legal obligations to Plaintiffs by disclosing Yukos confidential information to its litigation adversary, Promneftstroy.  After the close of fact discovery, Plaintiffs were informed by Julius Baer, a third-party bank headquartered in London, that Feldman and another former Yukos Group employee named Dmitri Merinson ("Merinson") had been involved in a kick-back scheme by which Merinson was paid over $3 million in return for directing certain Yukos Group banking to Julius Baer.  In view of this new information, the Court permitted Plaintiffs to amend their complaint and to take additional discovery regarding the new claims.

In discovery on the new claims, Feldman admitted not only that he was aware of the kick-back scheme, but that he had personally approved the arrangement.  Feldman also admitted that he never discussed or otherwise disclosed the illicit arrangement with his superiors at the Yukos Group.  Documents produced by Feldman during discovery on the new claims revealed that Feldman received $1.2 million in purported loans from Merinson following Merinson's receipt of the kick-backs from Julius Baer.  And documents produced by Julius Baer revealed that Feldman repeatedly insisted to Julius Baer that the arrangement be kept entirely secret.  In short, discovery in connection with the new claims revealed that Feldman was directly involved in orchestrating the illicit scheme, that he benefitted from it financially, and that he went to great lengths to keep it a secret from others at the Yukos Group.

Discovery on the new claims also revealed something even more disturbing – that Feldman had flat out lied under oath in his prior deposition in this case, and that he had

previously failed to produce documents in his possession that would have alerted Plaintiffs to the illicit kick-back scheme.

Plaintiffs and their counsel do not make these charges lightly.  But the record here reveals more than the sharp discovery practices that have become all too common in litigation.  The record here reflects what appears to have been a calculated effort to conceal highly material information that was directly called for by specific questions in deposition and written document requests.  The record also reflects a long pattern of misconduct, from the very start of this litigation.

As discussed in detail below, Feldman's litigation misconduct appears to have been willful and in bad faith.  The misconduct also appears to have been pervasive, encompassing at least two critical acts of perjury and several failures to produce documents that would have disclosed the illicit kick-back scheme.  And Feldman's misconduct was prejudicial to the Plaintiffs in that it required them to engage in costly motion practice and additional discovery that would not have been required but for Feldman's litigation misconduct.

Because Feldman appears to have engaged in extensive litigation misconduct, including perjury, Yukos respectfully submits that the Court should exercise its authority under Rule 37 and its inherent powers to sanction Feldman.

Defendant's litigation misconduct cannot be condoned.  The Second Circuit has admonished that, "in this day of burgeoning, costly and protracted litigation, courts should not shrink from imposing harsh sanctions where . . . they are clearly warranted." *Jones v. Niagara Frontier Transp. Auth*., 836 F.2d 731, 735 (2d Cir. 1987) (citation omitted).  If severe litigation sanctions are ever warranted, they are warranted here.

2

## BACKGROUND

This Court is already generally familiar with the facts and procedural background of this case, much of which are set forth in the Court's orders on the parties' respective summary judgment motions.  (Docket Entry No. ("DE") 266 and 267).   Accordingly, Plaintiffs set forth in this motion only the background that is directly germane to the instant motion.

Plaintiffs are entities affiliated with the former Yukos Oil Company ("Yukos Oil").  They control the offshore-to-Russia assets of Yukos Oil that they rescued from misappropriation by the Russian State.  Since the Russian assault on Yukos Oil 13 years ago, Plaintiffs and their affiliates have been in litigation in the Netherlands and elsewhere against a company named Promneftstroy, which colluded with Russia to rig a Yukos bankruptcy auction and purports to assert title to some of the assets Plaintiffs control.  Plaintiffs are charged with preserving those assets for the rightful shareholders.  They have successfully defeated Promneftstroy's claims in the Dutch court after over a decade of fighting, but the judgments remain on appeal to the Dutch Supreme Court for the time being.

Defendant was a trusted member of Plaintiffs' team; an in-house lawyer with access to critical information that, in the hands of Promneftstroy, could be damaging to Plaintiffs and interfere with their overarching mission to preserve the assets of Yukos Oil for the rightful shareholders.

Plaintiffs filed their complaint in this action on June 25, 2015.  The Complaint asserted four causes of action, each arising out of the Defendant's history of disloyalty and dishonestly while serving as an officer, director or trustee of Plaintiffs.  (DE 1).  At the heart of the case was Plaintiffs' claim that Feldman had improperly disclosed Yukos confidential information to Promneftstroy.

3

Once sued, Defendant retained Promneftstroy's U.S. counsel, Bailey & Glasser LLP, to represent him.   Feldman asserted numerous counterclaims and third-party claims against Plaintiffs and their personal representatives.   These counterclaims alleged all sorts of salacious misconduct by Plaintiffs, and read as though Promneftstroy had drafted them -- for good reason. Promneftstroy's counsel did.   Plaintiffs promptly filed a motion to disqualify Bailey & Glasser, and Bailey & Glasser responded by withdrawing from the representation.   Mandel Bhandari LLP subsequently appeared as defense counsel in November, 2013.

Plaintiffs filed motions to dismiss Feldman's counterclaims and third-party claims.   And all of Feldman's counterclaims and third-party claims were ultimately all dismissed.   (DE 267).

Discovery in this case closed in 2016. (DE 156, 161, 170, 171, 179).   After the close of fact discovery, Plaintiffs learned that Defendant had perpetrated yet another scheme:  a kick-back scheme pursuant to which Feldman allowed another Yukos employee, Dmitri Merinson, to receive over $3 million in kick-backs from Julius Baer, a bank to which Merinson caused the transfer of Yukos funds in exchange for illicit finders fees.   Upon learning from Julius Baer of Feldman's role in the scheme, Plaintiffs moved for leave to amend their complaint to assert claims against Feldman for his participation.   (DE 309-12).   The court granted the motion and permitted additional expedited discovery on the new claims.   (Declaration of Mary E. Flynn, dated December 19, 2017 ("Flynn Decl.") ¶ 2).

## A.     Defendant's Systematic Concealment Of The Kick-back Scheme During Discovery

Feldman actively concealed his involvement in the kick-back scheme not just while a director of Plaintiffs, but in this litigation, by withholding documents and lying at his deposition. (*Id.* ¶ 3).

1. **Feldman's Failure To Provide Documents Responsive To Plaintiffs 2015 Requests**

Prior to the original 2016 close of fact discovery, Feldman systematically withheld responsive documents that would have revealed the secret kick-back scheme that he and Merinson set up with Julius Baer.   Plaintiffs' 2015 written discovery requests to Feldman expressly required production of the following documents:

> 1.   Documents concerning your role, responsibilities, duties and obligations as a director of Yukos Capital.
>
> 2.   Documents concerning your role, responsibilities, duties and obligations as a director of YHIL.
>
> 16.   All documents concerning the transfer of funds in or out of any accounts belonging to any member of the Yukos Group . . . .
>
> 22.   All documents concerning any aid, advice or information provided to you by attorneys, accountants and other professionals concerning any aspect of the business, financial affairs or operations of any member of the Yukos Group while you were director of any of Yukos Capital, YHIL . . . .       (DE 312, at Ex. C).

Despite these requests, during the original fact discovery period, Feldman failed to produce any of his many exchanges with Julius Baer.  Feldman was in possession of documents including communications with Julius Baer officer Louise Whitestone, who set up the kick-back arrangement, Feldman's written confirmation to Julius Baer of his approval of the kick-back payments to Merinson, and information reflecting the "profit" Julius Baer made on the foreign exchange transaction that Feldman coordinated as a director of Yukos Capital and YHIL.  (Flynn Decl. ¶ 5).

But Feldman did not produce any of these documents until September 30, 2017 -- almost two years later -- after Julius Baer informed Yukos of the kick-back arrangement and the Court granted Yukos' motion to amend its complaint.   At his deposition, Feldman offered no explanation for his failure to produce these documents 18 months ago.  (Flynn Decl. ¶ 6).

Defense counsel initially tried to interfere with questioning on the subject, but Feldman ultimately admitted that he had provided the emails to his counsel at the outset of the case:

> Q: You're aware that you produced and counsel produced on your behalf e-mails to prepare for the discovery today, correct?
>
> A: Yes.
>
> Q: Where were those e-mails before they were produced?
>
> MR. BHANDARI: Objection to form.
>
> A: Can you be more specific which e-mails you're talking about.
>
> Q: Yes. You produced 1,124 documents for this part of the discovery in this case. And my question is, where did they come from?
>
> A: Came from my lawyers.
>
> Q: Were they on your computer? Were they hard copies?
>
> MR. BHANDARI: Objection to form. Why don't we take a moment because this might go into privileged communications between Mr. Feldman and the law firm. But we can have a discussion, and then he can answer the question so as to not reveal any privileged information.          * * *
>
> A: I had provided my counsel a long time ago with my e-mail password, and they had collected all my e-mails.
>
> Q: So these were all in your possession at the beginning of this case; is that correct?
>
> A: Again, I believe I provided my e-mail password a long time ago to my counsel, and -- and they did searches that produced the discovery.

(*Id*. Ex. 1 at pp. 466-68).

After the deposition, Plaintiffs asked defense counsel why Feldman's emails with Julius Baer were not produced during the original period for fact discovery. (*Id*. Ex. 2). Defendant's counsel claimed they had not previously searched for the term "Julius Baer" in Feldman's emails because the bank was not mentioned in Plaintiffs' original complaint, but offered no explanation

for the fact that although Feldman was aware of the banking relationship with Julius Baer and was in possession of responsive documents, none were produced.  (Flynn Decl. ¶ 7).

Defendant's counsel also stated that "even if Defendant had believed that Julius Baer documents were responsive to Plaintiffs' demands, it was his understanding that the documents were already in the possession, custody or control of Plaintiffs by virtue of their control of the relationship between Yukos Capital, Fair Oaks, and Julius Baer . . . .".  (*Id.* Ex. 3 at p. 2).  But it is undisputed that Yukos Group officers and directors, like Feldman, did not work out of a common headquarters.  Instead they generally worked in various locations around the world and used their own personal, non-company email accounts to transact Yukos business.  (DE 83 at 11-12, 138 at pp. 14-15, 20).  What's more, the documents make clear that Feldman never copied any of his superiors at Yukos on any of his communications with Julius Baer.  (Flynn Decl. ¶ 8).

Feldman himself had no explanation for his failure to produce his correspondence with Julius Baer, and suggested that he had not even made an effort to locate these critical documents:

> Q:  Did you ever e-mail either the signed or unsigned versions   of these letters to anyone?
>
> A:  I just have no recollection of it.
>
> Q:  Why did you not produce these letters in this case?
>
> MR. BHANDARI:  Objection.  Form.  And, again, to the extent this calls for privileged information or strategy, I'm going to instruct him not to answer.  If you have a follow-up request and there's something you think we should have produced, please let us know, but I'm going to instruct him not to answer as to why things were produced or not produced.
>
> Q:  Do you have in your possession, custody, and control copies of these letters, other than at your deposition today?
>
> A:  I have no idea.          (Flynn Decl. Ex. 1 at p. 534).

2.  **Feldman's Commission Of Perjury At His 2016 Deposition**

Feldman also concealed his involvement in the fraudulent kick-back scheme by committing perjury at his June 21, 2016 deposition, before Julius Baer had revealed the scheme.

In his 2016 deposition, Feldman categorically denied receiving any kick-backs from financial institutions.  (Flynn Decl. ¶ 9.)  In addition, he denied having any reason to think that Merinson received any such kick-backs:

> Q:  During your tenure at Yukos, did you ever receive any kick-backs from banks or financial institutions that held Yukos funds?
>
> A:  No.
>
> Q:  What about Dmitri Merinson[5]?
>
> A:  I don't know.        * * *
>
> Q:  Do you have any reason to think Dmitri Merinson did receive some form of introductory fee or kick-back?      * * *
>
> A:  I don't know.          (Flynn Decl. Ex. 1 pp. 389-90).

Although Feldman claimed not to know about the kick-backs to Merinson, he warned Merinson shortly after the deposition that Yukos was asking about this.  (Flynn Decl. ¶ 9, Ex. 12).

Feldman was of course deposed again in October 12, 2017, after Julius Baer disclosed the illegal kick-back scheme and this Court reopened discovery.  At his October 12, 2017 deposition, Feldman's story changed 180 degrees.  Rather than denying knowledge of the kick-back scheme -- which he could no longer do in light of the documents produced by Julius Baer -- Feldman admitted that he personally approved the kick-back scheme.  (Flynn Decl. ¶ 10, Ex. 1 at p. 533).  Feldman did not claim to have forgotten it:

> Q:  Did there come a time when you forgot that Dmitri Merinson had received finder's fees from Julius Baer?

---

[5]      The court reporter misspelled Dmitri's last name as "Merenson."

MR. BHANDARI: Objection to form.

A: No.                    (Flynn Decl. Ex. 1 at p. 522).

Instead he stated that he thought Merinson deserved the money:

Q: In your opinion, was it proper for Dmitri Merinson to receive a finder's fee for banking that Yukos Capital, Yukos Hydrocarbons, and Fair Oaks did with Julius Baer?

A: Yes.

Q: Why?

A: He did a great job.       (Flynn Decl. Ex. 1 at pp. 520, 604-05).

At his October 12, 2017 deposition, Feldman also admitted that Merinson "loaned" him $1.2 million so that he could buy a house in the Hamptons.  (*Id.* ¶ 11, Ex. 1 at pp. 473-75).  The fact that Merinson "loaned" Feldman $1.2 million to buy a house in the Hamptons seriously calls into doubt the veracity of Feldman's prior testimony that he never received any kick-backs.  This evidence suggests that Feldman approved the kick-backs to Merinson pursuant to an understanding that he would be provided a large portion of the kick-back, concealed in the form of a loan.

There can be no doubt that Feldman lied when he testified that he didn't know whether Merinson received any "sort of introductory fee or kick-back" from any bank or financial institution.  Feldman's warning to Merinson, his October 12, 2017 deposition testimony and the documents produced by Julius Baer make clear that Feldman personally approved the kick-back arrangement, purportedly on behalf of Yukos and that he had not forgotten it.

3. **Defendant's Failure To Produce Documents Concerning The "Loans"**

In this latest round of discovery concerning the New Kick-Back Claims, Plaintiffs learned that Merinson transferred $765,000 to the escrow account of Feldman's real estate lawyer on April 8, 2011, to be applied to the purchase by Feldman of a house in the Hamptons.

9

(Flynn Decl. Ex. 1 at pp. 473-75).   Merinson then transferred another $500,000 to Feldman on or about the same date.   (*Id.* at pp. 487-88).   Feldman testified that these were loans from Merinson to him, governed by two promissory notes Feldman produced in his recent production.   (*Id.* at 473, 487; Flynn Decl. Ex. 4 (Feldman Depo. Exs. 113 and 114)).   Feldman alleged that he made interest payments to Merinson on these loans.   (*Id.* at Ex. 1 at pp. 476-77, 486-87).   The alleged promissory notes matured in April, 2016, and Feldman testified that they were extended in November, 2016 to April 1, 2019.   (*Id.* at 485-88, Flynn Decl. Ex. 4 (Feldman Dep. Exs. 116 & 117)).   Feldman produced two extension documents, neither of which Merinson signed.   (*Id.*). Feldman testified that Merinson had wanted payment in 2016 and had then agreed to the extensions, but in 2017 Merinson needed money and demanded payment, so Feldman paid him $415,000.   (*Id.* Ex. 1 at pp. 478-80).   Feldman testified that he and Merinson had exchanges about Defendant's request for a loan and the extension of the loans in 2016, which may have been via email; he didn't remember.   (*Id.* at pp. 485, 486, 488).

Prior to Defendant's October 12, 2017 deposition, on August 29, 2017, Plaintiffs had issued a Second Request for Production of Documents requesting, among other things:

> All documents and communications with Merinson concerning (a) any bank accounts and banking and/or financial transactions, including but not limited to transactions affecting any of Plaintiffs, (b) actual or proposed agreements between You and Merinson, (c) promises made by Merinson in favor of You, (d) promises made by You in favor of Merinson, (e) payments or transfers to You, or for Your benefit, from Merinson and (f) payments or transfers to Merinson, or for his benefit, from You.

(Flynn Decl. at Ex. 5). Defendant produced no correspondence with Merinson concerning the loans, their maturity in 2016, their extension in 2016 and documents concerning the alleged interest and principal payments he testified that he made to Merinson. (*Id.* ¶ 15).   In fact, it is clear from Feldman's deposition testimony that he did not even look for them:

Q: Do you have any records in your possession, custody or control that show that you made the interest payments that you've been testifying to?

A: I don't know.          (*Id.* at Ex.1 at p. 477).

Defense counsel precluded further inquiry:

Q: Is there any reason why documents reflecting your interest payments to Mr. Merenson were not produced in this case?

MR. BHANDARI:  Objection to form.  Calls for a legal conclusion.  What document request did you make that would call for the production of such documents?

MS. FLYNN:  The document request -- our last document request, the third document request that reflected -- or that requested all transfers of money between Mr. Feldman and Mr. Merenson.

MR. BHANDARI:  Okay.  We'll take that under advisement.  If you want to follow up with a document request -- or follow up because you think that there was not documents produced that should have been produced, we can discuss that.          (*Id.* at pp. 476-77).

On October 20, 2017, Plaintiffs wrote to Feldman's counsel concerning Defendant's failure to produce these documents.  (Flynn Decl. at Ex. 2).  Defendant responded on October 26, 2017, with no explanation why these documents were not produced (or searched for), stating:

With respect to the loan between Mr. Feldman and Mr. Merinson, we will produce the requested documents concerning the loan to the extent that they are in Mr. Feldman's possession, custody, or control or can be obtained on demand from the relevant service providers.

(*Id.* at Ex. 3).  That was two months ago, and Feldman has still not produced these documents or confirmed that a search for them was even attempted.  (*Id.* ¶ 17).

At Feldman's October 20, 2017 deposition, Feldman's counsel also stated on the record that Feldman's counsel's communications with Merinson's counsel concerning the alleged loans were being withheld on the basis of a purported common interest agreement:

"[T]here's a common interest agreement between Mr. Feldman and Mr. Merinson, and so there are privileged communications both between counsel related to the loan . . .".

11

(*Id.* at Ex. 1 at p. 586).  But when Plaintiffs requested in a letter that Feldman's counsel identify any documents withheld on the basis of the alleged common interest agreement, Feldman's counsel flip-flopped and denied that any documents had been withheld on that basis:

> We can further confirm that no documents concerning communications between counsel relating to the loan have been withheld.  We will undertake a search to determine whether any written communications between Mr. Feldman and Mr. Merinson directly exist and will produce them to the extent that they can be located.       (*Id.* at Ex. 3).

At this point, it is unclear whether Feldman has withheld communications with Merinson regarding the extension and repayment of the purported "loan" on the basis of an alleged common interest agreement.  (*Id.* ¶ 19). Feldman's testimony suggests such documents exist and that Feldman has not produced any such documents.  Obviously, Feldman and Merinson cannot have a common interest in the loans.  Merinson is the alleged lender, and Feldman is the alleged borrower.  Their interests are necessarily adverse, unless the loan is some sort of an agreed contrivance to conceal Feldman's financial participation in the kick-back scheme.

## B.    Feldman's Prior Evasions And Acts of Perjury Regarding The Cooperation Agreements And Promneftstroy's Involvement In This Case

Feldman's lies concerning the kick-back scheme were not his first acts of litigation misconduct in this case.   Earlier in the litigation, Feldman also knowingly engaged in acts of evasion and made false and misleading statements about the Cooperation Agreements.

Plaintiffs moved for a preliminary injunction in October, 2015, and sought expedited discovery.  (DE 60-72).  The Court ordered expedited discovery and scheduled a limited issue hearing on, among other things, whether Feldman provided confidential information concerning Plaintiffs to Promneftstroy and would do so in the absence of an injunction.  (DE 97 at pp. 39-42).  Plaintiffs first took Feldman's expedited deposition on December 16, 2015, in a three-hour session.  (Flynn Decl. ¶ 20).

In that deposition, Feldman refused to answer several key questions. Feldman also admitted that a Promneftstroy affiliate was paying the cost of his defense in this action pursuant to what his counsel called a "Cooperation Agreement." Feldman refused to produce the Cooperation Agreement, alleging that it was immune from discovery, and this discovery dispute was brought to the Court. (DE 104). In fact, Feldman's counsel objected to its disclosure as well on the ground that disclosure of the information "risks the lengthy, expensive, and unnecessary multiplication of proceedings by Plaintiffs." (DE 112; Flynn Decl. ¶ 21).

Plaintiffs moved for an order to compel production of the Cooperation Agreement and for Defendant to sit for another deposition and answer the key questions previously refused. (DE 104). The Court granted Plaintiffs' application, and a second deposition was held. The Court also ordered the production of the Cooperation Agreement to Chambers for *in camera* inspection. (*Id.*). Feldman eventually disclosed that he actually had signed <u>two</u> cooperation agreements, and after *in camera* review, the Court ordered that Feldman produce them to Plaintiffs forthwith. (DE 111). Refusing to email them, Feldman sent them by U.S. mail, expressing concern that they may contain metadata and feigning ignorance that a photocopy of a document does not contain original metadata. (Flynn Decl. Ex. 6). It took another order from the Court agreeing that Feldman's position regarding metadata was "absurd" for Feldman's counsel to comply with the Court's order. (*Id.* at Ex. 7 at pp. 7-9).

Plaintiffs finally received the Cooperation Agreements, and they demonstrate that Feldman committed perjury in his testimony prior to their production, and Feldman's counsel suborned the perjury. (*Id.* ¶ 23).

On December 16, 2015 -- prior to Feldman's production of the Cooperation Agreements to Plaintiffs -- Feldman testified:

Q.  Mr. Feldman, did you promise to give Mr. Dietz or any other person or entity associated with Promneftstroy information concerning the Yukos Group?

A.  No.

(*Id*. Ex. 1 at p. 104).  Feldman further testified:

Q.  What is your understanding of the reason why this other entity is agreeing to pay your legal fees in this case?

MR. BHANDARI: Objection. Calls for speculation, calls for divulging information -- potentially divulging information in a common interest agreement.

MS. FLYNN: I can't tell if you're directing him not to answer or not.

MR. BHANDARI: Well, it calls for speculation. I don't know if he can answer.

A.  I don't know.

Q.  What did this entity get out of paying your fees?

MR. BHANDARI: Objection. Calls for speculation.

A.  I don't know.

Q.  Do you have any understanding of any benefit that the company that's paying your legal fees is deriving from paying your legal fees?

MR. BHANDARI: Objection. Calls for speculation.

A.  I don't know.           (*Id.* at pp. 136-37).

Feldman's December 16, 2015 testimony to the effect that he didn't know why Promneftstroy was paying his legal fees was demonstrably false, and Feldman's counsel knew that it was false, because both Feldman and his counsel signed the second Cooperation Agreement on November 6, 2015, a mere 6 weeks before Feldman gave this testimony.  Both Cooperation Agreements -- including the one Feldman and Mr. Bhandari signed 6 weeks before the deposition -- explicitly state the consideration to be provided by Feldman in exchange for the Promneftstroy entities' agreement to pay Feldman's legal fees.  It was Feldman's promise to

14

provide those entities with information concerning the Yukos Group. (*Id.* ¶ 24).   The

Cooperation Agreements provide:

> Mr. Feldman agrees to cooperate fully with the Investors by providing complete
> and truthful information regarding his role and actions related to the Various
> Yukos Entities.  Mr. Feldman will answer all the Investors' questions completely
> and truthfully, unless he is prohibited from doing so by any legal, contractual,
> fiduciary, and/or confidentiality obligation.  Mr. Feldman agrees not to withhold
> from counsel provided to him by the Investors or the Investors themselves (and
> identified in paragraph 4 below) any information, documentation, or physical
> evidence related to the subject matter of this Agreement, subject to the provisions
> below dealing with the protection of Attorney Eyes Only Information.
>
> Subject to Mr. Feldman's full compliance with his obligations in this Agreement,
> the Investors agree to assist in Mr. Feldman's defense by paying for the cost and
> expense associated with trial court legal representation in *Yukos Capital S.A.R.L.,
> et al. v. Daniel Caleb Feldman*, Case Number 1:15cv4964, currently pending
> before the United States District Court for the Southern District of New York (the
> "SDNY Case").

(*Id.* Exs. 8 and 9).   Feldman never corrected his testimony, nor did his counsel correct or

otherwise address it.  (*Id.* ¶ 24).

## C.   Feldman Asserted His Counterclaims For An Improper Purpose

In the Cooperation Agreements, Feldman agreed not to release any of his counterclaims

in this case without the prior agreement of the Promneftstroy-related entity paying his legal fees.

(Flynn Decl. at Exs. 8 and 9 at ¶¶ 20 and 17 respectively).   Feldman's counsel essentially

confirmed that the counterclaims (since dismissed) were filed for Promneftstroy's benefit:

> MR. BHANDARI:  . . . As Mr. Feldman testified before, Promneftstroy has an
> interest in this litigation just going forward.  If nothing else, we have gotten a lot
> of testimony from David Godfrey already on the stand about various things that
> he claims that were surveillance and pieces of information that have been
> obtained by Promneftstroy.  They are testifying about various things.   From
> Promneftstroy's position, having this litigation go forward, regardless of the
> outcome, regardless of what happens, that's a positive.  It does not mean that Mr.
> Feldman has shared confidential --
>
> THE COURT:  That's really a remarkable admission.

MR. BHANDARI:  I'm speaking as a person who is just logically looking at it. The enemy of your enemy is your friend.  If you are allowing a litigation to go forward and there are in fact counterclaims against Yukos entities and they have in fact done lots of things that are improper --

THE COURT:  Certainly suggests counterclaims are asserted for purposes other than they seem to have been asserted for on their face.

MR. BHANDARI:  That's not correct, your Honor.

THE COURT:  Certainly raises Rule 11 issues.

MR. BHANDARI:   Your Honor, we are happy to have that conversation with you, but the defamation claims that we have put in there are real defamation claims.  These are statements that were made and that harm his reputation, your Honor.

THE COURT:  You are telling me now that it is in the interests of Promneftstroy to have you assert defamation claims on behalf of Feldman and that's why they are paying his legal fees.  Is that the argument?

MR. BHANDARI:  Your Honor, what I'm saying is, it's entirely possible that Promneftstroy just wants the litigation to go forward.  The inference that should not be concluded is what I'm trying to say.  The inference that should not be drawn is that Mr. Feldman had confidential information that he was sharing with Promneftstroy, not the reason they are bringing this litigation.  It's not what happened.  This is not the only reason why someone would take the position that Promneftstroy has taken in this ligation and I'm providing to you another reason. I don't know.  I do not take my words from Promneftstroy.  I do not have any idea what their interests are.  But there is an interest other than getting confidential information because they have entered into this agreement.  And this agreement has nothing to do with providing confidential information that.   That is specifically excluded from it.  That's what I'm saying, Your Honor.

(DE 138 at pp. 201-02).   This reasoning certainly explains why defense counsel spent so much time in the examinations of Plaintiffs' witnesses on issues having nothing to do with this case. But Promneftstroy is not the only reason.  Feldman also went on a quest to obtain deposition testimony on issues irrelevant to this case for the purpose of assisting the Russian Federation, another Yukos Capital litigation adversary.   While Feldman was the sole director of Yukos Capital, Yukos Capital was litigating a claim against the Russian Federation pursuant to an Energy Charter Treaty ("ECT").  (Flynn Decl. Ex. 1 at 440).  GML, the majority shareholder

group of the former Yukos Oil Company, had ECT claims against the Russian Federation based on similar facts.  (*Id.*, DE 210 at par. 5).  Feldman testified that in 2015, he negotiated with the Russian Federation to assist it in its defense of the ECT claims (though Feldman asserts he was only going to help defend the Russian Federation against GML).  (Flynn Decl. Ex. 1 at 161-62, 440-43).  Feldman contends that he did not finalize his agreement with the Russian Federation (which was to net him $5 million), but Feldman assisted the Russian Federation nevertheless by asserting his dismissed counterclaims and seeking irrelevant testimony from Plaintiffs so that the Russian Federation could cite both in the ECT cases.  (*Id.* ¶ 26).

On November 28, 2017, the Russian Federation cited from Feldman's counterclaims and Plaintiff witness David Godfrey's deposition testimony in its "Defence on Appeal" in the ECT proceeding by GML in The Hague.  (Flynn Decl. Ex. 10 at pp. 253, 307-08, 583-84).  Defendant inquired of Godfrey regarding when he last saw Mikhail Brudno, and why they were meeting, although neither issue had any relevance to this case.  The Russian Federation *somehow* obtained the deposition transcript and cited Godfrey's responses to bolster its false allegation that so-called Russian oligarchs like Brudno improperly control the conduct of the Foundations.  (*Id*. at 307-08).  Defendant also inquired of Godfrey concerning a Yukos witness in the ECT case named Andrey Illarionov -- another matter having nothing to do with this case, and a name that has not otherwise come up in any filings or testimony in 3 years of this litigation.  The Russian Federation also cited Godfrey's responses to these questions in its recent filing in an attempt to discredit the witness.  (*Id*. at 583-84).  Defendant clearly used the opportunity he had in this case to question Godfrey on matters irrelevant to this case for the purpose of assisting Plaintiffs' adversary, the Russian Federation.  (*Id.* ¶ 27).

**D.**   **Defendant's Violation Of The Court's Order Extending Discovery**

In this Court's August 24, 2017 Order granting Plaintiffs' motion to file a Second Amended Complaint and requesting limited discovery, this Court ordered:   "Any further discovery shall be limited to the new claims . . . ."  (DE 322).  Despite this order, Feldman continued using discovery as a tool to vex and harass Plaintiffs and to try to obtain information for improper purposes.  (*Id.* ¶ 28).

In connection with the supplemental discovery on Plaintiffs' new kick-back claims, Feldman noticed the deposition of Bernard O'Sullivan, who was the first Yukos Group representative to learn of the kick-back scheme from Julius Baer. Feldman took Mr. O'Sullivan's deposition on October 11, 2017.  (*Id.* at Ex. 11).

Despite this Court's order that the discovery would be limited to the new claims, Defendant persisted in inquiring into matters well outside the new claims.  These included:

- O'Sullivan's personal relationship with the mother of his child (*Id.* at pp. 7-8);

- Fees paid by Yukos to O'Sullivan's law firm (*Id.* at pp. 80-85);

- Yukos' alleged efforts in "corporate or business intelligence" (*Id.* at pp. 91-92; 177-81; 196-97);

- The GML bonus and distribution (*Id.* at pp. 97-104);

- Yukos' policies regarding business expenses and travel (*Id.* at pp. 105-09);

- Yukos' business decisions in connection with GML (*Id.* at pp. 109-10);

- Banking by Yukos Group entities not parties to this case (*Id.* at pp. 122-23);

- Yukos Group's distributions to Yukos Oil shareholders (*Id.* at pp. 187-89);

- Misamore's activities unrelated to this action or the new claims, such as speeches he gave, and his resignation from Yukos' entity boards, etc. (*Id.* at pp. 187-94);

- O'Sullivan's conversations with Misamore relating to Godfrey and certain alleged statements made by Misamore to the press (*Id.* at pp. 193-94);

- O'Sullivan's relationship with Godfrey, knowledge of Godfrey's personal habits and

18

privileged conversations between O'Sullivan and Godfrey (*Id.* at pp. 194-95); and

- O'Sullivan's earnings and expenses in connection with this case, cost of flights and other travel expenses (*Id.* at pp. 240-42).

Plaintiffs objected, but Feldman's counsel persisted in asking these improper questions. (*Id.* ¶ 31). Feldman's counsel also wasted the time of everyone else present by taking a 50-minute break in the middle of the deposition (in addition to lunch), returning to ask a question, and then leaving again for another break. (*Id.* at Ex. 11 at pp. 142-43 and 184-85).

## LEGAL STANDARDS

Under Rule 37, district courts have broad authority to sanction litigants for a wide range of discovery misconduct. The Court also has inherent powers to "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). Once misconduct has been found, the court must determine the appropriate sanction. In doing so, the Court considers: (1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future. *See Skywark v. Isaacson*, No. 96 Civ. 2815, 1999 U.S. Dist. LEXIS 23184, at *53-56, 1999 WL 1489038, at *15 (S.D.N.Y. Oct. 14, 1999) (collecting cases), *aff'd*, 2000 U.S. Dist. LEXIS 1171, 2000 WL 145465 (S.D.N.Y. Feb. 8, 2000). The legal standards for these sanctions are as follows:

> A district court has wide discretion to determine appropriate sanctions for discovery abuses under both *Rule 37 of the Federal Rules of Civil Procedure* and its inherent powers…. *Rule 37* sanctions require a showing of violation of a court order… Sanctions under the court's inherent power require a showing of bad faith or willfulness… When deciding a proper sanction, a court generally must consider, in light of the full record of the case, (a) willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party has been

> warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party. ….  In the spoliation context, the court must also consider the "prophylactic, punitive and remedial rationales underlying the spoliation doctrine." ….  Thus, the sanctions should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence." .

*Arista Records LLC v. USENET.com*, 633 F. Supp. 2d 124, 138 (S.D.N.Y. 2009) (citations omitted); *see also Auscape, Int'l v. Nat'l Geographic Soc'y*, No. 02 Civ. 6441, 2003 U.S. Dist. LEXIS 561, 2003 WL 139213 (Kaplan, U.S.D.J.) (S.D.N.Y. Jan. 17, 2003); *Satcorp Int'l Group v. China Nat'l Import & Export Corp.*, 917 F. Supp. 271, 277-78 (S.D.N.Y. 1996) (sanctions warranted for willful failure to disclose).

Relief may also be granted to a party suffering from another party's perjury.  Our judicial system generally relies on litigants to tell the truth and participate in discovery in good faith.  *See United States v. Turns*, 198 F.3d 584, 587-88 (6th Cir. 2000) ("Our system of justice relies, in large part, on the theory that when a person takes the witness stand and swears to tell the truth, that he or she will in fact do so."); *Solar Turbines, Inc. v. United States*, 14 Cl. Ct. 551, 553 (Cl. Ct. 1988) ("our system of justice generally relies upon the basic honesty of most individuals, harsh <u>sanctions</u> for <u>perjury</u>, and a panoply of rights concerning discovery and cross-examination") (emphasis added).  Perjury can even result in terminating sanctions.  *See McMunn v. Mem'l Sloan Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) (same).

When counsel is aware that his client is committing perjury, counsel is obligated to correct the record.  *Andrades v. Ercole*, No. 06 Civ. 2573, 2010 U.S. Dist. LEXIS 79064, at *12, 2010 WL 3021252 (S.D.N.Y. July 21, 2010).  Counsel cannot sit mute and let the perjurious testimony stand.  (*Id.*).

## <u>ARGUMENT</u>

In view of the conduct described above, severe litigation sanctions are warranted.

## I.     Feldman's Perjury And Litigation Misconduct Were Intentional And In Bad Faith

Feldman intentionally attempted to deceive Plaintiffs and the Court.  As discussed above, there is no innocent explanation for Feldman's false testimony at his 2016 deposition that he did not know if Merinson had received any sort of finders' fees or kick-backs from any banks or financial institutions.  Given the extreme secrecy that Feldman insisted upon with Julius Baer, he plainly understood that he was engaging in misconduct.  He understood enough to warn Merinson.  Feldman ultimately admitted that he had not forgotten about the kick-back scheme.  He obviously would not have, since Merinson "loaned" him $1.2 million of the scheme proceeds.

## II.     Plaintiffs Have Been Prejudiced By Feldman's Misconduct

Plaintiffs have obviously been prejudiced by Feldman's lies and his failure to produce relevant documents.  Had Feldman been honest at his 2016 deposition and timely produced his communications with Julius Baer, a tremendous amount of work and expense could have been avoided in this case.  It would have been unnecessary to reopen discovery, and the case would have been ready for trial perhaps a year earlier.

Feldman's concealment of Merinson's kick-back scheme with Julius Baer also prejudiced Plaintiffs in other ways.  As was briefed to this Court during discovery, a Yukos Group company was involved in an employment dispute with Dmitri Merinson pending in Amsterdam.  (DE 166).  That case was settled in October 2016, and Plaintiffs' affiliate paid Merinson a settlement payment before Plaintiffs learned about the kick-backs.  Had Plaintiffs known of Merinson's improper kick-back arrangement with Julius Baer, they would have had additional defenses to Merinson's employment claims and would not have entered into the settlement agreement on the terms that they did.   (Flynn Decl. at ¶ 32).

### III.   Feldman Has Engaged In A Pattern Of Misbehavior

At the very outset of this case, Feldman falsely testified that he did not know why Promneftstroy had agreed to pay his legal fees, and that he did not promise to provide Promneftstroy with information about the Plaintiffs.  He then attempted to conceal his lie by withholding the Cooperation Agreements, which made clear that he had agreed to provide information to Promneftstroy and to pursue counterclaims against Plaintiffs for their benefit.

Even after all of this came out, Feldman continued to engage in further evasion and outright lies.  As discussed above, although document requests required him to produce documents regarding Yukos banking transactions and operations, he never produced any of his correspondence with Baer.  When he finally did, he failed to produce the most incriminating ones.  When expressly asked if he or Merinson had been paid any finders' fees of kick-backs from any Yukos Group banks or financial institutions, he flat out lied and said that he did not know.  And when instructed to limit discovery to the new kick-back claims, Feldman instead attempted to use discovery as a tool to harass Plaintiffs.

### IV.   Feldman And His Counsel Never Corrected The Misconduct

Importantly, neither Feldman nor his counsel ever corrected any of Feldman's deceptions.  Feldman could have corrected his deposition testimony after the fact.  He did not do so.  Counsel could have corrected the record.  Counsel did not do so.  Rather, Feldman and his counsel persisted in attempting to conceal the truth, for example, by claiming that Feldman's counsel's communications with Merinson's counsel regarding the $1.2 million "loan" were protected by a common interest agreement.

**V.**     **Unless Sanctioned, The Defense Is Likely To Continue To Engage In Misconduct**

As discussed above, Feldman and his counsel's conduct has been extreme and pervasive. Neither Feldman nor his counsel have demonstrated any regret or otherwise indicated that their conduct will change.  Every indication is that, without a sanction, Feldman will be encouraged to continue to flout his obligations to tell the truth and his counsel will be encouraged to continue to facilitate Feldman's obfuscations.

**VI.**     **In View Of The Above Factors, Litigation Sanctions Are Warranted**

Given the extreme egregiousness of his misconduct, which includes perjury, and the willful and pervasive nature of the misconduct, severe litigation sanctions are warranted here. Such sanctions should come as no surprise to Feldman.  Feldman is an attorney.  He is aware of his discovery obligations as a litigant and should have been aware that he could be subjected to sanctions for disregarding his discovery obligations and for committing perjury.

Indeed, the deceit Feldman has shown in the course of this litigation clearly tends to suggest that Plaintiffs claims are meritorious.  The pervasiveness of his conduct also raises the specter that the lies we have discovered may be just the tip of the iceberg.  Accordingly, Plaintiffs request that the Court impose a combination of the following sanctions:

1.     Instruct the jury that Feldman lied in his deposition testimony and failed to produce incriminating documents, and that they may therefore infer that he lied with respect to other facts.

2.     Preclude the introduction at trial by Feldman of any documentary or testimonial evidence concerning any payments purportedly made by Feldman to Merinson on account of the alleged "loans."

3.      Preclude the use at trial of any deposition testimony of Bernard O'Sullivan elicited by Feldman concerning matters unrelated to the new kick-back claims.

4.      Preclude Feldman from asserting at trial that he was motivated to seek assistance from Promneftstroy for any altruistic reasons or out of fear of reprisals or death threats.

Entering the combination of sanctions listed above will help to deter future litigation misconduct and remedy the prejudice that has been suffered by Plaintiffs.  It may also help to bring this litigation to an end more quickly, as it likely would have but for Feldman's misconduct.

The specific sanctions set forth above are also proportional to the misconduct at issue. Given his prior lies and evasive behaviors with respect to the Cooperation Agreements, Feldman should not be heard to claim that he was acting as some sort of whistleblower or that he was driven into the arms of Promneftstroy by fear of alleged death threats.  The jury should of course know of Feldman's litigation misconduct, and Feldman should not be allowed to introduce discovery about the partial repayment of the purported "loans" from Merinson given that Feldman failed to produce the relevant documents and improperly thwarted discovery with bogus claims of a common interest privilege.  Finally, having been specifically instructed to limit discovery to the kick-back issues, Feldman obviously should not be able to use testimony from O'Sullivan deposition on unrelated matters.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that their motion be granted in its entirety, together with such other and further relief as the Court deems just and proper.

Dated: New York, New York
        December 19, 2017

MORRISON COHEN LLP


By:     /s/ Mary E. Flynn
        Mary E. Flynn
        909 Third Avenue
        New York, New York 10022
        (212) 735-8600
        mflynn@morrisoncohen.com

        *Attorneys for Plaintiffs*

-and-

        Glen E. Summers
        BARTLIT BECK HERMAN PALENCHAR
        & SCOTT LLP
        1801 Wewatta Street, Suite 1200
        Denver, Colorado 80202
        glen.summers@bartlit-beck.com

        *Attorney for Plaintiff Marc Fleischman*

25